UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Greenbelt Division)

IN RE INTEGRAL SYSTEMS, INC.
SECURITIES LITIGATION

No. 08-cv-03387-RWT

IDENTIFICATION OF AMENDMENTS IN
PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Anthony Vidmar, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiffs information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Integral Systems, Inc. ("Integral Systems" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Integral Systems; and (c) review of other publicly available information concerning Integral Systems. Lead Plaintiffs, Anthony Vidmar, Robert Ulrich, Mauro DiBacco, Charles E. Varnell, Jr. and Nettie J. Varnell (collectively the "Ulrich Group" or "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based upon the investigation by Lead Counsel, which included, among other things, a review of United States Securities and Exchange Commission

("SEC") filings, wire and press releases and other public documents published by and regarding

Integral Systems, Inc. ("Integral" or the "Company"), conference calls and announcements made

by defendants, securities analysts' reports and advisories about the Company, and information

readily available on the Internet.  Lead Plaintiffs believe that substantial additional evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### I.    NATURE OF THE ACTION ~~AND OVERVIEW~~

1.    This is a federal class action on behalf of purchasers of Integral ~~Systems'~~

securities between ~~April 28, 2008~~ February 4, 2008 and December 10, 2008, inclusive (the

"Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the

"Exchange Act").

2.    ~~Integral Systems supplies precision technology to medical, electronics, and~~

~~industrial markets and semiconductor systems.~~  Integral builds satellite ground systems and

equipment for command and control, integration and test, data processing, and simulation. The

Company has a domestic and international customer base that includes government and

commercial satellite operators, spacecraft and payload manufacturers, and aerospace systems

integrators.

3.    During the Class Period, Integral's stock price closed as high as $52.71 per share on

August 14, 2008 (prior to a two-for-one stock split effective on August 25, 2008) as a direct

result of an intentional or deliberately reckless scheme by defendants to improperly inflate

Integral's stock price by (i) prematurely recording contract revenues; (ii) prematurely recording

software and equipment revenue; and (iii) prematurely recording warranty revenue.  In early

August 2008, with the share price artificially inflated to nearly the Class Period high by three

straight quarters of premature revenue recognition, Defendant Alan Baldwin, the Company's former CEO and President – who had boasted in a February 18, 2008 interview with the *Washington Post* that he had "a very strong background in accounting and in the public disclosure that's required in running a public company" – exercised all his current options and sold *every share* of Integral he could at more than $47 per share.

4.    On December 11, 2008 Integral Systems shocked investors when it revealed that the unaudited financial statements of the Company for the interim periods ended December 31, 2007, March 31, 2008 and June 30, 2008 should no longer be relied upon due to an error in the accounting treatment for certain transactions with respect to the timing of ~~the~~ revenue recognition ~~of revenue between periods~~. The Company further disclosed that, as a result, the Company would restate its previously filed financial statements for those interim quarterly periods in fiscal year 2008. The Company estimated that the net impact of the adjustments for the first three quarters of 2008 would result in a decrease of approximately $10 million in revenues, a decrease of approximately $3 million in gross profit, a decrease of approximately $4 million in operating income, and a decrease of approximately $0.13 in earnings per share.  On this news, shares of Integral declined $6.38 per share, or 28.61%, to close on December 11, 2008 at $15.92 per share, on unusually heavy volume.

5.    ~~Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company improperly recognized revenue; (2) that as a result, the Company misstated its financial results during the Class Period; (3) that the~~

~~Company's financial results were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (4) that the Company lacked adequate internal and financial controls; and (5) as a result, the Company's financial statements were materially false and misleading at all relevant times.~~

5.      Thereafter, to evade liability to Integral's investors, defendants dribbled out the details surrounding the restatement to obscure the fact that they violated the most basic of revenue recognition principles, among them the matching principle, which were applied to almost all of Integral's contracts:

(a)      First, during the December 11, 2008 conference call, only three types of accounting errors were identified.   In fact, as later revealed in correspondence with the SEC, there were four distinct types of errors;

(b)      Next, in the Form 10-K, filed on December 24, 2008, defendants vaguely referenced that there had been four types of accounting errors, gave line item changes for each restated quarter, and admitted to material weaknesses in internal controls over, *inter alia*, the Company's revenue recognition process;

(c)      Later, on February 12, 2009, in response to a number of questions posed by the SEC with respect to, *inter alia*, the restatement, in a letter signed by Defendant William Bambarger, Integral explained each of the four areas of restatement, identifying the accounting error, the correct Generally Accepted Accounting Principles ("GAAP") principle and/or company policy which should have been followed, and the total dollar amount of

each type of error.  The Company further set forth the actual and expected

dates on which the prematurely recognized revenues were/would be

ultimately recongized;

(d)    On March 20, 2009, the Company responded – yet again – to an SEC

letter inquiry.  Having received and reviewed Integral's February 12,

2009, explanation of the restatement, the SEC inquired as to why the

information had not been provided to investors as part of the explanation

of the restatement in the Form 10-K.  While Defendant William

Bambarger stated that Integral believed the Restatement complied with

both GAAP and Integral's obligations under the securities laws and

regulations, he agreed that Integral would supplement its disclosures in its

next periodic filing; and

(e)    On May 6, 2009, in conjunction with the filing of its Form 10-Q for the

second quarter of fiscal 2009 ("2Q'09"), Integral included verbal

explanations of the four error types, containing somewhat different and

expanded information from that initially provided to the SEC in the

February 12, 2009 letter – far more than was initially disclosed on

December 11, 2008 – and partially identified several of the contracts at

issue.  Integral also disclosed that of the $10.5 million in revenues

removed from 1Q'08, 2Q'08 and 3Q'08, only $4.3 million had been

recognized through the first six months of fiscal 2009; and

(f)     On August 5, 2009, in its most recent Form 10-Q to date, the Company reported that by the end of 3Q'09 it had finally recognized $10 million of the $10.5 million removed from the books for 1Q, 2Q and 3Q'08 (the Company had earlier informed the SEC that the remainder would be recognized in 4Q'09 and 1Q'10).

6.     These grudging disclosures constitute admissions that throughout the Class Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, specifically:  (1) that the Company prematurely and improperly recognized several categories of revenue; (2) that as a result, the Company misstated its financial results during the Class Period; (3) that the Company's financial results were not prepared in accordance with the Company's publicly-disclosed accounting policies and/or GAAP; (4) that the Company lacked adequate internal and financial controls; and (5) as a result, the Company's financial statements were materially false and misleading at all relevant times.

7.     While Integral's stock price was inflated during the Class Period, insiders unloaded their shares of Company stock on an unsuspecting public that – unlike defendants – did not realize that the stock price was artificially inflated.  Including Defendant Alan Baldwin's sales, defendants and other insiders reaped over $4.5 million in proceeds from selling Integral stock during the Class Period.

8.     As a result of defendants' ~~wrongful~~ fraudulent acts and omissions, and the ~~consequential~~ precipitous decline in the market value of the Company's ~~securities~~ common stock

upon disclosure of defendants' fraud, ~~Lead~~ Plaintiff<u>s</u> and other Class Members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b)<u>,</u> ~~and~~ 20(a)<u>, and 20A</u> of the Exchange Act, (15 U.S.C. §§ 78j(b)<u>,</u> ~~and~~ 78t(a)<u>, and 78t-1</u>), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to <u>Section 27 of the Exchange Act (15 U.S.C. § 78aa) and</u> 28 U.S.C. § 1331<u>,</u> ~~§27 of the Exchange Act (a5 U.S.C. §78aa)~~.

11.    Venue is proper in this Judicial District pursuant to ~~Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and~~ 28 U.S.C. § 1391(b) ~~, §27 of the Exchange Act (a5 U.S.C. §78aa(c))~~. ~~Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.~~   Many of the acts <u>and transactions</u> ~~charged~~ <u>alleged</u> herein, including the preparation and dissemination of materially false and~~/or~~ misleading information, occurred in substantial part in this Judicial District.    Additionally, Integral<u>'s</u> ~~Systems is a Maryland corporation and its~~ principal ~~place of business is~~ <u>executive offices are</u> located within this Judicial District.

12.    In connection with the acts, ~~transactions, and~~ conduct <u>and other wrongs</u> alleged ~~herein~~ <u>in this Amended Complaint</u>, defendants<u>,</u> directly or indirectly<u>,</u> used the means and instrumentalities of interstate commerce, including <u>but not limited to,</u> the United States mail<u>s</u>, interstate telephone communications, and the facilities of ~~a~~ <u>the</u> national securities exchange.

### III.    PARTIES

#### A.    Lead Plaintiffs

13.    ~~Plaintiff Anthony Vidmar, as set forth in the accompanying certification, incorporated by reference herein, purchased Integral Systems common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.~~  Lead Plaintiffs the Ulrich Group consist of Anthony Vidmar, Robert Ulrich, Mauro DiBacco, Charles E. Varnell, Jr., and Nettie J. Varnell.  As set forth in Lead Plaintiffs' certifications and detailed transaction charts already on file with the Court in connection with their motion to be appointed lead plaintiff, incorporated by reference herein, all members of the Ulrich Group purchased Integral common stock at artificially inflated prices during the Class Period and have been damaged thereby.  On August 21, 2009, this Court appointed the Ulrich Group as Lead Plaintiffs in this consolidated action.

#### B.    Defendants

14.    Defendant Integral Systems is a Maryland corporation and maintains its principal executive offices at ~~5000 Philadelphia Way, Lanham, Maryland 20706~~ 6721 Columbia Gateway Drive, Columbia, Maryland 21046.  Integral's fiscal reporting year runs from October 1st through September 30th.

15.    Defendant Alan W. Baldwin ("Baldwin") was ~~at all relevant times~~ President and Chief Executive Officer ("CEO"), and a director of Integral ~~Systems~~ until ~~his resignation on~~ July 9, 2008, at which time he resigned as CEO but continued serving as President and a director.  On December 10, 2008, Baldwin stepped down as President, but continued serving as a director.

16. Defendant John B. Higginbotham ("Higginbotham") ~~was, at all relevant times~~, became CEO and a director of Integral ~~Systems since~~ on July 9, 2008, and became President on December 10, 2008.  He resigned from all these positions on August 5, 2009.

17. Defendant William M. Bambarger ("Bambarger") was, at all relevant times, Chief Financial Officer ("CFO") and Treasurer of Integral ~~Systems~~.

18. Defendant Hemi G. Lee-Gallagher ("Lee-Gallagher") was, at all relevant times, Corporate Controller of Integral ~~Systems~~.

19. ~~Defendants~~ Baldwin, Higginbotham, Bambarger, and Lee-Gallagher are collectively referred to herein as the "Individual Defendants."  The term "defendants" as used herein refers collectively to all defendants unless otherwise specified.

20. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control and did control the contents of Integral's ~~Systems'~~ reports to the SEC, press releases ~~and~~, presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of ~~these~~ the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The ~~individual~~ defendants are liable for the false statements pleaded herein, as those statements were each "group-

9

published" information, the result of the collective actions of the ~~individual~~ defendants <u>and</u> <u>others acting at their direction</u>.

### IV.    DEFENDANTS' FRAUDULENT SCHEME AND CONDUCT

21.   During the Class Period, the Company prematurely and improperly accounted for revenue from warranties, equipment, and product sales, with respect to a number of contracts, chief among them the Next Generation Global Positioning System ("GPS OCX") contract and the Rapid Attack Identification Detection Reporting System ("RAIDRS") contract with the Federal Government.   As indicated by Defendant Bambarger in a call with investors on December 11, 2008, the GPS OCX and RAIDRS contracts, along with one additional contract, were responsible for 50-60% of the Company's government contract revenues, and 25-30% of the Company's total revenues.   In fact, as Defendant Bambarger noted in that same call, the RAIDRS program was the Company's largest revenue-generating contract.

22.   During the Class Period, in stark contrast to defendants' public claims of record growth, defendants deliberately and/or recklessly overstated Integral's revenue and profits and hid the true nature of the Company's financial condition.   Booking revenue up front before it was actually earned, defendants publicly claimed that they accurately estimated and deferred revenue relating to contracts, equipment, and warranties.   In reality the Company's internal controls were materially flawed and/or non-existent, and defendants' public claims of strict GAAP adherence were blatantly false as defendants knowingly and/or recklessly:   (i) prematurely recorded millions of dollars in revenue from the GPS OCX contract; (ii) prematurely recorded equipment revenue from the RAIDRS contract; (iii) prematurely recorded revenue from warranties; and (iv) prematurely recorded revenue on software sales.   In addition, defendants knowingly and

recklessly concealed the fact that Integral's internal control systems were seriously deficient and that the Company lacked sufficient qualified personnel to accurately perform its accounting and financial reporting.

23.    On December 24, 2008, Integral restated its financial statements for the first three quarters of fiscal year 2008 in its Annual Report filed with the SEC on Form 10-K ("the Restatement").   The changes in the financial statements "related to errors in the accounting treatment for certain transactions with respect to the timing of the recognition of revenue."   In the December 2008 Restatement, the Company admitted that material weaknesses in internal controls "resulted in numerous audit adjustments and restatements of the unaudited consolidated financial statements for the three-month periods ended December 31, 2007, March 31, 2008 and June 30, 2008."   Consequently, the overall impression created by Integral's financial statements was not consistent with the business realities of the Company's financial position and operations during the Class Period.

A.    **GPS OCX Contract**

24.    In an investor call held on February 4, 2008, Defendant Bambarger explained that the Company's Government Ground Systems segment revenue included $2.4 million of license revenue associated with the GPS OCX contract, a subcontract for Northrup Grumman.   He further explained that despite having originally planned to record the revenue from the delivery of licenses associated with this contract throughout the entire fiscal year, the Company elected to record such revenue in the first quarter.   Bambarger called this a "large, non-routine transaction[]."

25.   Recording the GPS OCX revenue on this basis was a deviation from GAAP and from affirmative statements set forth in the Company's financial statements regarding its purported adherence to such standards.  Despite the Company's assertions that negotiations lead to early delivery of licenses which were part of transaction, the contract contained ongoing obligations with respect to those licenses and/or the contract itself.  The contract was routine and specifically addressed by Integral's revenue recogntion policies, which applied percentage-of-completion accounting, under American Institute of Certified Public Accountants ("AICPA") Statement of Position No. ("SOP") 81-1, to long-term production or construction contracts, including those involving software licenses.  During the December 11, 2008 conference call, Bambarger vaguely indicated that the reason for the restatement was that it was "debatable" whether Integral was, with respect to the software being licensed, "making significant modifications or merely adding functionality above and beyond the software's core capabilities." Applying other GAAP, *e.g.,* Financial Accounting Standards Board Concepts Statement ("FASCON") No. 5, as well as the principles synthesized in SEC Staff Accounting Bulletin No. ("SAB") 101, Integral had not, by 1Q'08, performed the services necessary to complete the earning process for this revenue.[1]  (Bambarger's verbal explanation did not, however, appear in either the Form 10-K or the February 12, 2009, SEC letter.  It did not reappear until a Form 10-Q filed in May 2009, more than a year after the revenue was first improperly recognized.  The Form 10-Q filed in May 2009 also identified the GPS OCX contract as a cost-plus contract.)

26.   As defendants later admitted, $2.0 million of the $2.4 million portion of the GPS OCX contract revenue, recognized purportedly in connection with the "upfront" delivery of the

---

[1] The text of applicable GAAP and other authoritative provisions and an explanation of their application to the restated items are set forth in greater detail below, at Part VII, ¶¶ 139-175.

software licenses, should have been deferred to subsequent periods during which time the modifications to the software and/or related services required under the contract were actually to be performed.  This was necessary to accurately reflect the Company's true measurement of progress towards completion of its obligations under the contract, as required by SOP 81-1.  In the December 2008 Restatement, the Company switched back to the proper manner of revenue recongition, inexplicably abandoned in the announcements of February 4, 2008.  Instead of recognizing all of the GPS OCX revenue up front, CFO Bambarger indicated during the December 11, 2008 conference call that the Company would "defer approximately $2 million in revenue from Q1 2008 and earn that revenue as we progress through the contract, which is expected to end in 2009."   Specifically, $700,000 would move from fiscal 2008 to fiscal 2009.

27.   Because the Restatement of prior quarters in the 2008 Form 10-K did not adequately describe the nature of the accounting error or the proper accounting treatment, later, in a February 12, 2009 letter in response to questioning by the SEC, CFO Bambarger explained, for the first time, that SOP 81-1 and percentage-of-completion accounting applied to this contract involving software licenses, which resulted in the deferral of $1.3 million of revenue initially recognized during the Restatement period to subsequent periods in fiscal 2008 and fiscal 2009.

**B.    RAIDRS Contract**

28.   The Company also improperly recorded the impacts of a $5.1 million deposit paid for antenna equipment to be delivered under the RAIDRS contract.  Specifically, Integral purchased equipment to be used in a long-term production and/or services contract and passed along the cost to the government.  The Company improperly included costs to acquire the equipment in its measurement of progress towards completion of the project even though it had

not been delivered or installed.  Several other contracts were identified in the Restatement as having had similar premature revenue recognition.

29.   As admitted by Defendant Bambarger during the December 11, 2008, conference call, the applicable accounting principle required deferral of such costs, and associated revenues, until the equipment had actually been employed in tangible steps to complete the RAIDRS contract.  By prematurely accounting for the equipment revenue and expenses, the Company violated GAAP and SEC rules relating to expense and revenue recognition.   In the Restatement, the Company deferred revenues and costs for equipment from 2008 "to primarily fiscal 2009" in a total amount of $6.3 million.

30.   In the February 12, 2009 letter responding to the SEC's request for "greater insight into the errors in 'accounting treatment'" described in the Restatement, Bambarger ultimately explained that the Company had improperly included the cost of the equipment in the percentage of completion on a cost-to-cost basis.  Consequently, Integral removed the advance purchases from its calculations in the Restatement, in accordance with GAAP, again citing SOP 81-1 (as it had with respect to the accounting for the GPS OCX contract) – specifically, here,  paragraph 50. That provision clearly provides:

> For production-type contracts, the complement of expensive components (for example, computers, engines, radars, and complex "black boxes") to be installed into the deliverable items may aggregate a significant portion of the total cost of the contract. In some circumstances, the costs incurred for such components, even though the components were specifically purchased for the project, should not be included in the measurement before the components are installed if inclusion would tend to overstate the percentage of completion otherwise determinable.

Here, a May 20, 2008, press release valued the RAIDRS contract at $21 million; thus, the percentage of completion was clearly overstated by the $5.1 million equipment deposit.  Indeed,

one can deduce from later SEC filings that the utilization of the equipment did not occur until 3Q'09, more than a year after the revenue was first recognized.  In the February 12, 2009 SEC letter, Integral also disclosed that the total amount of contract revenue prematurely recognized due to this type of incorrect accounting treatment was $7.0 million.   The Form 10-Q filed on May 6, 2009 additionally identified the revenue at issue as having been prematurely recognized in both 2Q'08 and 3Q'08, for both the RAIDRS contract and a smaller commerical contract.  As to the smaller contract, defendants' belated disclosure suggested there was no valid basis for the premature revenue recognition, as payment was contractually tied to performance milestone completion, apparently not permitting defendants to employ cost-to-cost percentage-of-completion accounting.

**C.     Warranty Revenue**

31.    Integral typically includes warranties of 30, 90, or 360 days on its contracts. Services provided under the warranties are known as "Post Contract Services" ("PCS").  During the Class Period, the Company recorded, in certain instances, the entire amount of the warranty revenue upon delivery of the underlying products and services, in violation of GAAP and SEC rules.

32.    Defendant Bambarger admitted that the Company had been improperly prematurely recording this revenue in the December 11, 2008 conference call, and explained that accounting rules require a portion of the revenue to be deferred until expiration of the warranty.

33.    In the February 12, 2009 letter responding to the SEC's request for "greater insight" regarding the errors in accounting treatment described in the Restatement, Bambarger further explained:

15

> [T]he Company has concluded that it improperly accounted for the PCS-related services element within its percentage of completion calculation . . . Through its restatement, the Company has corrected the accounting for the PCS-related services element, deferring and recognizing revenue for the PCS-related services over the service period, and accounting for the residual contract value on a percentage-of-completion basis. The correction of this error resulted in the net deferral of $1.9 million in revenue initially recognized in the restatement period.

Neither the original restatement in the fiscal 2008 Form 10-K nor the February 12, 2009 letter in response to the SEC's requests for greater detail regarding the deferred revenue specified in which quarter or quarters of the three restated quarters the warranty revenue was prematurely recognized.  In the Form 10-Q filed on May 6, 2009, the Company finally indicated that warranty revenue was improperly recognized in all three restated quarters.

### D.      Off-the-Shelf Product Sales

34.      Company subsidiaries RT Logic and SAT Corporation sell certain products which require little or no customization to configure to the customer's needs.  As such, these sales should have been accounted for under SOP 97-2, as set forth in Integral's discussion of its revenue recognition policies in its public filings with the SEC.  During the Class Period, Integral incorrectly applied percentage-of-completion accounting to these contracts thereby recognizing revenue ratably during production of the products, rather than recognizing the revenue upon customer acceptance or shipment, in accordance with SOP 97-2.

35.      In the February 12, 2009 letter to the SEC, Defendant Bambarger acknowledged this error and indicated that revenue was deferred from the Restatement Period in the amount of $296,000.  Neither the original Restatement in the fiscal 2008 Form 10-K nor the February 12, 2009 letter in response to the SEC's requests for greater detail regarding the deferred revenue specified in which quarter or quarters of the three restated quarters this revenue was prematurely

recognized.  In the Form 10-Q filed on May 6, 2009, the Company finally indicated that this revenue was improperly recognized in all three restated quarters.

### E.    Internal Control Deficiencies

36.    Prior to the Class Period, Integral had a history of poor internal controls in its accounting division.  Specifically, Gary Prince ("Prince") served as Integral's CFO from 1992 until 1995, when he plead guilty to conspiracy to commit securities and bank fraud and to making false statements to SEC staff, relating to financial fraud at the Financial News Network, where he had been CFO prior to 1992.  In 1997, the SEC permanently denied Prince the privilege of practicing as an accountant before the SEC.  After a short prison term, Integral re-hired Prince in 1998 as an executive vice president and included him in the group of most senior officers that made policy decisions for the Company.  However, Integral and several of its officers intentionally hid this fact from investors, in violation of federal law.

37.    According to a cease-and-desist order between Integral and the SEC, entered into in July 2009, from 1998 to 2007, Prince "trained and supported the inexperienced CFOs who succeeded him.  Prince had access to the Company's financial databases and often suggested how accounting entries should be handled.  Prince prepared the Company's quarterly financial forecasts.  He drafted the MD&A sections of periodic filings, and he also reviewed and edited the entirety of each filed periodic report."  The SEC brought an administrative action against the Company and three former officers for failing to disclose Prince's *de facto* executive officer status and his prior securities fraud in its annual reports for fiscal years 1999-2005.

38.    Although the Company relied heavily on Prince's accounting expertise, it terminated his employment on March 30, 2007, and failed to replace him with an equally

competent accountant.  In fact, a caller in the December 11, 2008 conference call with Higginbotham and Bambarger indicated that Prince had attempted to alert the Company to accounting errors even after his dismissal, but that the Company "was not listening to him."

39.   During the Class Period, Integral's internal controls with respect to financial reporting were egregiously inadequate.  Yet defendants repeatedly misrepresented to investors and the market that the Company had adequate internal controls in place to ensure the reliability of Integral's financial statements and reported financial condition.  Defendants Baldwin, Bambarger, and Higginbotham each certified that Integral's internal controls were designed under their supervision to ensure that material information relating to Integral's financial statements was reliable and reported in accordance with GAAP.  Defendants also certified that the information contained in Integral's quarterly SEC filings throughout the Class Period fairly presented in all material respects the financial condition and results of operations of the Company, when in fact they, and others at their direction, had knowingly and/or recklessly materially misstated the Company's reported revenues and earnings per share.

40.   Throughout the Class Period, defendants operated Integral with a combination of control deficiencies that they knew, or were deliberately reckless in not knowing, resulted in material misstatements in the Company's SEC filings and reported financial results.  Ultimately, after Integral restated its financial statements for each quarter of fiscal year 2008, the Company reported that its internal controls and procedures were not effective as of September 30, 2008, and that the material weaknesses in internal controls contributed to the need to restate its quarterly results for quarters ended December 31, 2007, March 31, 2008, and June 30, 2008.

41.    The material weaknesses identified by the Company had an adverse impact on the Company's ability to accurately report financial results for its core operations. Specifically, the Company admitted that it lacked adequate internal controls to ensure that revenue was recognized in accordance with its stated accounting policies and/or GAAP. Additionally, in direct contradiction to numerous Class Period public statements, the Company admitted that it did not have adequate skilled accounting personnel to ensure that accouting procedures were correctly followed.

42.    The material weaknesses identified by the Company affected its ability to report accurately its revenue from the GPS OCX contract, the RAIDRS contract, software product sales, and warranties. Defendants knew that Integral's future and the value of their personal Integral stock holdings depended on demonstrating that the Company could be profitable and knowingly and/or recklessly manipulated the Company's reported revenue to meet or exceed earnings and performance expectations and to prop up the Company's stock price.

~~SUBSTANTIVE ALLEGATIONS~~

~~Background~~

~~43.    Integral Systems builds satellite ground systems and equipment for command and control, integration and test, data processing, and simulation~~

~~Statements Issued Before the Class Period~~

**V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**

**A.    First Quarter 2008 Revenue and Earnings Report**

43.    The Class Period begins on February 4, 2008. On that day, Integral ~~Systems~~ issued a press release entitled "Integral Systems Announces Record Financial Results for the First

Quarter of Fiscal Year 2008." ~~Therein, the Company, in relevant part, stated:~~  In that press

release, the Company reported:

~~**Management raises EPS outlook for the
Fiscal year to $1.48 - $1.50**~~

~~Integral Systems, Inc. (NASDAQ ISYS) ("Company") today reported financial
results for the first quarter of fiscal 2008,~~ Revenue for the quarter was $37.3
million, up $9.9 million or 36% from the first quarter of fiscal 2007. First quarter
operating income was $8.3 million compared to $2.9 million for the first quarter
of last fiscal year, and net income was $7.0 million ($0.75 per diluted share)
compared to $2.1 million ($0.19 per diluted share) for the first quarter of fiscal
2007.

44.    In that same press release, Integral announced that it was raising its earnings

projections from its previous forecast of $1.38-$1.40 per share to $1.48-$1.50 per share.

45.    The February 4, 2008 press release specifically discussed revenue from the GPS-

OCX contract:

~~The first quarter results include two large non-routine transactions that have a
significant impact on the Company's results.~~  Revenue for the Government
Ground Systems segment includes $2.4 million of license revenue for the newly
awarded GPS OCX (Next Generation Control Segment) contract. The Company
was able to deliver these licenses to the customer during the first quarter as a
result of favorable contract terms that included up front delivery of the licenses
under the contract. . . . ~~Additionally, the Company recorded a $1.6 million tax
credit for tax deductible research and development expenditures that were
incurred in prior years and it has filed amended tax returns. Excluding the impact
of these two significant events, the Company's earnings per share on a fully-
diluted basis would have been $0.42 for the quarter.~~

~~The increase in revenue, operating income, and net income in the first quarter of
fiscal year 2008 compared to the corresponding period in 2007 is attributable to
increases in all of the Company's operating segments. The Government Ground
Systems segment revenue grew 11%, excluding the acceleration of the GPS OCX
license revenue, over the same period last year and 27% in total. Higher revenue
from national and civilian programs accounted for the 11% increase. The
Commercial Ground Systems segment revenue grew 27% in fiscal 2008,
primarily attributed to increased shipments to customers from the Company's
SAT subsidiary and new work awarded in 2007. The Space Communication~~

~~Systems segment revenue grew 35% in fiscal 2008 due to new RT Logic contracts and higher product shipments from the Lumistar subsidiary.~~

~~"We are very pleased with our strong start for fiscal 2008. We had some very positive non-recurring financial events in the first quarter, and all three of our operating groups started out of the gate better than expected," commented Alan Baldwin, chief executive officer. "We are executing on our growth strategy and are experiencing positive increases in backlog and higher product demand for our subsidiaries."~~ The $2.4 million of license revenue generated from the GPS OCX contract represents acceleration into the first quarter of the entire GPS OCX license revenue previously anticipated by the Company to have been recognized throughout the entire fiscal year. ~~Therefore, while the first quarter reflects this very positive result, it does not have an impact on total year revenue and earnings projections. Operating income is expected to be slightly higher in 2008 than initial guidance due to higher demand for products and services, particularly with the Air Force and national programs, partially offset by higher costs for investments in R&D efforts and infrastructure developments. Income tax expense is expected to be significantly lower in 2008 on a percentage basis due to recovery of R&D tax credits from prior years.~~

~~As a result of all of these factors, earnings are now expected to be in the range of $1.48 - $1.50 on a per share basis for fiscal 2008.~~

~~(Emphasis in original).~~

46.    In the February 4, 2008 press release, Defendant Baldwin stated, "We had some very positive non-recurring financial events in the first quarter, and all three of our operating groups started out of the gate better than expected."

47.    On the same day, February 4, 2008, Integral filed the press release with the SEC as an exhibit to a Current Report on Form 8-K. Defendant Bambarger signed the Form 8-K.

48.    On February 4, 2008, Defendants Baldwin and Bambarger also conducted a conference call discussing the financial results for the first quarter of fiscal year 2008. In that call, Defendant Bambarger discussed the GPS-OCX contract and reiterated that "we negotiated favorable contract terms that included upfront delivery of the licenses under the contract, alllowing us to recognize license revenue and profit in the first quarter, rather than during the

entire fiscal year, as we had originally planned."   When Defendant Baldwin described which of the three types of contracts (*see* ¶ 51, below) the GPS-OCX contract was, he confusingly referred to two of the three types of contracts: "It's a fixed price, fixed fee – it's a cost plus fix-fee contract."

49.    In that same conference call, Defendant Baldwin touted the Company's finance and accounting initiatives.  In particular, he indicated that in conjunction with the Company's cost point implementation project, Integral had made a number of key hires in the accounting department, including a senior corporate controller, a senior contract administrator, and a senior treasury analyst.

50.    On February 7, 2008, Integral filed its Quarterly Report with the SEC on Form 10-Q.  That report affirmed the previously announced financial results and further explained:

> The increase in revenue in this segment in the first quarter 2008 was primarily attributable to the up-front delivery of licenses under the GPS OCX (Next Generation Control Segment) contract with Northrop Grumman Corporation, which was awarded during the first quarter 2008.

51.    The Form 10-Q also elaborated on the "Critical Accounting Policies" used by the Company in the preparation of its financial reports.  Those policies included:

> Revenue Recognition
>
> *Contract Revenue* – We earn revenues from sales of our products and services and may be either a prime contractor directly to the end-user of our products and services or we may act as a subcontractor under a contract with another contractor.  Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the purchase price is fixed and determinable, and collectibility is reasonably assured.  We generally earn revenue under three types of contracts: fixed-price, cost-plus a fixed fee, and time & materials ("T&M") contracts.  Revenue under a fixed-price contract is recognized using a percentage of completion method based on costs incurred in relation to total estimated costs.  Under a cost-plus contract, we are reimbursed for allowable costs within the contractual terms and conditions and are paid a

negotiated fee. The fee may be fixed or based on performance incentives. Revenue recognition under a cost-plus contract is based upon actual costs incurred and a pro rata amount of the negotiated fee.

52.    The Company further described its accounting policies, attesting that:

In accordance with SOP 97-2, "*Software Revenue Recognition,*" for a Software-Only Sale, we recognize revenue when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery has occurred, the vendor's fee is fixed or determinable, and collectibility is reasonably assured. *In situations where software is sold together with services and/or hardware, we recognize software license revenue on a percentage of completion basis.* (Emphasis added).

53.    With regard to its warranty provisions, referred to by the Company as post-contract customer support ("PCS"), the Company described its accounting practices as follows:

We recognize PCS revenue on a percentage of completion basis when PCS is part of a broader fixed-price contract that includes software and services. Alternatively, when PCS services (i.e., software maintenance and support) are awarded to us under a separate maintenance contract, we recognize PCS revenue on a straight-line basis pro rata over the term of the maintenance contract.

54.    The February 7, 2008 Form 10-Q also stated that the Company's financial statements were "prepared in accordance with accounting principles generally accepted in the United States."

55.    The Company further reported that management, including Defendants Baldwin and Bambarger, had evaluated the effectiveness of the Company's internal controls and procedures as of December 31, 2007, and that they "were effective to ensure that the information required to be disclosed by us in this quarterly report on Form 10-Q was recorded, processed, summarized and reported within the time periods specified in the SEC's rules and Form 10-Q."

56.    ~~On~~ The February 7, 2008~~, Integral Systems filed its Quarterly Report with the SEC on~~ Form 10-Q~~. The Company's 10-Q~~ was signed by Defendants Bambarger and Lee-Gallagher~~, who certified:~~.

57. <u>Defendants Baldwin and Bambarger further certified the financial information in the Quarterly Report, stating that:</u>

1. I have reviewed this Form 10-Q of Integral Systems, Inc. (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

58. <u>With regard to internal controls and procedures, Defendants Baldwin and Bambarger each certified the financial results and sound condition of the Company's internal control procedures pursuant to Sarbanes-Oxley, stating in pertinent part:</u>

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

59.    Defendants Baldwin and Bambarger further certified, pursuant to the Sarbanes-Oxley Act, that all required disclosures had been made, stating:

~~5.~~   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

60.    Finally, Defendants Baldwin and Bambarger personally certified the accuracy of the Company's reported financial results as required by Sarbanes-Oxley, stating that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

61.  The statements in ¶¶ 24, 43, 45, 46, 48-50, 54-60, above were materially false and misleading when made because defendants knowingly and/or recklessly reported or failed to disclose or indicate the following:

(a)  That the Company's financial results were materially inflated, and the Company's reported revenues were materially misstated, as set forth in the Annual Report filed with the SEC on Form 10-K on December 24, 2008, with revenues overstated by $3.35 million (nearly 10%), net income overstated by $1.971 million (39%), and earnings per share overstated $0.10 (from $0.27 to $0.37);

(b)  That the Company prematurely recognized warranty revenue by including what is clearly defined as "*post*-contract" support services within a contract's percentage-of-completion calculations rather than determining the value of those services and recording the "revenue on a straight-line basis pro rata over the term of the maintenance contract" as if they were being provided under a separate services contract.  In the February 12, 2009 letter to the SEC, Defendant Bambarger admitted this error.  The Company's Form 10-K for fiscal 2008 stated the Company's new policy, in compliance with GAAP.  Specifically, FASCON 5, SAB 101, and Emerging Issues Task Force No. ("EITF") 00-21, *inter alia*, required the Company to segregate the warranty from the remainder of the contract because such services have an objective value to customers on a stand alone basis over the life of the post-contract warranty; the warranty

services are not provided, and thus payment therefor is not earned, until such time as the period(s) of the warranty occur(s) and elapse(s). Indeed, the SEC was critical of Integral for aggregating all forms of revenues in a single line item. In its February 12, 2009 response, after Integral reviewed its presentation of revenues and its obligations under Regulation S-X, Bambarger agreed that, starting with 1Q'09, the Company would report three revenue lines: contract revenue, product revenue, and software maintenance revenue;

(c)     That the Company prematurely recognized $2.4 million of license revenue from the GPS OCX contract in 1Q'08, because of the nature of the Company's ongoing obligations to significantly modify the software under license and to provide services and/or hardware under the contract, specifically:

(i)     the January 17, 2008 press release announcing the contract (actually awarded in late 2007, during the Company's 1Q'08) indicated that the contract was valued at "approximately $20.6 million with a period of performance through March 2009;"

(ii)     during the February 4, 2008 conference call, Defendant Baldwin described the scope of work under the 18-month contract, under which Integral was "to do systems-requirement analysis, develop the preliminary system design, develop the initial OCX system to work with existing GPM 2R-M satellites;"

27

(iii)    the February 4, 2008 press release admitted that defendants originally determined that the revenue for the licenses was to be "recognized throughout the entire fiscal year," but instead decided to accelerate the revenue, due to the fact that the Company had negotiated "favorable contract terms that included up front delivery of the licenses."   Later, however, in the December 11, 2008 conference call, Defendant Bambarger did not describe the issue as a question of the timing of delivery of the licenses but rather whether the software involved in the subcontract was sold off-the-shelf with "add[ed] functionality" or required "significant modifications."   Further, rather than recognizing revenue on a contract involving 18 months of performance only over fiscal 2008, as originally indicated, all applicable revenue recognition policies would require the fee revenue to be tied to costs (*pro rata*) or performance in measurement of progress towards completion of the project.[2]   Thus, upon announcing the Restatement in that conference call, Defendant Bambarger indicated that $2 million taken up front in 1Q'08 would be earned "as we progress through the contract, which is expected to end in 2009."   In the Form 10-Q

---

[2] During the April 28, 2008 conference call discussing the second quarter of fiscal 2008, defendant Bambarger admitted that the accelerated revenue had originally been expected to be recorded into 2009 as well.  *See* ¶ 75, below.

filed in May 2009, Integral described the contract as "nearing completion" in 2Q'09;

(iv)    Scienter is particularly evident under these facts.  Whether it was a fixed fee contract (as stated in the February 4, 2008, conference call), a combined sale of software and services (as stated in the February 12, 2009 letter to the SEC), or a cost-plus contract (as also stated in the February 4, 2008 conference call and much later indicated in the May 6, 2009 Form 10-Q), all of the Company's applicable revenue recognition policies (quoted above) did not permit upfront recognition of license revenue in the manner initially applied by the Company and defendants.  Specifically, the Company's stated revenue recognition policy concerning software license revenue expressly stated:  "In situations where software is sold together with services and/or hardware, we recognize software license revenue on a percentage of completion basis."  Thus, regardless of whether any modification to the software was to occur, since this contract included services and hardware, percentage-of-completion accounting would require ratable recognition of costs and revenue dictated by the extent of progress towards completion of the entire project.  Therefore, upfront recognition of the license revenue would not be justified;

(d)     That the Company prematurely recognized revenue on two subsidiaries'
off-the-shelf product sales using the percentage-of-completion method of
revenue recognition, rather than complying with its stated policy of
applying SOP 97-2 to "software only sales, where significant
customization is not required."  Integral later admitted, in the Feburary 12,
2009 letter to the SEC, that revenue should have been recognized on
customer acceptance or shipment.  In the Form 10-Q filed May 6, 2009,
Integral further admitted that it improperly recognized revenue during this
quarter by using percentage-of-completion accounting to account for off-
the-shelf product sales;

(e)     That defendants failed to implement adequate controls and procedures to
account accurately for the revenues from warranties, equipment, and
product sales with respect to a number of contracts, including the GPS
OCX;

(f)     That the Company's financial statements were not prepared in accordance
with GAAP, and defendants knowingly and/or recklessly violated
FASCON 5, EITF 00-21, SAB 101, and the requirements AICPA SOP 81-
1 and 97-2 because the Company did not properly recognize contract,
product, and service revenue correctly due to its egregious lack of
adequate internal controls; and

(g)     That Integral's internal controls were wholly inadequate and/or non-
existent in that the Company lacked: (i) adequate controls to ensure that

warranty revenue was recognized in accordance with GAAP; (ii) adequate controls to ensure that revenue from warranties, off-the-shelf software sales and contracts subject to long-term contract accounting was appropriately recognized; and (iii) adequate skilled accounting personnel with the knowledge to properly account for the Company's revenue, despite Baldwin claiming to have special accounting and reporting expertise and the Company's having hired three new senior accounting staff members.

62.    In the December 2008 Restatement, Integral admitted that that it had improperly recognized revenue, stating:

> ***The significant adjustment related to errors in the accounting treatment for certain transactions with respect to the timing of the recognition of revenue*** between periods due to multiple element software arrangements specifically related to the accounting for post contract support services, software licenses, the treatment of certain transactions that do not involve significant customization, modification, or production and the timing of revenue associated with some reimbursable costs on government programs. Therefore, we have restated such financial statements to reflect the adjusted accounting treatment for these contracts and other adjustments identified as part of the audit.  (Emphasis added).

63.    Because the SEC found this explanation lacking in sufficient detail, Defendant Bambarger explained the errors related to the GPS OCX contract in more detail in a February 12, 2009 letter responding to questions posed by the SEC, stating,  "Errors were identified during the audit with respect to the timing of revenue recognition relating to an upfront license fee on one of the Company's contracts.  The Company improperly recognized upfront license fee revenue of $2.4 million.   Through its restatement, the Company applied percentage-of-completion

accounting under SOP 81-1 for the entire contract, which resulted in the deferral of $1.3 million of revenue initially recognized during the restatement period."

64.    In that same letter, Defendant Bambarger also explained the errors related to warranty revenue, stating:

> Errors were identified during the audit with respect to the timing of revenue recognition for the PCS-related services element on certain of the Company's contracts. The Company has concluded that it improperly accounted for the PCS-related services element within its percentage of completion calculation. . . . The correction of this error resulted in the net deferral of $1.9 million in revenue initially recognized in the restatement period.

As it had always done with respect to its separate service contracts, the Company determined that it was required to "defer[] and recogniz[e] revenue for the PCS-related services over the service period."  In the Form 10-Q filed on May 6, 2009, executed by Defendants Bambarger and Lee-Gallagher, Integral further indicated that the errors were made with respect to fixed-price contracts as to which Integral incorrectly determined that the entire contract value was "a single element" – despite the separate specification of *post*-contract services, *i.e.*, warranties.

65.    In the February 12, 2009 letter, Defendant Bambarger also explained that the Company recognized revenue from off-the-shelf software products on a percentage-of-completion basis instead of in accordance with both GAAP and the Company's stated policy of applying SOP 97-2 to sales which did not require significant customization or modification: "Through its restatement, the Company has determined that revenue should be recognized in accordance with SOP 97-2, therefore the revenue recognition point is upon customer acceptance or upon shipment, as appropriate, and upon having met all revenue recognition criteria defined in SOP 97-2."

66.    In the December 2008 Restatement, the Company also admitted that weaknesses in internal controls "resulted in a material misstatement of our previously reported revenue, gross profit and net income for the quarters ended December 31, 2007, March 30, 2008, and June 30, 2008."

67.    The Company further admitted in the December 2008 Restatement that despite Defendant Baldwin's professed accounting and reporting expertise and the addition of three senior staff members to the accounting department in 1Q'08 it "did not have an adequate level of skilled accounting resources to ensure that accounting processes were being completed effectively and on a timely basis."

68.    The Company further admitted in the December 2008 Restatement that although it corrected the accounting errors made in the first three quarters of fiscal 2008, ended June 30, 2008, that: "As a result of these material weaknesses, we concluded that our internal control over financial reporting was not effective as of September 30, 2008."  This was confirmed in the February 12, 2009 letter to the SEC, with the Company agreeing that it would continue to make this statement until such time as the material weaknesses had been corrected.

~~Materially False and Misleading~~
~~Statements Issued During the Class Period~~

**B.    Second Quarter 2008 Revenue and Earnings Report**

69.    ~~The Class Period begins~~ On April 28, 2008~~.  On this day~~, Integral ~~Systems~~ issued a press release ~~entitled, "Integral Systems Announces Financial Results for the Second Quarter of Fiscal Year 2008." Therein, the Company, in relevant part, stated:~~ announcing the Company's financial results for the Second Quarter of Fiscal Year 2008.  In that press release, the Company announced:

*Revenue grew 55% - Management raises*
*EPS outlook far the fiscal year to $1.90*

Integral Systems, Inc. (NASDAQ ISYS) ("Company") today reported financial results for the second quarter of fiscal 2008.   Revenue for the quarter was $44.9 million, up $15.8 million or 55% from the second quarter of fiscal 2007. Second quarter income from operations was $5.8 million compared to $2.9 million for the second quarter of last fiscal year, and net income was $4.0 million ($0.44 per diluted share) compared to $2.1 million ($0.19 per diluted share) for the second quarter of fiscal 2007.

The second quarter results reflect solid financial performance and growth in all three of the Company's operating segments. Government Ground Systems revenue grew 76% over the prior year due to increased revenue from two large government contracts. Commercial Ground Systems revenue grew 18% over the prior year due primarily to revenue from the Protostar contract and completion of work by the Company's SAT subsidiary on several large government contracts. Space Communications Systems revenue grew 40% over the prior year due to higher demand for its products and services. Gross profit and operating income grew proportionately in all operating segments as a result of higher revenue.

The second quarter results add to a strong first quarter, resulting in year-to-date revenue of $82.2 million compared to $56.4 million for the same period in 2007. Revenue, gross profit and operating income are higher in fiscal 2008 over 2007 in all of the Company's operating segments. "We are on target for another year of record revenue and earnings and all three of our operating groups are performing better than expected," commented Alan Baldwin, chief executive officer.  "Our growth strategy is beginning to materialize and all of our financial metrics are showing positive results."

70.    The Company also further increased its projected earnings per share to $1.90.

71.    The April 28, 2008 press release specifically discussed revenue from the GPS-OCX

contract:

The results for the first six months of 2008 include a large amount of license revenue generated from the GPS OCX contract and recovery of R&D tax credits from prior years. Revenue and operating income is expected to be higher in 2008 as a result of these two factors as well as continuing higher demand for the Company's products and services, particularly with the Air Force and national programs, partially offset by higher costs for investments in R&D efforts and infrastructure developments.  Outstanding shares of the Company are lower in

~~2008 due to recent share repurchase. As a result of all of these factors, earnings~~
~~for fiscal 2008 are now estimated to be $1.90 on a per share basis.~~

~~(Emphasis in original).~~

72.    In the April 28, 2008 press release, Defendant Baldwin stated "We are on target for another year of record revenue and earnings and all three of our operating groups are performing better than expected . . . Our growth strategy is beginning to materialize."

73.    On April 28, 2008, Defendants Baldwin and Bambarger conducted a conference call discussing the financial results for the second quarter of fiscal year 2008.  In that call, Defendant Bambarger stated, "Revenue for the quarter was $44.9 million, up 55% over 2007.  This is primarily because our government business continues to grow with GPS, CCS-C and RAIDRS programs leading the way."

74.    More specifically, in that call, Defendant Bambarger explained that "we did have significant subcontractor flowthrough costs on our RAIDRS program in Q2 that were accelerated at the request of the customer."   When asked by an analyst whether there was anything that should be viewed as "one-time in nature," Defendant Bambarger indicated that with respect to the RAIDRS contract, "we did accelerate some contractor cost at the request of the customer and that has an effect on revenue and project cost almost equal.  But that's only the major significant event that would be out of the ordinary as far as routine business operations is concerned."

75.    Defendant Bambarger again discussed the GPS OCX contract in that call, stating that "in the first quarter we had significant accelerated revenue on our GPS contract for the licenses that we sold, which was at very high profit.  That was anticipated to be spread throughout the remainder of this year and even a little into the next fiscal year."

76.    Defendant Baldwin proudly stated that, over the time he and Defendant Bambarger had been at the helm, "we've been beefing up or busy building the staff in terms of . . . finance and accounting. . . . So there has been a lot of very talented people that have been added."

77.    The market reacted to this news, and trading volume spiked, with nearly four times as many shares trading as in the previous trading day, and the trading price increased approximately 11.70%, to close on April 28, 2008, at $35.13 per share.

78.    On April 29, 2008, Integral filed the April 28, 2008 press release with the SEC as an exhibit to a Current Report on Form 8-K.  Defendant Bambarger signed the Form 8-K.

79.    On May 7, 2008, Integral filed its quarterly report *with the SEC* for 2Q'08 on Form 10-Q.  ~~The Company's 10-Q was signed by Defendants Bambarger and Lee Gallagher, and reaffirmed the Company's financial results previously announced on April 28, 2008.  The Company's 10-Q also contained Sarbanes Oxley required certifications, signed by Defendants Baldwin and Bambarger, substantially similar to the certifications in ¶21, *supra*.~~  In that Form 10-Q, the Company continued to emphasize the importance of the GPS OCX contract to its revenue.  In describing its Ground Systems Segment, the Company stated, "The increase in revenue in this segment for the six months ended March 31, 2008 was primarily attributable to the up-front delivery of licenses under the GPS OCX (Next Generation Control Segment) contract with Northrop Grumman Corporation, which was awarded during the first quarter 2008."

80.    The Form 10-Q also highlighted the importance of the GPS OCX contract to the gross profit in the Ground Systems segment, stating, "The increase in gross profit is primarily

attributable to the GPS OCX (Next Generation Control Segment) contract which included $2.4 million of license revenue."

81.    The May 7, 2008 Form 10-Q also elaborated on the "Critical Accounting Policies" used by the Company in the preparation of its financial reports.  Those policies included:

Revenue Recognition

*Contract Revenue* – We earn revenues from sales of our products and services and may be either a prime contractor directly to the end-user of our products and services or we may act as a subcontractor under a contract with a prime contractor.  Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the purchase price is fixed and determinable, and collectibility is reasonably assured.  We generally earn revenue under three types of contracts: fixed-price, cost-plus a fixed fee, and time & materials ("T&M") contracts.  Revenue under a fixed-price contract is recognized using a percentage of completion method based on costs incurred in relation to total estimated costs or other measures of completion that are deemed appropriate.  Under a cost-plus contract, we are reimbursed for allowable costs within the contractual terms and conditions and are paid a negotiated fee.  The fee may be fixed or based on performance incentives.  Revenue recognition under a cost-plus contract is based upon actual costs incurred and a pro rata amount of the negotiated fee.

82.    The Company further described its accounting policies, attesting that:

In accordance with SOP 97-2, "*Software Revenue Recognition,*" for a Software-Only Sale, we recognize revenue when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery has occurred, the vendor's fee is fixed or determinable, and collectibility is reasonably assured. In situations where software is customized or otherwise modified and sold together with services and/or hardware, we recognize software license revenue on a percentage of completion basis.

83.    With regard to its warranty provisions, the Company described its accounting practices as follows:

We recognize PCS revenue on a percentage of completion basis when PCS is part of a broader fixed-price contract that includes customization or implementation support services. Alternatively, when PCS services (i.e., software maintenance and support) are awarded to us under a separate maintenance contract, we

recognize PCS revenue on a straight-line basis pro rata over the term of the maintenance contract.

84.    The May 7, 2008 Form 10-Q also stated that the Company's financial statements were "prepared in accordance with accounting principles generally accepted in the United States."

85.    The Company further reported that management, including Defendants Baldwin and Bambarger, had evaluated the effectiveness of the Company's internal controls and that they "were effective to ensure that the information required to be disclosed by us in this quarterly report on Form 10-Q was recorded, processed, summarized and reported within the time periods specified in the SEC's rules and Form 10-Q."

86.    The May 7, 2008 Form 10-Q was signed by Defendants Bambarger and Lee-Gallagher.

87.    Defendants Baldwin and Bambarger each certified the financial information presented in the Form 10-Q, the accuracy of the Company's reported financial results, and the efficacy of the Company's internal controls as required by Sarbanes-Oxley, as set forth in ¶¶ 57-60, above, and incorporated by reference herein.

88.    The statements in ¶¶ 69, 73-76, 79-80, 84-86, above were materially false and misleading when made because defendants knowingly and/or recklessly reported or failed to disclose or indicate the following:

    (a)    That the Company's financial results were materially inflated, and the Company's reported revenues were materially misstated, as set forth in the annual report filed with the SEC on Form 10-K on December 24, 2008, with revenues overstated by $7.148 million (nearly 19%), net income

overstated by $933,000 million (30%) and earnings per share overstated by $0.06 (from $0.16 to $0.22);

(b)    That the Company prematurely recognized warranty revenue for periods of time which had not yet elapsed, and the services could thus not have been provided, for the reasons stated in ¶¶ 61(b) and 64, above;

(c)    That the Company prematurely recorded revenues on software products in violation of SOP 97-2, for the reasons stated in ¶¶ 61(d) and 65, above, by inexplicably applying percentage-of-completion accounting;

(d)    That the Company prematurely recognized $6.3 million of revenue from pass-through equipment costs on the RAIDRS contract in 2Q'08 and 3Q'08, because, although the Company paid a deposit for antenna equipment, the equipment had not yet been employed in tangible efforts towards completion of the project, in violation of SOP 81-1, ¶ 50. As later admitted in the Feburary 12, 2009 letter to the SEC, Integral should not have included the advanced costs of the equipment in its percentage-of-completion calculations for the contract, utilizing the cost-to-cost method. The percentage of completion standard which defendants acknowledged applied, SOP 81-1, ¶ 50, provides that costs for large equipment purchases should be deferred until the activity associated with the item purchased has progressed sufficiently. Here, a mere deposit was paid, and the antennae were neither delivered nor installed at the time the Company prematurely recognized the revenue and the cost and that, in fact, that

occurrence was more than a year away.  Defendants acted with scienter because, *inter alia*:

(i)    Integral's SEC filings indicated that most of the Company's contracts are accounted for under percentage-of-completion accounting.  There is nothing new or unusual about the contract from this perspective;

(ii)    Bambarger and Baldwin both represented to investors that additional accounting and contract administration personnel were added to strengthen the Company's execution of these matters and Balwin publicly professed his expertise in accounting and reporting matters; and

(iii)    The revenue recognition principles involved were not complicated to apply.  Not only is SOP 81-1, ¶ 50, quite clear on this point with respect to cost-to-cost percentage-of-completion accounting, but under FASCON 5 and SAB 101, revenue cannot be recognized until it is earned;

(e)    That the Company recognized revenue on an advance purchase of large equipment on another contract, in violation of SOP 81-1, ¶ 50.  Although the item was part of the December 2008 Restatement, the Company disclosed, for the first time, in the Form 10-Q filed May 6, 2009, that as with the RAIDRS contract, such revenue was prematurely recognized on a

smaller commercial contract in both 2Q'08 and 3Q'08.  As described therein:

> For the commercial project, reimbursement for the purchases occurs upon the achievement of performance milestones. As disclosed at the time in the Company's periodic filings under the Securities Exchange Act of 1934 (the "Exchange Act"), the Company recognized revenue under cost-plus contracts during these periods based upon actual costs incurred and a pro rata amount of the negotiated fee.  During the fiscal year 2008 audit, the Company determined that the advance equipment purchases should not be included in the measurement of costs incurred until such time as the equipment is utilized in the projects.

Thus, Integral admitted that it had been recognizing revenues in advance of utilizing the equipment it acquired towards actual completion of the project.  This accounting also violated FASCON 5 and SAB 101 because Integral recognized revenues before they were earned pursuant to the terms of the contract at issue;

(f)    That defendants failed to implement adequate controls and procedures to account accurately for the revenues from warranties, equipment, and product sales with respect to a number of contracts, including the GPS OCX and RAIDRS contracts;

(g)    That the Company's financial statements were not prepared in accordance with GAAP, and defendants knowingly and/or recklessly violated FASCON 5, EITF 00-21, SAB 101, and the requirements SOP 81-1 and 97-2 because it did not properly recognize contract, product, and service

revenue correctly due to its egregious lack of adequate internal controls; and

(h)    That Integral's internal controls were wholly inadequate and/or non-existent in that the Company lacked: (i) adequate controls to ensure that warranty revenue was recognized in accordance with GAAP; (ii) adequate controls to ensure that revenue from off-the-shelf software sales and contracts subject to long-term contract accounting was appropriately recognized; and (iii) adequate skilled accounting personnel with the knowledge to properly account for the Company's revenue, despite Baldwin claiming to have special accounting and reporting expertise, the Company's having hired three new senior accounting staff members in 1Q'08, and Baldwin proudly taking credit (on behalf of himself and Bambarger) for adding a number of talented people to the accounting department in 2Q'08.

89.    In the December 2008 Restatement, Integral admitted that that it had improperly recognized revenue, stating:

> ***The significant adjustment related to errors in the accounting treatment for certain transactions with respect to the timing of the recognition of revenue*** between periods due to multiple element software arrangements specifically related to the accounting for post contract support services, software licenses, the treatment of certain transactions that do not involve significant customization, modification, or production and the timing of revenue associated with some reimbursable costs on government programs. Therefore, we have restated such financial statements to reflect the adjusted accounting treatment for these contracts and other adjustments identified as part of the audit.  (Emphasis added).

90.    In the February 12, 2009 letter to the SEC, signed by Defendant Bambarger, and in the May 6, 2009 Form 10-Q, executed by Defendants Bambarger and Lee-Gallagher, Integral explained in more detail the errors related to the GPS OCX contract, off-the-shelf software sales, and warranties, as described above in ¶¶ 63-65.

91.    In that same letter, Defendant Bambarger also explained the errors related to the RAIDRS contract in more detail stating:

> The Company made large dollar advance purchases of equipment on certain of its contracts. Errors were identified during the audit relating to the timing of revenue recognition with respect to these contracts. The Company incorrectly included advanced purchases of equipment in its progress towards completion calculations under the cost-to-cost method and overstated the percentage of completion otherwise determinable on certain contracts.  In accordance with paragraph 50 of SOP 81-1, the Company removed the advance purchases from its calculations in connection with the restatement.  The correction of these errors resulted in a net deferral of $7.0 million in contract revenue.

92.    In the Form 10-Q filed on May 6, 2009, Integral further explained that this was a cost-plus fixed fee contract and that in addition to prematurely recognizing the cost and revenues associated with deposits for equipment in 2Q'08, it had also improperly recognized a *pro rata* portion of the negotiated fee.  (This explanation likely accounts for part of the difference between the $5.1 million deposit paid for the equipment and the additional revenue ultimately deferred for recognition in later periods.)  Integral also made similar disclosures with respect to a smaller commercial contract, noting, however, that revenues were earned based upon the achievement of performance milestones and thus should not have been recognized predicated upon cost-to-cost percentage of completion accounting principles.

93.    In the December 2008 Restatement, the Company also admitted that weaknesses in internal controls "resulted in a material misstatement of our previously reported revenue, gross

profit and net income for the quarters ended December 31, 2007, March 30, 2008, and June 30, 2008."

94.    <u>The Company further admitted that despite Defendant Baldwin's professed accounting and reporting expertise and his proudly taking credit (on behalf of himself and Bambarger) for adding a number of talented people to the accounting department in 1Q'08 and 2Q'08,  that Integral "did not have an adequate level of skilled accounting resources to ensure that accounting processes were being completed effectively and on a timely basis."</u>

95.    <u>The Company further admitted in the December 2008 Restatement that although it corrected the accounting errors made in the first three quarters of fiscal 2008, ended June 30, 2008, that: "As a result of these material weaknesses, we concluded that our internal control over financial reporting was not effective as of September 30, 2008."  This was confirmed in the February 12, 2009 letter to the SEC, with the Company agreeing that it would continue to make this statement until such time as the material weaknesses had been corrected.</u>

C.    <u>**Third Quarter 2008 Revenue and Earnings Report**</u>

96.    On July 24, 2008, Integral ~~Systems~~ issued a press release ~~entitled, "Integral Systems Announces Financial Results for the Third Quarter of Fiscal Year 2008." Therein, the Company, in relevant part, stated~~: <u>announcing the Company's financial results for 3Q'08.  In that press release, the Company announced:</u>

> **~~Revenue grew 17% - Management outlook for the fiscal year remains strong~~**
>
> ~~Integral Systems, Inc. (Nasdaq: ISYS) ("Company") today reported financial results for the third quarter of fiscal 2008.~~  Revenue for the quarter was $41.8 million, up $5.9 million or 16.5% from the third quarter of fiscal 2007. Third quarter income from operations was $7.1 million compared to $5.3 million for the third quarter of the last fiscal year, and net income was $4.7 million ($0.55 per

diluted share) compared to $3.8 million ($0.34 per diluted share) for the third quarter of fiscal 2007.

~~The third quarter results reflect what management believes to be solid financial performance and growth in the Company's Space Communications Systems segment and the Company's Government Ground Systems segment. Gross profit and operating income grew significantly in these operating segments as a result of higher revenue and lower overhead support costs. Our Commercial Ground Systems segment was affected by higher legal and support costs to support their international operations.~~

~~These results add to an excellent first half of the year, resulting in a 34.2% increase in the year-to-date revenue of $124.0 million compared to $92.3 million for the same period in 2007.  "We have significant momentum going into the fourth quarter of this year and the beginning of the next fiscal year," commented John Higginbotham, Chief Executive Officer. "This momentum, combined with our excellent financial resources, allows us to focus on strategic growth initiatives that will continue to drive value for our shareholders."~~

~~The results for the nine months ended June 30, 2008 include a large amount of license revenue generated from the GPS OCX contract in the first quarter and recovery of R&D tax credits from prior years that was recorded in the first quarter as well.  Revenue and operating income is expected to be higher in 2008 as a result of these two factors as well as continuing higher demand for the Company's products and services, particularly with the Air Force and national programs, partially offset by higher costs for investments in R&D efforts and infrastructure developments. The Company had a lower number of outstanding shares in 2008 than 2007 due to recent share repurchases. As a result of all of these factors, management is increasing the Company's earnings projection for fiscal 2008 to approximately $2.15 on a per share basis.  Included in this projection is the estimated financial impact of equity awards to management and directors projected to be granted in the fourth quarter.~~

~~As one of its strategic initiatives, the Company is considering filing a universal shelf registration statement with the Securities and Exchange Commission to facilitate the raising of capital over the next three years.~~

~~(Emphasis in original).~~

97.    The Company also further increased its projected earnings per share to $2.15.

98.    On July 25, 2008, Integral filed the July 24, 2008 press release with the SEC as an

exhibit to a Current Report on Form 8-K.  Defendant Bambarger signed the Form 8-K.

99. On that same day, Defendants Bambarger and new CEO Higginbotham conducted a conference call discussing the financial results 3Q'08. Defendant Bambarger specifically attributed the quarter's performance to the GPS OCX and RAIDRS contracts, stating, "Revenue was higher by 14% over the prior year for our Government business, due to GPS and RAIDRS projects and higher license and maintenance revenue than we had over the prior year."

100. On August 7, 2008, Integral ~~Systems~~ filed its quarterly report with the SEC on Form 10-Q for 3Q'08. ~~The Company's 10-Q was signed by Defendants Bambarger and Lee Gallagher, and reaffirmed the Company's financial results previously announced on July 24, 2008. The Company's 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Higginbotham and Bambarger, substantially similar to the certifications contained in ¶21, supra.~~ In that Form 10-Q, the Company continued to emphasize the importance of the GPS OCX contract to its revenue. In describing its Ground Systems Segment, the company stated, "The increase in revenue in this segment for the nine months ended June 30, 2008 was primarily attributable to the up-front delivery of licenses under the GPS OCX (Next Generation Control Segment) contract with Northrop Grumman Corporation, which was awarded during the first quarter 2008."

101. The Form 10-Q also highlighted the importance of the GPS OCX contract to the gross profit in the Ground Systems segment, stating, "The increase in gross profit was primarily attributable to the GPS OCX (Next Generation Control Segment) contract which included $2.4 million of license revenue."

102. The August 7, 2008 Form 10-Q also elaborated on the "Critical Accounting Policies" used by the Company in the preparation of its financial reports. Those policies included:

Revenue Recognition

*Contract Revenue* – We earn revenues from sales of our products and services and may be either a prime contractor directly to the end-user of our products and services or we may act as a subcontractor under a contract with a prime contractor. Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the purchase price is fixed and determinable, and collectibility is reasonably assured. We generally earn revenue under three types of contracts: fixed-price, cost-plus a fixed fee, and time & materials ("T&M") contracts. Revenue under a fixed-price contract is recognized using a percentage of completion method based on costs incurred in relation to total estimated costs or other measures of completion that are deemed appropriate. Under a cost-plus contract, we are reimbursed for allowable costs within the contractual terms and conditions and are paid a negotiated fee. The fee may be fixed or based on performance incentives. Revenue recognition under a cost-plus contract is based upon actual costs incurred and a pro rata amount of the negotiated fee.

103. The Company further described its accounting policies, attesting that:

In accordance with SOP 97-2, "*Software Revenue Recognition,*" for a Software-Only Sale, we recognize revenue when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery has occurred, our fee is fixed or determinable, and collectibility is reasonably assured. In situations where software is customized or otherwise modified and sold together with services and/or hardware, we recognize software license revenue on a percentage of completion basis.

104. With regard to its warranty provisions, the Company described its accounting practices as follows:

We recognize PCS revenue on a percentage of completion basis when PCS is part of a broader fixed-price contract that includes customization or implementation support services. Alternatively, when PCS services (i.e., software maintenance and support) are awarded to us under a separate maintenance contract, we recognize PCS revenue on a straight-line basis pro rata over the term of the maintenance contract.

105.  The August 7, 2008 Form 10-Q also stated that the Company's financial statements were "prepared in accordance with U.S. generally accepted accounting principles."

106.  The Company further reported that management, including Defendants Higginbotham and Bambarger, had evaluated the effectiveness of the Company's internal controls and that they "were effective to ensure that the information required to be disclosed by us in this quarterly report on Form 10-Q was recorded, processed, summarized and reported within the time periods specified in the SEC's rules and Form 10-Q."

107.  The August 7, 2008 Form 10-Q was signed by Defendants Bambarger and Lee-Gallagher.

108.  Defendants Higginbotham and Bambarger each certified the financial information presented in the Quarterly Report, the accuracy of the Company's reported financial results, and the efficacy of the Company's internal controls as required by Sarbanes-Oxley, as set forth in ¶¶ 57-60, above, and incorporated by reference herein.

109.  The statements in ¶¶ 96, 99-101, 105-108, above, were materially false and misleading when made because defendants knowingly and/or recklessly reported or failed to disclose or indicate the following:

(a)  That the Company's reported revenues were materially misstated, as set forth in the annual report filed with the SEC on Form 10-K on December 24, 2008. (Because a substantial amount of revenue prematurely recorded in 1Q'08 and 2Q'08 should have been – and, as a result of the Restatement, was – recognized in 3Q'08, after removing the inflated amounts prematurely recognized in 3Q'08, the net result was a slight

improvement in Integral's reported revenues, net income and earnings per share);

(b)    That the Company prematurely recognized warranty revenue for periods of time which had not yet elapsed, and the services could thus not have been provided, for the reasons stated in ¶¶ 61(b) and 64, above;

(c)    That the Company prematurely recognized revenue for software products in violation of SOP 97-2, for the reasons stated in ¶¶ 61(d) and 65, above, by inexplicably applying percentage-of-completion accounting;

(d)    That the Company prematurely recognized revenue in connection with large equipment purchases on the RAIDRS contract, in violation of GAAP and the Company's own revenue recognition policies, for the reasons stated in ¶¶ 88(d), 91, and 92, above;

(e)    That the Company prematurely recognized revenue on advance purchase equipment costs on a commercial contract, in violation of GAAP and the Company's own revenue recognition policies, for the reasons stated in ¶¶ 88(e), 91, and 92, above;

(f)    That defendants failed to implement adequate controls and procedures to account accurately for the revenue from warranties, off-the-shelf software sales, and the GPS OCX and RAIDRS contracts;

(g)    That the Company's financial statements were not prepared in accordance with GAAP, and defendants knowingly and/or recklessly violated FASCON 5, EITF 00-21, SAB 101, and the requirements SOP 81-1 and

97-2 because it did not properly recognize contract, product, and service revenue due to its egregious lack of adequate internal controls; and

(h)  That Integral's internal controls were wholly inadequate and/or non-existent in that the Company lacked: (i) adequate controls to ensure that warranty revenue was recognized in accordance with GAAP; (ii) adequate controls to ensure that revenue from off-the-shelf software sales and multiple element contracts subject to long-term contract accounting was appropriately recognized; and (iii) adequate skilled accounting personnel with the knowledge to properly account for the Company's revenue, despite Baldwin claiming to have special accounting and reporting expertise, the Company's having hired three new senior accounting staff members in 1Q'08, and Baldwin proudly taking credit (on behalf of himself and Bambarger) for adding a number of talented people to the accounting department in 1Q'08 and 2Q'08.

110.  In the December 2008 Restatement, Integral admitted that it had improperly recognized revenue, stating:

> ***The significant adjustment related to errors in the accounting treatment for certain transactions with respect to the timing of the recognition of revenue*** between periods due to multiple element software arrangements specifically related to the accounting for post contract support services, software licenses, the treatment of certain transactions that do not involve significant customization, modification, or production and the timing of revenue associated with some reimbursable costs on government programs. Therefore, we have restated such financial statements to reflect the adjusted accounting treatment for these contracts and other adjustments identified as part of the audit.  (Emphasis added).

111.  In the February 12, 2009 letter to the SEC, signed by Defendant Bambarger, and in the May 6, 2009 Form 10-Q, executed by Defendants Bambarger and Lee-Gallagher, Integral explained in more detail the errors related to the off-the-shelf software sales, the GPS OCX contract, RAIDRS contract and the smaller commercial contract, and warranties, as described above in ¶¶ 63-65, 91, and 92.

112.  In the December 2008 Restatement, the Company also admitted that weaknesses in internal controls "resulted in a material misstatement of our previously reported revenue, gross profit and income for the quarters ended December 31, 2007, March 30, 2008, and June 30, 2008."

113.  The Company further admitted that despite Defendant Baldwin's professed accounting and reporting expertise and his proudly taking credit (on behalf of himself and Bambarger) for adding a number of talented people to the accounting department in 1Q'08 and 2Q'08,  that Integral "did not have an adequate level of skilled accounting resources to ensure that accounting processes were being completed effectively and on a timely basis."

114.  The Company further admitted in the December 2008 Restatement that although it had corrected the accounting errors made in the first three quarters of fiscal 2008, ended June 30, 2008, "[a]s a result of these material weaknesses, we concluded that our internal control over financial reporting was not effective as of September 30, 2008."  This was confirmed in the February 12, 2009 letter to the SEC, with the Company agreeing that it would continue to make this statement until such time as the material weaknesses had been corrected.

**D.**     **Additional Class Period False and/or Misleading Statements**

115.  On September 23, 2008, Integral ~~Systems~~ filed a Current Report with SEC on Form

8-K. Therein, the Company, in relevant part, stated:

> On September 19, 2008, the Audit Committee of the Board of Directors of
> Integral Systems, Inc. (the "Company") dismissed Bernstein & Pinchuk LLP
> ("B&P") as the independent registered public accounting firm for the Company
> following completion of services related to review of the Company's financial
> statements for the third quarter ended June 30, 2008. On September 19, 2008, the
> Audit Committee, following a comprehensive evaluation process of several
> leading public accounting firms, engaged Ernst & Young LLP ("E&Y") as the
> Company's new independent registered public accounting firm.
>
> The reports of B&P on the Company's consolidated financial statements and on
> the effectiveness of the Company's internal control over financial reporting and
> management's assessment thereof for the years ended September 30, 2007 and
> September 30, 2006, did not contain an adverse opinion or a disclaimer of
> opinion, nor were such reports qualified or modified as to uncertainty, audit
> scope, or accounting principle.
>
> During the years ended September 30, 2007 and September 30, 2006, and through
> September 19, 2008, there were no disagreements with B&P on any matter of
> accounting principle or practice, financial statement disclosure, or auditing scope
> or procedure, which disagreements, if not resolved to the satisfaction of B&P,
> would have caused them to make reference thereto in their reports on the financial
> statements for such years.
>
> During the years ended September 30, 2007 and September 30, 2006, and through
> September 19, 2008, there were no "reportable events" requiring disclosure
> pursuant to paragraph (a)(1)(v) of Item 304 of Regulation S-K.

116.  The September 23, 2008 Form 8-K was signed by Defendant Bambarger.

117.  On October 20, 2008, Integral ~~Systems~~ issued a press release entitled, "Integral

Systems Announces Fiscal Year 2008 Earnings Release Date." Therein, the Company, in

relevant part, stated:

> Integral Systems, Inc. (Nasdaq: ISYS) ("Company") today announced it will
> release results for the fiscal year 2008 through PR Newswire on Thursday,
> December 11, 2008, before the market opens.  Management is allowing extra time

to release final year end results due to the decision to change auditors and the significant effort involved in the transition.

"The audit planning process is complete and our transition to Ernst & Young is proceeding very well," commented William Bambarger, Chief Financial Officer. "Year end is always a very busy time and this year is especially so, given our successful growth in 2008 and our decision to change auditors."

118.    On the same day, October 22, 2008, Integral filed the press release with the SEC as an exhibit to a Current Report on Form 8-K.  Defendant Bambarger signed the Form 8-K.

119.    The statements in ¶¶ 115 and 117 above were materially false and misleading when made because defendants knowingly and/or recklessly reported or failed to disclose or indicate the following:

(a)    that the Company's financial results were materially inflated, and the Company's reported revenues were materially misstated, as set forth in the annual report filed  with the SEC on Form 10-K on December 24, 2008;

(b)    that the Company prematurely recognized warranty revenue;

(c)    that the Company prematurely recognized $2.4 million of revenue from the GPS OCX contract in the First Quarter 2008;

(d)    that the Company prematurely recognized $7.0 million of revenue from pass-through equipment costs on the RAIDRS contract and (at least) on a separate commercial contract;

(e)    that the Company prematurely recognized software sales revenue using a percentage-of-completion accounting measure rather than its stated policy, SOP 97-2, for off-the-shelf sales;

(f)    that defendants failed to implement adequate controls and procedures to account accurately for the revenues from products sales, equipment and warranties in violation of GAAP and various SEC rules;

(g)    that the Company's financial statements were not prepared in accordance with GAAP, and defendants knowingly and/or recklessly violated FASCON 5, EITF 00-21, SAB 101, and the requirements SOP 81-1 and 97-2 because it did not properly recognize contract, product, and service revenue correctly due to its egregious lack of adequate internal controls; and

(h)    that Integral's internal controls were wholly inadequate and/or non-existent in that the Company lacked: (i) adequate controls to ensure that warranty revenue was recognized in accordance with the Company's policies; (ii) adequate controls to ensure that revenue from software arrangements subject to long-term contract accounting was appropriately recognized; (iii) adequate internal controls to ensure the proper recogniton of revenue to delivered and undelivered elements of multiple-element arrangements; and (iv) adequate skilled accounting personnel with the knowledge to properly account for the Company's revenue, despite Baldwin claiming to have special accounting and reporting expertise, the Company's having hired three new senior accounting staff members in 1Q'08, and Baldwin proudly taking credit (on behalf of himself and

Bambarger) for adding a number of talented people to the accounting department in 1Q'08 and 2Q'08.

120.  In the December 2008 Restatement, Integral admitted that that it had improperly recognized revenue, stating:

> ***The significant adjustment related to errors in the accounting treatment for certain transactions with respect to the timing of the recognition of revenue*** between periods due to multiple element software arrangements specifically related to the accounting for post contract support services, software licenses, the treatment of certain transactions that do not involve significant customization, modification, or production and the timing of revenue associated with some reimbursable costs on government programs. Therefore, we have restated such financial statements to reflect the adjusted accounting treatment for these contracts and other adjustments identified as part of the audit.  (Emphasis added).

121.  In the February 12, 2009 letter to the SEC, signed by Defendant Bambarger, and in the May 6, 2009 Form 10-Q, executed by Defendants Bambarger and Lee-Gallagher, Integral explained in more detail the errors related to the GPS OCX contract, RAIDRS contract, software sales, and warranties, as described above in ¶¶ 63-65, 91, and 92.

122.  In the December 2008 Restatement, the Company also admitted that weaknesses in internal controls "resulted in a material misstatement of our previously reported revenue, gross profit and net income for the quarters ended December 31, 2007, March 30, 2008, and June 30, 2008."

123.  The Company further admitted that, despite Defendant Baldwin's professed accounting and reporting expertise and his proudly taking credit (on behalf of himself and Bambarger) for adding a number of talented people to the accounting department in 1Q'08 and 2Q'08,  that Integral "did not have an adequate level of skilled accounting resources to ensure that accounting processes were being completed effectively and on a timely basis."

124.  The Company further admitted in the December 2008 Restatement that although it had corrected the accounting errors made in the first three quarters of fiscal 2008, ended June 30, 2008, that: "As a result of these material weaknesses, we concluded that our internal control over financial reporting was not effective as of September 30, 2008."  This was confirmed in the February 12, 2009 letter to the SEC, with the Company agreeing that it would continue to make this statement until such time as the material weaknesses had been corrected.

28.    The statements contained in ¶¶19-27 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company improperly recognized revenue; (2) that as a result, the Company misstated its financial results during the Class Period; (3) that the Company's financial results were not prepared in accordance with GAAP; (4) that the Company lacked adequate internal and financial controls; and (5) as a result, the Company's financial statements were materially false and misleading at all relevant times.

## VI.    THE TRUTH EMERGES

125.  On December 11, 2008, Integral ~~Systems~~ shocked investors when it issued a press release entitled, "Integral Systems Announces Preliminary Financial Results for Fiscal Year 2008."  Therein, the Company, in relevant part, stated:

> Successful completion of 2008 - a record setting year; Management's outlook for fiscal year 2009 remains solid
>
> Integral Systems, Inc, (Nasdaq: ISYS) (the "Company") today reported preliminary financial results for the fourth quarter and fiscal year ended September 30, 2008. Revenue for the year was approximately $160 million, up approximately $32 million or 25% from fiscal 2007. Income from operations was approximately $25 million compared to $16.9 million for fiscal 2007, and net income was approximately $18 million ($1.00 per diluted share) compared to $12.8 million ($0.58 per diluted share) for fiscal 2007.

Revenue for the fourth quarter was approximately $46 million, up $10 million or 27% from the same period in 2007.  Income from operations was approximately $7 million compared to $5.8 million for the fourth quarter of 2007.  The fourth quarter of 2008 included approximately $1.5 million of audit related fees and approximately $0.4 million of non-cash stock compensation expense. As a result, net income was approximately $5 million ($0.27 per diluted share) compared to $4.8 million ($0.23 per diluted share) for the fourth quarter of 2007.

"We are very proud of our success in 2008 and are continuing to grow despite the challenging global business climate," commented John Higginbotham, Chief Executive Officer.  "We are focused on future growth opportunities and we are working diligently to ensure the infrastructure is in place to support the Company's ongoing growth."

Fiscal 2008 includes a large amount of license revenue generated from the GPS OCX contract and the recovery of R&D tax credits from prior years that was recorded in the first quarter.  Revenue and operating income were higher in 2008 compared to 2007 as a result of these two factors as well as continuing higher demand for the Company's products and services, particularly with the Air Force and national programs, partially offset by higher costs for investments in R&D efforts and infrastructure developments.  The Company also had a lower number of outstanding shares in 2008 than 2007 due to share repurchases.

"We are pleased with Integral's solid financial results for 2008 and are optimistic for continued growth in 2009. We estimate a 10% revenue growth rate in fiscal year 2009, primarily due to higher sales on existing government contracts and higher demand for our commercial products and services," commented Bill Bambarger, Chief Financial Officer. "Given the current economic conditions we are cautiously optimistic that we will continue to be profitable and will deliver comparable results in 2009."

Gross margin is expected to decrease to approximately 34% in 2009 due primarily to fewer high-margin license sales. Operating margin is expected to decrease to approximately 13% in 2009 due to lower gross margins, infrastructure investments such as business development, R&D and corporate services, and higher non-cash stock compensation expenses. Interest income for 2009 is expected to be consistent with 2008. Income tax expense is expected to be significantly higher in 2009, approximately 36% of net income, due to non-recurring recovery of R&D tax credits that were recognized in 2008. As a result of all of these factors, earnings are estimated to be $1.01 on a per share basis in fiscal 2009.

The Company also filed a Current Report on Form 8-K today describing adjustments to be made to its previously filed unaudited interim financial statements, for the first three quarters of 2008 arising from revisions to the

accounting treatment for certain revenue items. ***The adjustments primarily relate to the timing of the recognition of revenue due to specific warranty provisions in some of our contracts, accounting for the sale of software licenses and revenue associated with certain reimbursable casts on government programs***. The Company estimates that the net impact of the adjustments described above for the first three quarters of 2008 results in a decrease of approximately $10 million in revenues, a decrease of approximately $3 million in gross profit, a decrease of approximately $4 million in operating income and a decrease of approximately $0.13 in earnings per share for those three quarters. While ***these adjustments had an impact on our previously reported 2008 quarterly results of operations and will result in the restatement of these periods***, we expect to realize in fiscal year 2009 a majority of the revenue and earnings that are being deferred. (Emphasis added). ~~The preliminary results for the fourth quarter and the fiscal year ended September 30, 2008 set forth in this earnings release reflect these adjustments.~~

~~These preliminary results are based on unaudited financial information and preliminary information reviewed by management to date. These preliminary results remain subject to the completion of the Company's internal review of its financial results and its independent auditors' completion of their audit of the Company's financial statements and potential revisions resulting; therefrom, some of which may be material. *We do not expect that we will be able to file our Annual Report on Form 10-K by the applicable December 15, 2008 due date as a result of the significant additional effort involved to transition our newly appointed independent auditors as previously announced in September 2005 and expect file with the Securities and Exchange Commission (the "SEC') to obtain an extension of that date as permitted by SEC rules.* We currently expect to report our final results in the Company's Annual Report on Form 10-K on or about Wednesday, December 24, 2008.~~

~~[Emphasis Added]~~

126.    On this news, shares of Integral ~~Systems~~ declined $6.38 per share, or 28.61%, to close on December 11, 2008, at $15.92 per share, on unusually heavy volume.

127.    Also on December 11, 2008, Defendants Bambarger and Higginbotham conducted a conference call discussing the financial results for the fourth quarter of fiscal year 2008 and the impending Restatement. In that call, Defendant Bambarger explained that "the vast majority of adjustments so far involve the timing of revenue recognition."

128. <u>Bambarger continued in that conference call to explain the restatement of revenue from the GPS OCX contract, stating that the Company had "decided that we would be conservative in the accounting treatment of the sale of licenses on this contract and will defer approximately $2 million in revenue from Q1 2008."</u>

129. <u>In that same conference call, Bambarger explained the restatement of the RAIDRS contract revenue as follows:</u>

> <u>The largest [restatement] has to do with RAIDRS, our RAIDRS program. This is a cost plus contract and in the second quarter of 2008, we made a significant $5.1 million deposit to a third party vendor for antenna equipment. This is an allowable cost, was billed to the customer and was subsequently paid to us. However, the equipment has not been delivered yet, nor has it been installed.</u>

> <u>Accounting rules require that we must defer the revenue and cost until the equipment is delivered and installed.</u>

130. <u>Bambarger also explained the restatement of warranty revenue in that conference call, as follows:</u>

> <u>We typically include a 30, 90 or a 360-day warranty on our contracts. We have been recognizing 100% of the revenue on our contracts when the products and services have been delivered to our customer. Accounting rules require that we must defer a portion of the contract revenue to properly account for the warranty provisions of the contract. According, we are deferring approximately $2 million of revenue on our contracts with warranty provisions from fiscal 2008.</u>

131. <u>A restatement is reserved only for the revising of financial statements to correct material errors in previously reported financial statements. (FAS 154 ¶¶ 2, B30). The December 2008 Restatement of Integral's publicly-filed financial statements for the quarters ended December 31, 2007, March 31, 2008, and June 30, 2008 therefore constitutes an **admission** that those financial statements were materially false and misleading when initially made.</u>

132. In the December 24, 2008 Restatement, Integral admitted that it had made significant accounting errors, stating:

> ***The significant adjustment related to errors in the accounting treatment for certain transactions with respect to the timing of the recognition of revenue*** between periods due to multiple element software arrangements specifically related to the accounting for post contract support services, software licenses, the treatment of certain transactions that do not involve significant customization, modification, or production and the timing of revenue associated with some reimbursable costs on government programs. Therefore, we have restated such financial statements to reflect the adjusted accounting treatment for these contracts and other adjustments identified as part of the audit. (Emphasis added).

133. The restated quarterly financial data resulted in a decrease in revenue of $3.35 million for 1Q'08 and $7.148 million for 2Q'08 and a corresponding decrease in net income of $1.971 million and $933,000, respectively.

134. The Company further admitted in the December 2008 Restatement that it lacked adequate internal controls:

> [W]e identified the following material weaknesses as of September 30, 2008.

>> (1)    We have determined that the internal controls we designed to ensure that revenue is recognized in a timely and accurate manner are ineffective. Specifically, our internal controls over software revenue recognition have not been designed to provide reasonable assurance that (i) revenue is recognized in accordance with our stated accounting policies when the licensed software does not require significant production, customization or modification, (ii) software arrangements subject to long-term contract accounting include appropriate measures of progress towards completion and revenue is recognized based on these estimates in the proper period and (iii) appropriate allocations of revenue to delivered and undelivered elements have been made under multiple-element revenue arrangements, and revenue for those elements is recorded in the proper period. ***These deficiencies resulted in a material misstatement of our previously reported revenue,***

> ***gross profit and net income for the quarters ended December 31, 2007, March 30, 2008 and June 30, 2008.***
>
> (2)     We did not have an adequate level of skilled accounting resources to ensure that accounting processes were being completed effectively and on a timely basis. Effective monitoring controls require accounting personnel with an adequate level of knowledge and experience to be in place and effective in order to handle the complexities of accounting for our operations. We had ineffective corporate oversight of our subsidiaries and therefore management has determined that we have a material weakness in internal controls over monitoring our financial statement close and financial reporting processes.

> As a result of these material weaknesses, we concluded that our internal control over financial reporting was not effective as of September 30, 2008.  (Emphasis added).

135.  On January 29, 2009, the SEC Division of Corporation Finance sent a letter to Integral making more than a dozen comments with respect to certain of Integral's recent public filings, primarily its Form 8-K, filed December 11, 2008 (attaching the press release issued that day and warning investors that they could no longer rely upon the accuracy of the financial statements issued for the quarters ending December 31, 2007, March 31, 2008, and June 30, 2008) and the 2008 Form 10-K, filed December 24, 2008, containing the Restatement.

136.  As explained in detail above, on February 12, 2009, Integral responded to the SEC, in correspondence which addressed each of the comments in the SEC's earlier letter.  The explanations of the four accounting errors and various charts contained therein (detailing, *inter alia*, the accrual and expected accrual dates of the revenue removed by the Restatement), had not been provided to investors in conjection with the Restatement.  Integral also agreed that it should not combine all revenues in a single line item and would instead, in the future, separately report contract revenue, product revenue and software maintenance revenue.

137.  In response to the detailed explanations provided by Integral, on March 10, 2009, the SEC sent a follow-up letter, inquiring as to why Integral had not been forthright in the first instance, by failing to include these explanations in the Restatement.  Integral responded, in a letter dated March 20, 2009.  Therein, Integral defended the adequacy of its Restatement, claiming that it complied with both FAS 154 and SAB 99 by making all necessary material disclosures.  The letter concluded:  "However, in light of the Staff's suggestion that the more detailed information provided by the Company in response to prior comment numbers 5 and 6 would be beneficial to readers of the Company's public filings, the Company intends to include certain of such information in the Company's next regular quarterly filing with the Commission."

138.  In its 2Q'09 Form 10-Q, filed May 6, 2009, Integral provided investors with the accounting bases for the Restatement, a specification of certain items restated, and the quarters in which each error occurred, all of which was initially omitted from the 2008 Form 10-K.  Instead of the vague, skeletal description of the nature of the Restatement set forth in the 2008 Form 10-K, quoted above in ¶¶ 62, 89, 110, 120 and 132, Integral finally explained:

> *Timing of Revenue Recognition for Advance Purchases of Equipment*. During the second and third quarters of fiscal year 2008, the Company made advance purchases of equipment under a major cost plus incentive award fee U.S. government contract, and also under a second commercial contract. The Company received timely reimbursement from the government for the cost incurred on the government project. For the commercial project, reimbursement for the purchases occurs upon the achievement of performance milestones. As disclosed at the time in the Company's periodic filings under the Securities Exchange Act of 1934 (the "34 Act"), the Company recognized revenue under cost-plus contracts during these periods based upon actual costs incurred and a pro rata amount of the negotiated fee. During the fiscal year 2008 audit, the Company determined that the advance equipment purchases should not be included in the measurement of costs incurred until such time as the equipment is utilized in the projects.

*Timing of Revenue Recognition on Multiple Element Contracts Involving Post-Contract Customer Support ("PCS")*. During the first three quarters of fiscal year 2008, the Company recognized revenue under its fixed-price contracts using the contract value as one single element. As disclosed at the time in the Company's periodic filings under the 34 Act, the Company recognized PCS revenue during these periods on a percentage-of-completion basis. During the fiscal year 2008 audit, the Company determined that it should have allocated a portion of the total contract value based on vendor specific objective evidence of the fair value to the PCS services and recognize revenue for the PCS element separately from the remainder of the contract.

*Timing of Revenue Recognition on Multiple Element Contracts Involving Software Licenses*. During the first quarter of fiscal year 2008, the Company made up-front delivery of software licenses under the GPS OCX cost-plus contract with Northrop Grumman Corporation and received payment of $2.4 million for those licenses. As disclosed at the time in the Company's periodic filings under the 34 Act, the Company recognized revenue of $2.4 million relating to the sale of these licenses. During the fiscal year 2008 audit, the Company determined that it should have applied percentage-of-completion accounting for the entire contract, including the software licenses, as significant modification of the software was being performed.

*Timing of Revenue Recognition on Certain Contracts That Do Not Involve Significant Customization, Modification, or Production*. During the first three quarters of fiscal year 2008, the Company's subsidiaries, Real Time Logic, Inc. and SAT Corporation, made certain software sales under contracts that did not require significant customization to configure the products for the customers. These contracts were accounted for under the percentage-of-completion method. During the fiscal year 2008 audit, the Company determined that it should have recognized revenue on these sales upon either shipment or customer acceptance, depending upon the terms of the specific contract.

As specified above, these explanations provided investors with necessary details concerning the transactions at issue – and demonstrate the blatant manner in which defendants violated Integral's stated revenue recognition policies and/or GAAP.

## ~~UNDISCLOSED ADVERSE FACTS~~

~~42.    The market for Integral Systems' securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Integral Systems' securities traded at artificially inflated prices during~~

the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Integral Systems' securities relying upon the integrity of the market price of the Company's securities and market information relating to Integral Systems, and have been damaged thereby.

43.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Integral Systems' securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Integral Systems' business, operations, and prospects as alleged herein.

44.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Integral Systems' financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**VII.    DEFENDANTS' ~~INTEGRAL SYSTEMS'~~ VIOLATION OF GAAP RULES IN ~~ITS~~ INTEGRAL'S FINANCIAL STATEMENTS ~~FILED WITH THE SEC~~**

139. ~~These~~ The Company's financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP; nor ~~was~~ did the financial information provide a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about, its revenues in violation of GAAP rules.

140. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. ~~Regulation S-X (17 C.F.R. §210.4-01 (a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).~~ The SEC requires that public companies file quarterly and annual financial statements that are prepared in conformity with GAAP. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

141. At all relevant times during the Class Period, Integral's financial statements were represented to have been prepared in accordance with GAAP, which includes the requirements of FASCON 5, SAB 101, and SOP 81-1 and 97-2.

142. FASCON 5 states, in relevant part:

65

Revenues are not recognized until earned.  An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.

FASCON 5, ¶ 83 (footnote omitted).

143.  Furthermore, SAB 101, "Revenue Recognition in Financial Statements," discusses the application of existing accounting literature, including FASCON 5, ¶ 83, by SEC registrants, such as Integral.  SAB 101 provides, in relevant part:

The staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met:

• Persuasive evidence of an arrangement exists,

• Delivery has occurred or services have been rendered,

• The seller's price to the buyer is fixed or determinable, and

• Collectibility is reasonably assured.  (SAB 101, § A(1))

(Footnotes omitted).

144.  Certain arrangements may require the performance or delivery of both products and services, i.e., "multiple elements."  SOP 97-2 sets forth the applicable guidance relating to accounting for transactions that involve the delivery of multiple elements.  SOP 97-2 provides that revenue should only be recognized when certain criteria are met, similar to the criteria described above under SAB 101.  SOP 97-2 provides the following, in relevant part:

If the arrangement does not require significant production, modification, or customization of software, revenue should be recognized when all of all of the following criteria are met the following criteria are met.

• Persuasive evidence of an arrangement exists.

• Delivery has occurred.

• The vendor's fee is fixed or determinable.

- Collectibility is probable.

145.  With respect to the delivery criterion, SOP 97-2 further provides, in relevant part:

[T]he delivery of an element is considered not to have occurred if there are undelivered elements that are essential to the functionality of the delivered element, because the customer would not have the full use of the delivered element.

SOP 97-2 ¶ 13 (emphasis omitted).

146.  SAB 101, in fact, reiterates this particular guidance from SOP 97-2 and further provides, in relevant part:

If an arrangement . . . requires the delivery or performance of multiple deliverables, or "elements," the delivery of an individual element is considered not to have occurred if there are undelivered elements that are essential to the functionality of the delivered element because the customer does not have the full use of the delivered element.

In licensing and similar arrangements (e.g., licenses of motion pictures, software, technology, and other intangibles), the staff believes that delivery does not occur for revenue recognition purposes until the license term begins. Accordingly, if a licensed product or technology is physically delivered to the customer, but the license term has not yet begun, revenue should not be recognized prior to inception of the license term. Upon inception of the license term, revenue should be recognized in a manner consistent with the nature of the transaction and the earnings process.

(Footnotes omitted).

147.  The recognition of revenue, therefore, in such circumstances, shall not occur until delivery of all associated elements of an integrated, or multiple-element, arrangement has occurred.  In this instance, as admitted in the December 2008 Restatement, the Company had not satisfied its obligations under the contracts specified above, and therefore accelerating the revenue recognition was a violation of GAAP.

148.  In fact, the Company's accounting failures came despite disclosures within public filings, quoted above, expressly stating that the tenets of SOP 97-2 governed its software

contracts and related revenue. In certain instances, with respect to software product sales, however, the Company elected to employ SOP 81-1, which resulted in accelerated, ratably-recognized revenue, instead of waiting for shipment or customer acceptance, as required by SOP 97-2.

149. Guidance surrounding the consideration and utilization of percentage-of-completion accounting for long-term contracts is set forth in SOP 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts." SOP 81-1, ¶ 1, states, as the reason for its issuance, the then-changing environment surrounding the manner in which business contracts were being executed, including contracts such as those governing, for example, the development and production of military and commercial aircraft, weapons delivery systems, space exploration hardware, and computer software.

150. SOP 81-1, ¶ 3, provides the following with respect to revenue recognition and its application to production- and construction-type contracts:

The pervasive principle of realization and its exceptions and modifications are central factors underlying accounting for contracts. APB Statement 4 states:

Revenue is generally recognized when both of the following conditions are met: (1) the earnings process is complete or virtually complete, and (2) an exchange has taken place. [Paragraph 150]

Revenue is sometimes recognized on bases other than the realization rule. For example, on long-term construction contracts revenue may be recognized as construction progresses. This exception to the realization principle is based on the availability of evidence of the ultimate proceeds and the consensus that a better measure of periodic income results. [Paragraph 152]

The exception to the usual revenue realization rule for long-term construction-type contracts, for example, is justified in part because strict adherence to realization at the time of sale would produce results that are considered to be unreasonable. The judgment of the profession is that revenue should be recognized in this situation as construction progresses. [Paragraph 174]

151.    <u>SOP 81-1, ¶ 12 provides the following with respect to which types of contracts are covered thereby:</u>

> Contracts covered by this statement of position are binding agreements between buyers and sellers in which the seller agrees, for compensation, to perform a service to the buyer's specifications.  Contracts consist of legally enforceable agreements in any form and include amendments, revisions, and extensions of such agreements. Performance will often extend over long periods, and the seller's right to receive payment depends on his performance in accordance with the agreement. The service may consist of designing, engineering, fabricating, constructing, or manufacturing related to the construction or the production of tangible assets.

152.    <u>SOP 81-1, ¶ 22, further provides the rationale for percentage-of-completion accounting:</u>

> [T]he business activity taking place supports the concept that in an economic sense performance is, in effect, a continuous sale (transfer of ownership rights) that occurs as the work progresses.  Also under most contracts for the production of goods and the provision of related services that are accounted for on the basis of units delivered, both the contractor and the customer obtain enforceable rights as the goods are produced or the services are performed.  As units are delivered, title to and the risk of loss on those units normally transfer to the customer, whose acceptance of the items indicates that they meet the contractual specifications.  For such contracts, delivery and acceptance are objective measurements of the extent to which the contracts have been performed.  The percentage-of-completion method recognizes the legal and economic results of contract performance on a timely basis.  Financial statements based on the percentage-of-completion method present the economic substance of a company's transactions and events more clearly and more timely than financial statements based on the completed-contract method, and they present more accurately the relationships between gross profit from contracts and related period costs.  The percentage-of-completion method informs the users of the general purpose financial statements of the volume of economic activity of a company.

153.    <u>In light of these parameters, the Company expressly recognized that it was required to utilize SOP 81-1 when accounting for fixed-price and cost-plus contracts.</u>

154.    <u>A number of "input" and "output" approaches that may be employed to measure contract progress are provided within SOP 81-1, ¶¶ 44-51.  In summary, those paragraphs</u>

demonstrate that the primary driver towards determining and recording revenue on these types of contracts is the relationship between costs incurred to date on a project and the total estimated costs to complete the project – be it measured by hours worked to date, efforts-expended to date, or a simple ratio of costs incurred to total estimated costs.

155.  SOP 81-1, ¶ 79, also speaks directly to the relationship between the measurement of progress and the company's ability to accurately record and depict associated revenue and/or gross profit.  As set forth therein, in relevant part:

> Total estimated gross profit on a contract, the difference between total estimated contract revenue and total estimated contract cost, must be determined before the amount earned on the contract for a period can be determined. ***The portion of total revenue earned or the total amount of gross profit earned to date is determined by the measurement of the extent of progress toward completion using one of the methods discussed in paragraphs .44 to .51 of this statement.*** The computation of income earned for a period involves a determination of the portion of total estimated contract revenue that has been earned to date (earned revenue) and **the *portion of total estimated contract cost related to that revenue*** (cost of earned revenue).  (Emphasis added).

156.  FASCON No. 6, "Elements of Financial Statements" ("FASCON 6"), is the accounting profession's conceptual framework that sets forth guidance outlining the criteria for recognition of individual items within a company's financial reporting process.  It contains certain guidance pertaining to the concept of "recognition" in the context of financial reporting. It provides, in relevant part:

> Recognition is the process of formally recording or incorporating an item in the financial statements of an entity. Thus, an asset, liability, revenue, expense, gain, or loss may be recognized (recorded) or unrecognized (unrecorded).  FASCON 6, ¶ 143.

157.  FASCON 6 also describes how a company is to reflect transactions within the financial reporting periods to which component costs and associated revenues relate.  This

concept reflects the "matching principle" of accounting and is referred to as accrual accounting.

It is discussed within FASCON 6 in the following manner, in relevant part:

> Items that qualify under the definitions of elements of financial statements and that meet criteria for recognition and measurement (paragraph 23) are accounted for and included in financial statements by the use of accrual accounting procedures. Accrual accounting and related concepts are therefore significant not only for defining elements of financial statements but also for understanding and considering other aspects of the conceptual framework for financial accounting and reporting. FASCON 6, ¶ 134.

158. The matching principle is a concept at the core of accrual accounting, specific discussion of which is also included within FASCON 6, which states, in relevant part:

> Matching of costs and revenues is simultaneous or combined recognition of the revenues and expenses that result directly and jointly from the same transactions or other events. In most entities, some transactions or events result simultaneously in both revenue and one or more expenses. The revenue and expense(s) are directly related to each other and require recognition at the same time. FASCON 6, ¶ 146.

159. FASCON 6 then continues to describe the objectives generally accepted and associated with the concepts of accrual accounting. It provides, in relevant part:

> Accrual accounting attempts to record the financial effects on an entity of transactions and other events and circumstances that have cash consequences for the entity in the periods in which those transactions, events, and circumstances occur rather than only in the periods in which cash is received or paid by the entity. Accrual accounting is concerned with an entity's acquiring of goods and services and using them to produce and distribute other goods or services. It is concerned with the process by which cash expended on resources and activities is returned as more (or perhaps less) cash to the entity, not just with the beginning and end of that process. It recognizes that the buying, producing, selling, distributing, and other operations of an entity during a period, as well as other events that affect entity performance, often do not coincide with the cash receipts and payments of the period (FASB Concepts Statement No. 1, *Objectives of Financial Reporting by Business Enterprises*, paragraph 44, and FASB Concepts Statement No. 4, *Objectives of Financial Reporting by Nonbusiness Organizations*, paragraph 50). FASCON 6, ¶ 139.

160. GAAP requires that financial statements be prepared on an accrual basis; as such, so, too, must all financial statements prepared and filed by registrants be prepared on such a basis.

161. FASCON 6 also provides, in relevant part:

Accrual accounting uses accrual, deferral, and allocation procedures whose goal is to relate revenues, expenses, gains, and losses to periods to reflect an entity's performance during a period instead of merely listing its cash receipts and outlays. Thus, recognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities – including matching of costs and revenues, allocation, and amortization – is the essence of using accrual accounting to measure performance of entities. The goal of accrual accounting is to account in the periods in which they occur for the effects on an entity of transactions and other events and circumstances, to the extent that those financial effects are recognizable and measurable. FASCON 6, ¶ 145.

162. Despite all of the foregoing accounting guidance, however, including the Company's professed support of those principles, defendants still caused the Company to misstate revenues and certain reimbursable costs in its financial statements, in violation of GAAP and other accounting rules, for the three-month periods ended December 31, 2007, March 31, 2008, and June 30, 2008. The Company's restatement indicated that the originally-filed financial statements in question included errors related to various revenue and cost-related components. The accounting for such items is governed by the matching principle and revenue recognition principles discussed above, the tenets of which were violated by Integral in its Class Period filings and related disclosures. Therefore, notwithstanding the most basic tenets of accrual accounting – as outlined in FASCON 6 – and in violation of other basic revenue recognition principles (*e.g.*, FASCON 5, SAB 101, EITF 00-21, SOP 81-1 and SOP 97-2), defendants caused the Company to accelerate revenue into earlier periods on the GPS-OCX contract, contracts with reimbursable costs including the RAIDRS contract and another, smaller

commerical contract, on off-the-shelf product sales, and in connection with warranty provisions on certain contracts.

163.   In an investor call held on February 4, 2008, Defendant Bambarger explained that revenue for its Government Ground Systems segment included $2.4 million of license revenue associated with the GPS OCX contract.   He additionally stated that, despite having originally planned to record the revenue from the delivery of licenses associated with this contract throughout the entire fiscal year, the Company elected to record such revenue (and profit) in 1Q'08.   Such accounting, however, was in violation of the principles and standards excerpted and discussed above, including FASCON 5, SOP 81-1, and SAB 101.

164.   Defendants caused the recording of the GPS OCX revenue to deviate not just from the accounting standards themselves but from affirmative statements set forth in the Company's financial statements regarding its purported adherence with those standards, specifically SOP 81-1.   In violation of those standards, defendants caused the Company to improperly recognize $2.4 million of revenue in 1Q'08, whereas the majority of that revenue should have been deferred to subsequent periods, during which time related modifications to the software and/or related services were to be performed and appropriately factored into measurement of overall progress towards completion of the project.

165.   Notwithstanding contract negotiations that resulted in the "upfront" delivery of certain licenses under the contract, the ongoing obligations of the Company with respect to those licenses, the related or underlying software, and required modifications thereto did not change and had not been disposed of by the Company at the time the licenses were initially delivered. As such, the Company was subject to the foregoing accounting guidance, despite defendants'

decision to improperly record the subject revenue entirely in 1Q'08.  Specifically, measurements of progress under SOP 81-1, as well as those principles set forth in, at a minimum, FASCON 5 and SAB 101, had not been satisfied by the end of 1Q'08.  The Restatement reversed the recording of that revenue and profit, instead allocating it across the remaining periods of fiscal 2008 – and beyond – as called for by GAAP and the SEC rules.  In the February 12, 2009 letter to the SEC, Defendant Bambarger admitted that $1.3 million in revenue was deferred from the Restatement Period into later periods.

166.  In 2Q'08, as described by Defendant Bambarger on the December 11, 2008 investor call, an additional restatement item concerned deposits that had been made by the Company for equipment to be used in connection with the RAIDRS contract.  In connection with that contract, the Company included in its financial statements the costs of purchasing such equipment and the reimbursements it received on such costs, despite both (a) the equipment not having been delivered and (b) the equipment not having been installed.  As indicated by the accounting principles set forth above, and ultimately admitted by Defendant Bambarger in the Feburary 12, 2009 letter to the SEC, the accounting rules, *e.g.*, SOP 81-1, ¶ 50, require deferral of the inclusion of such costs in measurements of progress on long-term projects until such time as the equipment has been employed in efforts towards completion.  By failing to do so, the Company violated GAAP and the SEC rules relating to expense and revenue recognition, contributing to the need to restate its financial statements.  As ultimately admitted in the Form 10-Q filed on May 6, 2009, such pass-through equipment purchase revenue was improperly recognized, in the total amount of $7.0 million in 2Q'08 and 3Q'08, on both the RAIDRS contract and a smaller commercial contract.

167.    As explained in the December 11, 2008 conference call, the Company offered warranties on certain of its contracts and products in 30-, 90-, or 360-day arrangements. Contract revenue associated with warranties purchased by customers was, and would be, subject to the same accrual accounting, matching and revenue recognition principles discussed above. Defendants, however, caused the Company to improperly account for such revenue, in violation of FASCON 5, EITF 00-21 and SAB 101, by recognizing revenues in advance of the periods during which such revenue was earned (or would have been earned) by not waiting until the warranty obligations had been fully performed and discarded.  In that warranty services were specifically identifiable and expected to be performed as *post*-contract services, recognition of warranty revenue prior to the warranty period(s) was in violation of GAAP and SEC rules.  In the February 12, 2009 letter to the SEC, Defendant Bambarger admitted that Integral was forced to defer a $1.9 million (net) of warranty revenue from the Restatement period into subsequent periods.

168.    As Integral's new revenue recognition policy (set forth in the 2008 Form 10-K) indicated, Integral was required to segregate post-contract warranty services from the base contract because it was able to assign an objective evidence of the fair value to those services. However, Integral's Class Period policy demonstrated that defendants understood the applicable principles at the time, as it expressly recognized that when such services were provided under a separate maintenance contract, revenue was to be recognized on a straight-line basis *pro rata* over the term of the maintenance contract.

169.    Defendants vaguely acknowledged during the December 11, 2008 conference call and in the Restatement that Integral had prematurely recognized revenue on product sales "that

do not involve significant customization, modification, or production." In the February 12, 2009 letter to the SEC, Defendant Bambarger explained that this reference was to off-the-shelf software sales by RT Logic and SAT Corporation which should have been accounted for pursuant to SOP 97-2, as set forth in the Company's revenue policy. Instead, percentage-of-completion accounting under SOP 81-1 was applied, which resulted in premature revenue recognition in the amount of $296,000. In the Form 10-Q filed on May 6, 2009, defendants admitted that the revenues were originally recognized in all three restated quarters.

170. As a publicly traded company, Integral was required, during the relevant timeframe, to maintain books and records in sufficient detail to reflect the transactions of the Company and, therefore, to prepare financial statements in accordance with GAAP. Specifically, the Exchange Act requires public companies to:

(A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

   i.    transactions are executed in accordance with management's general or specific authorization;

   ii.    transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and

   iii.    to maintain accountability for assets;

   iv.    access to assets is permitted only in accordance with management's general or specific authorization; and

     v.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

The accounting misstatements that necessitated the restatement of prior period financial information demonstrate the Company's inability to have maintained books and records in a manner required of it by the foregoing.

171. In addition, defendants knowingly and/or recklessly concealed the fact that Integral's internal control systems were seriously deficient and that Integral's accounting personnel were not trained to apply the basic accounting principles necessary to record Integral's revenue consistently with the Company's accounting policies and/or GAAP.

172. Integral's Class Period financial statements and other publicly issued statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP; nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

~~33.     The fact that Integral Systems expects to restate its financial statements, and informed investors that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No.20, 7-13; SFAS No. 154, 25).~~

173. Given these accounting irregularities, the Company's ~~announced~~ publicly-reported financial results were in violation of GAAP and the following principles:

     (a)    ~~The principle that "interim financial reporting should be based upon the same accounting principles and practices~~

~~used to prepare annual financial statements" was violated~~

~~(APB No. 28, 10);~~

(a)     The principle that "financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions" ~~was violated~~ (~~FASB Statement of Concepts No. 1, 34~~ FASCON 1, ¶ 34);

(b)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources" ~~was violated~~ (~~FASB Statement of Concepts No. 1, 40~~ FASCON 1 ¶ 40);

(c)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" ~~was violated~~ (~~FASB Statement of Concepts No.1, 42~~ FASCON 1 ¶ 42);

(d)     The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" ~~was violated~~ (~~FASB Statement of Concepts No. 1, 50~~ FASCON 1 ¶ 50);

(e)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" ~~was violated~~ and because that information should be reliable as well as relevant is a notion that is central

to accounting (~~FASB Statement of Concepts No. 2, 58 50~~ <u>FASCON 2 ¶¶ 58-59</u>);

(f)    ~~The principle that~~ <u>The assertion of</u> "completeness~~,~~ <u>–</u> meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" ~~was violated~~ (~~FASB Statement of Concepts No. 2, 79~~ <u>FASCON 2 ¶ 79</u>); ~~and~~

(g)    <u>The principle that financial reporting should be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASCON 2 ¶ 81); and</u>

(h)    ~~The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, 95).~~

(h)    <u>The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, 10).</u>

174.    The <u>undisclosed</u> adverse information concealed by defendants during the Class Period, ~~and detailed above~~ <u>as set forth in this Complaint, is the type of information which, because of SEC regulations, regulations of the national stock exchanges, and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is</u>

expected to be and must be disclosed.  Defendants' failure to disclose adverse information during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law.  17 C.F.R. §229.303.

175.  By failing to file financial statements with the SEC that conformed to GAAP (and the rules and regulations of the SEC), defendants repeatedly disseminated financial statements that are "presumed to be misleading or inaccurate."

## VIII.  LOSS CAUSATION

45. ~~Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.~~

46. ~~During the Class Period, Plaintiff and the Class purchased Integral Systems' securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.~~

176.  The market for Integral securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Integral securities traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and other members of the Class purchased or otherwise acquired Integral securities relying upon the integrity of the market price of Integral securities and market information relating to Integral, and have been damaged thereby.

177.  During the Class Period, defendants materially misled the investing public, thereby inflating the price of Integral securities, by publicly issuing false and misleading

statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

178.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Integral's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Integral and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

179.    On December 11, 2008, Integral revealed that the unaudited financial statements of the Company for the interim periods ended December 31, 2007, March 31, 2008, and June 30, 2008 should no longer be relied upon due to an error in the accounting treatment for certain transactions with respect to the timing of the recognition of revenue. The Company further disclosed that, as a result, the Company would restate its previously filed financial statements for those interim quarterly periods in fiscal year 2008. The Company estimated that the net impact of the adjustments for the first three quarters of 2008 would result in a decrease of approximately

$10 million in revenues, a decrease of approximately $3 million in gross profit, a decrease of approximately $4 million in operating income, and a decrease of approximately $0.13 in earnings per share.

180.    On this news, shares of Integral declined $6.38 per share, or 28.61%, to close on December 11, 2008, at $15.92 per share, on unusually heavy volume.

181.    The timing and magnitude of Integral's stock price decline negates any inference that the loss suffered by Lead Plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.* damages, suffered by Lead Plaintiffs and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Integral's stock price and the subsequent significant decline in Integral's share price when the full truth was gradually revealed to the market.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

182.  As alleged herein, defendants acted with scienter ~~in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws~~.  Defendants each and in concert knowingly and/or recklessly engaged in acts, practices and a scheme and course of business that artificially inflated Integral's stock price beginning at least in February, 2008, and continuing during the Class Period.  Defendants also knew and/or recklessly disregarded that the public documents and

statements they personally made or issued or disseminated in the name of the Company were materially false and misleading; knew and/or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and/or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their acts, practices, and course of business, including receipt of information reflecting the true facts regarding Integral ~~Systems~~, ~~his/her~~ their control over, and/or receipt, and/or modification of Integral's ~~Systems' allegedly~~ materially misleading misstatements and/or their associations with the Company ~~which~~ that made them privy to confidential proprietary information concerning Integral ~~Systems~~, participated in the fraudulent scheme alleged herein, the principal purpose and effect of which was to create the false appearance of revenue and profitability intending to deceive investors and the market.

183. Defendants knowingly and/or with deliberate recklessness prematurely recorded revenue in Integral's reported financial results in 1Q'08, 2Q'08 and 3Q'08 and falsely reported related information to investors and the public. Defendants also knew and/or with deliberate recklessness disregarded that their public claims of Integral's strict GAAP adherence were blatantly false because of the prematurely recorded millions of dollars in contract, equipment, product and warranty revenue. Defendants knew that their actions violated GAAP, but also knowingly and/or with deliberate recklessness reported this prematurely recorded revenue with no justification other than to boost improperly the Company's reported financial performance and condition for their own personal benefit.

184.  With respect to the GPS OCX contract, Defendant Bambarger indicated in the February 4, 2008 conference call that Integral had originally planned on recognizing the contract revenue over the entire fiscal year 2008.  However, the Company changed course and recognized all the revenue from the contract in the first quarter, purportedly because the contract "included upfront delivery of the licenses."  Nonetheless, in the December 11, 2008 conference call, the Restatement, and the February 12, 2009 letter to the SEC, the Company admitted that the revenue should have been recognized over the course of fiscal year 2008 (and into fiscal 2009) and that recognizing all the revenue from that contract in the 1Q'08 was improper.  Defendants' statements that the Company had initially planned to properly recognize the revenue over the course of the contract's performance (in April 2008, acknowledging this would include fiscal 2009) demonstrate knowing and/or deliberately reckless conduct in prematurely recognizing revenue.

185.  Additionally, Integral had been specifically warned that its Class Period revenue recognition over quarters was not correct, as was made clear during the December 11, 2008 conference call.  At that time, a caller revealed that, during an earlier shareholder meeting, these very concerns had been raised and that management had assured shareholders that everything was being done correctly.  The caller also indicated that Gary Prince, the former executive vice president and managing director of operations, who had worked at the Company for 25 years and handled such accounting matters prior to his departure in 2007, had attempted to alert the Company to the accounting problems earlier, but that the Company "was not listening to him." Bambarger defended the Company's decision to recognize the GPS OCX license revenue in 1Q'08, claiming that Integral restated in a "conservative" move – improperly suggesting that

GAAP permitted Integral to choose in which quarter it would recognize the revenues – to avoid a recurrence of prior management's troubles with the SEC.  (Indeed, the Company had such a poor history that Bambarger further indicated that when he and Higginbotham joined Integral, the Company "couldn't procure the services of a Big Four accounting firm.")

186.  In addition, defendants knowingly and/or with deliberate recklessness concealed the fact that Integral's internal control systems were seriously deficient and that Integral's accounting personnel were not trained to process basic accounting to record Integral's revenues from contracts, equipment, product sales and warranties.  This occurred despite Defendant Baldwin's assertions that he had "a very strong background in accounting and in the public disclosure that's required in running a public company" and that the Company had made a number of senior level hires in the accounting department.  Moreover, defendants knowingly and/or with deliberate recklessness falsely certified the Company's internal controls and financial reporting in violation of Sarbanes-Oxley.

187.  Furthermore, as described below, defendants had the motive to commit the fraud as they enjoyed rich compensation packages, which depended in large part upon the Company's financial performance and its stock price.  On December 5, 2007, the Company's Board of Directors adopted the 2008 Stock Incentive Plan.  Under that plan, the Individual Defendants were eligible for bonuses tied to the Company's financial performance of up to 900,000 shares of Integral stock.  They also received numerous options on Integral stock pursuant to their employment contracts, and as the Company's stock price increased, so did the value of the options granted to the defendants.  Their options also were subject to vesting schedules that stretched for up to four years after the grant dates, which created the need for defendants to

artificially boost the Company's stock price above the exercise price so that defendants' options could vest and be sold.

**A.   Defendant Baldwin**

188.   During the Class Period, Defendant Baldwin knowingly and/or with deliberate recklessness approved and participated in acts and practices that created a false impression of record growth and adequate internal controls.

189.   As Chairman and CEO of the Company, Baldwin personally signed Integral's periodic reports filed on Form 10-Q on February 7, 2008 and May 7, 2008, which he knew, or with deliberate recklessness disregarded, were false and misleading and omitted material information that was necessary under the circumstances to avoid making statements that were misleading.  He also certified the Company's financial results and sound internal controls in each of these quarterly reports.  Baldwin also knowingly and/or with deliberate recklessness gave materially false and misleading reports regarding the Company's financial results and condition in press releases and in conference calls with analysts and investors.  This occurred despite Baldwin's assertions that he had "a very strong background in accounting and in the public disclosure that's required in running a public company."  Baldwin had a duty to speak truthfully on the calls and correct any false or misleading information provided to analysts, investors and the public, and he knowingly and/or with deliberate recklessness breached this duty.

190.   As CEO and a member of Integral's Board, Baldwin was responsible for ensuring that the Company properly reported its financial statements and the true nature of the Company's internal controls.  As a Director, Baldwin had a duty of oversight that required him to implement reporting or information systems or controls and review information related Integral's operations

to be informed of risks.  For the reasons stated herein, he breached this duty, either knowingly or with deliberate recklessness.  During the Class Period, Baldwin failed to establish reporting and information systems, failed to review information he was required to review, and/or failed to monitor or oversee employees.  In fact, Baldwin certified in writing in the quarterly reports issued on February 7, 2008, and May 7, 2008, that he was the officer responsible for establishing and maintaining disclosure controls and procedures.  The controls and procedures were clearly ineffective as they did not timely discover the events which led to the Restatement.

191.    Baldwin's motive to commit fraud included his ability to profit from sales of Integral stock at artificially-inflated prices.  Baldwin enjoyed a rich compensation package, which depended in large part on the Company's stock price, and of course, the continuing viability of the Company.

192.    Baldwin initially joined Integral's Board of Directors on December 6, 2006.  At that time, he was awarded a grant of options to purchase 5,000 shares of stock. Those options vested immediately.

193.    On May 30, 2007, Baldwin was appointed interim CEO of Integral, at which time he was awarded an additional grant of options to purchase 50,000 shares of stock.  Those options vested on July 30, 2007; August 1, 2007; September 1, 2007; October 1, 2007; and November 1, 2007.

194.    Throughout the Class Period, Baldwin was also eligible for bonuses of up to 900,000 stock options under the 2008 Stock Incentive Plan.

195.    On July 9, 2008, Baldwin's employment agreement with Integral was amended when he stepped down as CEO.  At that point, the Company agreed to grant Baldwin options to

purchase an additional 120,000 shares (adjusted from 60,000 to reflect the Company's subsequent two-for-one stock split, which was effective on August 25, 2008) of Integral stock within thirty days of the amendment to his employment agreement. These additional 120,000 options will vest in three blocks of 40,000 shares, in July 2009, July 2010, and July 2011.

196.    During the Class Period, Baldwin unloaded as many Integral shares as he could. Exercising all of his then-exercisable options to do so, in early August, 2008, Baldwin acquired 55,000 shares of Integral stock. On August 4, 2008, Baldwin sold 29,235 for gross proceeds $1,386,908. On August 5, 2008, he sold his remaining 25,765 shares for gross proceeds of $1,233,885. These sales are highly probative of scienter as they represent the only times that Baldwin has sold Integral stock, they accounted for 100% of Baldwin's Integral stock, and they occurred a mere six weeks before Integral replaced its outside auditors.

### B.    Defendant Higginbotham

197.    During the Class Period, Defendant Higginbotham knowingly and/or with deliberate recklessness approved and participated in acts and practices that created a false impression of record growth and adequate internal controls.

198.    As Chairman and CEO of the Company, Higginbotham personally signed Integral's periodic report filed on Form 10-Q on August 7, 2008, which he knew and/or with deliberate recklessness disregarded was false and misleading and omitted material information that was necessary under the circumstances to avoid making statements that were misleading. He also certified the Company's financial results and sound internal controls in that quarterly report. Higginbotham also knowingly and/or with deliberate recklessness gave materially false and misleading reports regarding the Company's financial results and condition in conference

calls with analysts and investors and in press releases. Higginbotham had a duty to speak truthfully on the calls and correct any false or misleading information provided to analysts, investors and the public, and he knowingly or with deliberate recklessness breached this duty.

199. As CEO and a member of Integral's Board, Higginbotham was responsible for ensuring that Integral properly reported its financial statements and the true nature of the Company's internal controls. As a Director, Higginbotham had a duty of oversight that required him to implement reporting or information systems or controls and review information related to Integral's operations to be informed of risks and he breached this duty, either knowingly or with deliberate recklessness. During the Class Period, Higginbotham failed to establish reporting and information systems, failed to review information that he was required to review, and/or failed to monitor or oversee employees. In fact, Higginbotham certified in writing in the quarterly report issued on August 7, 2008, that he was the officer responsible for establishing and maintaining disclosure controls and procedures. The controls and procedures were clearly ineffective as they did not timely discover the events which led to the Restatement.

200. Higginbotham's motive to commit fraud included his ability to profit from sales of Integral stock at artificially-inflated prices. Higginbotham enjoyed a rich compensation package, which depended in large part on the Company's stock price, and of course, the continuing viability of the Company. Higginbotham's initial employment contract with the Company when he began employment on July 9, 2008, specified that, within thirty days of his start date, he would be granted options to purchase 275,000 shares of the Company's common stock. These shares were in fact granted on July 29, 2008, and were scheduled to vest on July

29, 2011. He was also eligible for an additional annual grant, with a target award of at least 50,000 shares.

201.    Throughout the Class Period, Higginbotham was also eligible for bonuses of up to 900,000 stock options under the 2008 Stock Incentive Plan. On August 6, 2008, after only one month on the job, the Compensation Committee of the Board of Directors approved a grant of 50,000 options to Higginbotham pursuant to the 2008 Stock Incentive Plan. These shares were scheduled to vest on August 6, 2011.

**C.    Defendant Bambarger**

202.    During the Class Period, Defendant Bambarger knowingly and/or with deliberate recklessness approved and participated in acts and practices that created a false impression of record growth and adequate internal controls.

203.    As CFO of the Company, Bambarger personally signed all of Integral's financial reports issued during the Class Period, which he knew and/or with deliberate recklessness disregarded were false and misleading and omitted material information that was necessary under the circumstances to avoid making statements that were misleading. He also certified the Company's financial results and sound internal controls in each of these financial statements. Throughout the Class Period, Bambarger also signed the Company's Form 8-Ks, that attached the Company's false and misleading quarterly and year-end revenue and earnings releases, which Bambarger knew and/or recklessly disregarded were false when he signed the Form 8-Ks and caused them to be publicly filed. Bambarger also knowingly and/or recklessly personally gave materially false and misleading reports regarding the Company's financial results and condition for each period in the Class Period in conference calls with analysts and investors and in press

releases. Bambarger had a duty to speak truthfully on the calls and correct any false or misleading information provided to analysts, investors and the public, and he knowingly and/or with deliberate recklessness breached this duty.

204.    As Integral's CFO, Bambarger was responsible for ensuring that Integral properly reported its financial statements and the true nature of the Company's internal controls. In fact, Bambarger certified in writing in each of the financial reports issued during the Class Period that he was the officer responsible for establishing and maintaining disclosure controls and procedures. The controls and procedures were clearly ineffective as they did not prevent the events which led to the Restatement. Bambarger also certified in writing in each of these financial reports filed with the SEC that he had reviewed the financial statements and that they fairly presented in all material respects the financial condition, results of operations, and cash flows of Integral and that they were free of material misstatements and omissions. The Restatement was an admission that these statements were not true at the time they were made.

205.    Bambarger's motive to commit fraud included his ability to profit from sales of the Integral stock at artificially-inflated prices. Bambarger enjoyed a rich compensation package, which depended in large part on the Company's stock price, and of course, the continuing viability of the Company. As part of Bambarger's initial employment contract, he was granted options to purchase 25,000 shares of Integral stock on September 25, 2007. These shares were scheduled to vest on September 25, 2008.

206.    Throughout the Class Period, Bambarger was also eligible for bonuses of up to 900,000 stock options under the 2008 Stock Incentive Plan.

    **D.    Defendant Lee-Gallagher**

207.    During the Class Period, Defendant Lee-Gallagher knowingly and/or with deliberate recklessness approved and participated in acts and practices that created a false impression of record growth and adequate internal controls.

208.    As Controller of the Company, Lee-Gallagher personally signed Integral's quarterly reports filed during the Class Period, which Lee-Gallagher knew and/or with deliberate recklessness disregarded were false and misleading and omitted material information that was necessary under the circumstances to avoid making statements that were misleading.

209.    As Controller for Integral, Lee-Gallagher was responsible for ensuring that Integral properly accounted for the Company's revenues.  In fact, Lee-Gallagher signed each of the quarterly reports filed by Integral during the Class Period.

210.    Lee-Gallagher's motive to commit fraud included her ability to profit from sales of Integral stock at artificially-inflated prices.  Lee-Gallagher enjoyed a rich compensation package, which depended in large part on the Company's stock price, and of course, the continuing viability of the Company.  Throughout the Class Period, Lee-Gallagher was eligible for bonuses of up to 900,000 stock options under the 2008 Stock Incentive Plan.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

48.    The market for Integral Systems' securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Integral Systems' securities traded at artificially inflated prices during the Class Period. On August 14, 2008 the price of the Company's common stock reached a Class Period high of $26.35 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Integral

~~Systems' securities and market information relating to Integral Systems, and have been damaged thereby.~~

~~49.    During the Class Period, the artificial inflation of Integral Systems' stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Integral Systems' business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Integral Systems and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.~~

211.  At all relevant times, the market for Integral ~~Systems' securities~~ <u>common stock</u> was an efficient market for the following reasons, among others:

      (a)     Integral ~~Systems~~ stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

      (b)     As a regulated issuer, Integral ~~Systems~~ filed periodic public reports with the SEC and the NASDAQ;

      (c)     Integral ~~Systems~~ regularly communicated with public investors via established market communication mechanisms, including through regular

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Integral ~~Systems~~ was followed by several securities analysts employed by major brokerage firms who wrote reports ~~about the Company, and these reports~~ which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

212. As a result of the foregoing, the market for Integral ~~Systems' securities~~ common stock promptly digested current information regarding Integral ~~Systems~~ from all publicly-available sources and reflected such information in Integral's ~~Systems'~~ stock price. Under these circumstances, investors who acquired Integral's ~~Systems' securities~~ common stock during the Class Period ~~suffered similar injury through their purchase of Integral Systems' securities at artificially inflated prices and a presumption of reliance applies~~ presumptively relied upon defendants' misrepresentations and omissions when they acquired such stock at prices which were inflated thereby.

## XI.     NO SAFE HARBOR

~~52.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be~~

~~characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Integral Systems who knew that the statement was false when made.~~

213. <u>The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. Financial statements filed with the SEC and prepared in accordance with GAAP are statutorily excluded from any safe harbor protections. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Integral who knew that those statements were false when made.</u>

## XII.    LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

214.  Lead Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Integral Systems' securities common stock during the Class Period, between April 28, 2008 February 4, 2008, and December 10, 2008, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

215.  The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Integral Systems' securities common stock were was actively traded on the National Association of Securities Dealers Automated Quotations Market ("NASDAQ").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Integral Systems shares were traded publicly during the Class Period on the NASDAQ and has more than 17 million of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Integral or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

216.  Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

217. <u>Lead</u> Plaintiff<u>s</u> will fairly and adequately protect the interests of the members of the Class and ~~has~~ <u>have</u> retained counsel competent and experienced in class and securities litigation.

218. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period ~~omitted and/or~~ misrepresented material facts about the business, operations and ~~prospects~~ <u>management</u> of Integral ~~Systems~~; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

219. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### XIII.   FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### <u>Promulgated Thereunder Against All Defendants</u>

220. <u>Lead</u> Plaintiff<u>s</u> repeat~~s~~ and realleg~~es~~ each and every allegation contained above as if fully set forth herein.

221. As senior officers of the Company during the Class Period, the Individual Defendants are liable as direct participants of the wrongs complained of herein. Through their positions of control and authority, the Individual Defendants had the ability to, and did, control all of the Company's false and misleading statements and omissions, including the content of all of its public filings, statements, reports, and press releases, as set forth in detail, above. In addition, certain of the false and misleading statements constitute "group published information," which the defendants were responsible for creating.

222. As set forth above, defendants knew of the material misrepresentations and/or omissions set forth herein, or acted with deliberately reckless disregard of their truth in that they failed to check information that they had a duty to monitor, even though such information was available to them. Defendants' material misrepresentations and/or omissions were made knowingly and/or with deliberate recklessness to conceal Integral's true financial and operating condition from the investing public and to support the artificially-inflated price of Integral shares.

223. During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Integral Systems' securities common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

224. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ~~securities~~ common stock in an effort to maintain artificially high market prices for Integral ~~Systems' securities~~ common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

225. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Integral's ~~Systems'~~ financial well-being, business relationships, and prospects, as specified herein.

~~57. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Integral Systems' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Integral Systems and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.~~

226.  Each of the ~~individual~~ defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of ~~their~~ <u>his</u> responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

227.  The Defendants had actual knowledge of the misrepresentations and~~/or~~ omissions of material facts set forth herein, or acted with <u>deliberate</u> reckless disregard for the<u>ir</u> truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or ~~recklessly~~ <u>with deliberate recklessness</u> and for the purpose and effect of concealing Integral<u>'s</u> ~~Systems'~~ financial well-being<u>, business relationships,</u> and prospects from the investing public and supporting the artificially inflated price of its ~~securities~~ <u>common stock</u>.  As demonstrated by defendants' overstatements and~~/or~~ misstatements of the Company's ~~business, operations,~~ financial well-being~~, and prospects~~ throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were <u>deliberately</u> reckless in

failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

228. As a result of the dissemination of the materially false and/~~or~~ misleading information and/~~or~~ failure to disclose material facts, as set forth above, the market price of Integral common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Integral ~~Systems' securities~~ common stock ~~was~~ were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the ~~securities~~ common stock trades, and/or in the absence of material adverse information that was known to or was ~~recklessly~~ disregarded with deliberate recklessness by defendants, ~~but~~ and not disclosed in public statements ~~by Defendants during the Class Period~~, Lead Plaintiffs and other members of the Class acquired Integral ~~Systems' securities~~ common stock during the Class Period at artificially high prices and were damaged thereby when the true facts were later revealed and/or the risks posed by defendants' fraud materialized.

229. At the time of said misrepresentations and/~~or~~ omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Integral ~~Systems~~ was experiencing, which were not disclosed by defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Integral ~~Systems securities~~ common stock, or, if they had acquired such ~~securities~~ common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

230.  By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

231.  As a direct and proximate result of defendants' wrongful conduct, <u>Lead</u> Plaintiff<u>s</u> and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ~~securities~~ <u>common stock</u> during the Class Period.

### XIV.   SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### <u>Against the Individual Defendants</u>

232.  <u>Lead</u> Plaintiff<u>s</u> repeat~~s~~ and realleges each and every allegation contained above as if fully set forth herein.

233.  The Individual Defendants acted as controlling persons of Integral ~~Systems~~ within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading.

234.  The Individual Defendants were provided with, or had ~~unlimited~~ <u>unfettered</u> access to copies of the Company's reports, press releases, public filings, and other statements alleged by <u>Lead</u> Plaintiff<u>s</u> to be misleading prior to and/or <u>shortly</u> after these statements were issued and had the ability <u>and the duty</u> to prevent the issuance of ~~the~~ <u>material mis</u>statements <u>and/or</u> <u>omissions</u> or cause the <u>mis</u>statements <u>and omissions</u> to be corrected.

235. In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

236. As set forth above, ~~Integral Systems and~~ the Individual Defendants <u>and the Company</u> each violated Section 10(b) and Rule 10b-5 by their acts and ~~/or~~ omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the ~~Individual~~ defendants are liable pursuant to Section 20(a) of the Exchange Act.

237.  As a direct and proximate result of defendants' wrongful conduct, <u>Lead</u> Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's ~~securities~~ <u>common stock</u> during the Class Period.

### XV.    THIRD CLAIM
#### Violation of Section 20A of The Exchange Act
#### Against Defendant Baldwin

238.  <u>Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.</u>

239.  <u>This claim is brought pursuant to Section 20A of the Exchange Act on behalf of Class members who purchased Integral stock contemporaneously with sales by Defendant Baldwin, who sold, at least, 55,000 shares of his Integral stock during the Class Period for proceeds of, at a minimum, $2,620,793.</u>

240.  <u>As heretofore alleged, Defendant Baldwin sold Integral common stock on the open market while in the possession of the material, adverse non-public information set forth above. This conduct violated Section 20A of the Exchange Act.</u>

241.  Defendant Baldwin, while in the possession of the material, adverse non-public information set forth above, sold Integral common stock while Class members, including Lead Plaintiffs, contemporaneously purchased Integral common stock of the same class sold by Defendant Baldwin.

242.  Specifically, Lead Plaintiffs' purchases during the Class Period were as follows:

| | **Transaction** | **Date** | **Quantity** | **Price** |
|---|---|---|---|---|
| Anthony Vidmar | Purchase | 8/21/2008 | 100 | $22.50 |
| Charles E. Varnell, Jr. and Nettie J. Varnell | Purchase | 8/6/2008 | 10 | $50.00 |
| | Purchase | 8/15/2008 | 10 | $53.00 |
| | Purchase | 8/19/2008 | 10 | $50.25 |
| | Purchase | 9/22/2008 | 50 | $20.05 |
| Robert J. Ulrich | Purchase | 5/7/2008 | 280 | $35.78 |
| | Purchase | 8/27/2008 | 250 | $44.09 |
| | Purchase | 10/28/2008 | 285 | $21.48 |
| | Purchase | 11/5/2008 | 250 | $22.24 |
| | Purchase | 12/3/2008 | 290 | $21.88 |
| Mauro DiBacco | Purchase | 12/1/2008 | 233 | $23.79 |

243.  Lead Plaintiffs Charles E. Varnell, Jr. and Nettie J. Varnell puchased 10 shares of Integral stock on August 6, 2008, within one and two days from when Baldwin sold 29,235 shares on August 5, 2008, and 25,765 shares on August 4, 2008, respectively.  Defendant Baldwin's sales and Lead Plaintiffs Charles E. Varnell, Jr. and Nettie J. Varnell's purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

244.  Numerous other Class members also purchased Integral common stock contemporaneously with Defendant Baldwin's sale of stock during the Class Period based upon material, adverse nonpublic information.

245. By virtue of the conduct alleged above, Defendant Baldwin has violated Section 20A of the Exchange Act and is liable to the Class for the substantial damages that they suffered.

246. Accordingly, under Section 20A of the Exchange Act, Defendant Baldwin is liable to Lead Plaintiffs and the Class for all profits gained and losses avoided by Defendant Baldwin as a result of his stock sales.

247. Defendant Baldwin is required to account for all such stock sales and to disgorge his profits or ill-gotten gains.

## XVI.   **PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs prays for relief and judgment, as follows:

(i)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(ii)    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(iii)   Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(iv)    Such other and further relief as the Court may deem just and proper.

## XVII.  **JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demands a trial by jury.

Dated:  September 23, 2009                    Respectfully submitted,


**COHEN MILSTEIN SELLERS & TOLL PLLC**
By: /s/ ANDREW N. FRIEDMAN
ANDREW N. FRIEDMAN (Bar No. 14421)
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Telephone:     (202) 408-4600
Facsimile:     (202) 408-4699

**GLANCY BINKOW & GOLDBERG LLP**
LIONEL Z.GLANCY (*pro hac vice*)
MICHAEL GOLDBERG (*pro hac vice*)
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:     (310) 201-9150
Facsimile:     (310) 201-9160

*Co-Lead Counsel for the Putative Class*

**LAW OFFICES OF HOWARD G. SMITH**
HOWARD G. SMITH
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone:     (215) 638-4847
Facsimile:     (215) 638-4867
*Attorney for Plaintiff*