**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

|  |  |
|---|---|
| In Re Integral Systems, Inc.<br>Securities Litigation | Civil Action No. 8:08-cv-03387 (RWT) |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

John C. Millian (Bar No. 06459)
Michael D. Billok (Bar No. 16952)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500 (main phone)
(202) 530-9566 (Millian direct fax)
(202) 530-9534 (Billok direct fax)
jmillian@gibsondunn.com
mbillok@gibsondunn.com

*Attorneys for Defendants*

*Of Counsel for Defendants:*
Daniel A. Cantu
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500  (main)
(202) 530-9661  (Cantu direct fax)
dcantu@gibsondunn.com

Dated:  October 26, 2009

# TABLE OF CONTENTS

Page

INDEX TO APPENDIX OF EXHIBITS.................................................................iii

I.      INTRODUCTION ....................................................................................1

II.     BACKGROUND .......................................................................................3

      A.     The Parties .......................................................................................3

      B.     The Key Events During the Relevant Time Period ................................4

            1.     End of Fiscal Year 2007 ...........................................................4

            2.     First Quarter of Fiscal Year 2008 ...............................................5

            3.     Second Quarter of Fiscal Year 2008 ..........................................6

            4.     Third Quarter of Fiscal Year 2008 .............................................7

            5.     The Restatement.......................................................................8

            6.     The Litigation .........................................................................10

      C.     The Accounting Errors in the Restatement ..........................................11

            1.     Timing of Revenue Recognition on the Sale of Software Licenses
                 Under the GPS OCX Contract ..................................................12

            2.     Timing of Revenue Recognition on an Antenna Sale Under the
                 RAIDRS Contract ..................................................................13

            3.     Timing of Revenue Recognition on Post-Contract Services
                 Included in Multiple Element Contracts .....................................15

            4.     Contracts Without Significant Customization ............................15

III.ARGUMENT ...............................................................................................16

      A.     All of Plaintiffs' Claims Fail Unless the Complaint Adequately
          Alleges *Scienter* In Support of Plaintiffs' Securities Fraud Claim ..............17

      B.     To Survive a Motion to Dismiss, the Complaint Must Plead As to Each
          Defendant Specific Facts Sufficient to Support a "Strong Inference Of
         Scienter," That Is, an Inference Both "Cogent" and "At Least as Compelling
         as Any Opposing Inference" That Could Be Drawn from the Facts Alleged........18

B.   None of Plaintiffs' Allegations Raise *Any* Inference of Scienter .........................21

1.   The Job Descriptions of the Individual Defendants Fail to Establish Scienter ...................................................................................................21

2.   Allegations of Internal Control Weaknesses and the Failure to Follow GAAP—Inherent to Restatements—Do Not Create a Strong Inference of Scienter .....................................................................22

3.   The Issuance of Stock Options, and Allegations of Stock Sales by the Defendant Least Familiar with the Accounting Issues, Fail to Raise an Inference of Scienter .................................................................25

4.   Conclusory Statements That Accounting Errors Were "Evident," Without Allegations Concerning Defendants' Knowledge of the Underlying Transactions, Are Insufficient to Establish Scienter..............29

C.   Taking the Allegations of the Complaint as a Whole, an Inference of Fraud or Recklessness Is Far Less Cogent Than an Inference That the Accounting Errors Were Mere Mistakes. .............................................32

IV.   CONCLUSION.....................................................................................................36

## INDEX TO APPENDIX OF EXHIBITS

<u>Date</u>               <u>Description (¶ where first cited in Complaint)</u>                                <u>Exhibit</u>

### *SEC Filings and Earnings Releases*

12/12/07        SEC Form 10-K for fiscal year 2007 (ended 9/3007) [judical notice]................. A

2/7/08          SEC Form 10-Q for the 1st Q FY2008 (ended 12/31/07) (¶ 50) ........................ B

4/28/08         Transcript of 2nd Q FY2008 earnings call held 4/28/08 (¶ 73)........................... C

5/7/08          SEC Form 10-Q for the 2nd Q FY2008 (ended 3/3108) (¶ 79) ........................ D

8/7/08          SEC Form 10-Q for the 3rd Q FY2008 (ended 7/31/08) (¶ 100)........................ E

12/11/08        Transcript of 4th Q FY2008 earnings call held 12/11/08 (¶ 4)............................ F

12/24/08        SEC Form 10-K for fiscal year 2008 (ended 9/30/08) (¶ 5) ............................... G

2/9/09          SEC Form 10-Q for the 1st Q FY2009 ended 12/31/08 (¶ ___)........................ H

3/20/09         Letter to SEC re: comments on Form 10-K (¶ 5)................................................ I

5/6/09          SEC Form 10-Q for the 2nd Q FY2009 (ended 3/27/09) (¶ 5) ........................... J

### *Form 4 Filings*

9/27/07         Form 4 for William Bambarger (¶ 205) ............................................................ K

7/31/08         Form 4 for Alan Baldwin (¶ 195)...................................................................... L

7/31/08         Form 4 for John Higginbotham (¶ 200) ........................................................... M

7/31/08         Form 4 for William Bambarger [judicial notice] ............................................... N

8/6/08          Form 4 for Alan Baldwin (¶ 196)...................................................................... O

8/8/08          Form 4 for John Higginbotham (¶ 201) ............................................................ P

### *GAAP Literature*

7/15/81         Financial Accounting Standards Board, "Statement of Position 81-1:
                Accounting for Performance of Construction-Type and Certain
                Production-Type Contracts" (¶ 149) ................................................................. Q

10/27/97        Financial Accounting Standards Board, "Statement of Position 97-2:
                Software Revenue Recognition" (¶ 34).................................................................  R

--              Section Co5, "Contractor Accounting:  Government Contracts,"
                from Accounting Research Bulletin 43 [judicial notice] .....................................  S

                ***Stock Prices***

--              Stock price data for Integral Systems, Inc. [judical notice] .................................  T

# I.    INTRODUCTION

In December 2008, Integral Systems, Inc. ("Integral" or the "Company") announced that it would restate its previously-filed unaudited interim financial statements for the first three quarters of that fiscal year based on four accounting errors related to revenue recognition. Two of these errors involved specific transactions that took place in FY2008—antenna equipment purchases, and the sale of software associated with GPS satellites—and the other two errors involved longer-term accounting practices—revenue recognition of post-contract support services, and of software products that did not require significant customization by the Company. The restatement, issued on December 24, 2008, resulted in a deferral of approximately $10 million in revenue from fiscal 2008 into fiscal 2009. Plaintiffs, pleading little more than the fact of the restatement, have charged the Company and several of its key officers with securities fraud under Sections 10(b), 20(a) and 20A of the Securities Exchange Act.

Plaintiffs in securities fraud cases are required to state with particularity facts that give rise to a "strong inference" of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). That inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324.

Notwithstanding the prolixity of the Complaint, plaintiffs fail to meet that high bar here. In essence, they ask the Court to consider the restatement itself, the purported simplicity of the accounting errors in light of the defendants' positions at the Company, the fact that the defendants were eligible for or received stock options, and one defendant's stock sale following resignation as sufficient to infer that the Company and the individual defendants engaged in intentional wrongdoing or at least reckless misconduct.

Contrary to plaintiffs' assertions, the facts alleged imply neither knowledge nor recklessness. *First*, it is settled law that a financial restatement is not an admission that the Company knew of accounting errors at the time they were made: there is no "fraud by hindsight," and conditions inherent to a restatement—errors in GAAP accounting and inadequate internal controls—similarly do not demonstrate that the defendants knew of errors at the time they were made.  *Second*, there can be no inference of scienter based on job description alone; plaintiffs must allege facts concerning the defendants' actual knowledge or reckless behavior.  *Third*, stock sales by only one of four defendants after he resigns is not evidence of scienter—and the issuance of stock options at high exercise prices weighs *against* a finding of scienter.  *Fourth*, a contention that accounting errors should have been evident will fail where the proper accounting treatment is not readily apparent from a simple reading of the rules, and a previous auditor had not discerned at least two of the errors.

In addition to plaintiffs' assertions, the Complaint also shows that rather than conceal the errors in accounting treatment, the Company had contemporaneously *announced* them to investors. Further, Integral had recently hired a new Chief Financial Officer and Controller, and was hiring new accounting staff and transitioning to the services of the Ernst & Young accounting firm. Accounting errors are more likely to occur during a transition.

Because the Company made no attempt to hide its accounting treatment from investors or auditors, the individual defendants had no financial incentive to inflate revenues, the accounting guidelines were difficult to interpret, and the Company's accounting function was in a period of transition, the most cogent and compelling inference from the allegations is that the December restatement reflects simple accounting mistakes, not intentional fraud or recklessness, and the Complaint must be dismissed accordingly.

## II.      BACKGROUND

### A.      The Parties

Plaintiffs are five individual investors who collectively purchased 2,328 shares of Integral stock during the proposed class period.  Plaintiffs assert that they have suffered losses of approximately $22,000 as a result of the actions complained of in the Complaint.  Complaint ¶ 13; Memorandum in Support of Motion of the Ulrich Group for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Co-Lead Counsel, at 5 (Feb. 17, 2009).

Defendant Integral Systems builds satellite ground systems and equipment for satellite missions involving communications, science, meteorology, and earth resource applications.  The Company's products include hardware, software, and service components, "from RF [radio frequency] converters to the software that drives the satellite operator's consoles."  *See* App. Ex. G at 1-2.[1]  Integral's fiscal year runs from October 1 to September 30; the Company's total revenues were $160 million in the FY 2008 (ended September 30, 2008).  *Id.* at 12, 27; Compl. ¶ 14.

---

[1] The Court may properly consider the full contents of documents that plaintiffs rely upon in their Amended Complaint without converting this motion to dismiss into a motion for summary judgment.  *In re E.spire Commc'ns, Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 737 (D. Md. 2001). ("In deciding a motion to dismiss a securities fraud complaint, a court is entitled to rely on public documents quoted by, relied upon, incorporated by reference in, or otherwise integral to the complaint, and such reliance does not convert such a motion into one for summary judgment."). The Court may also properly take notice in ruling on a motion to dismiss of certain other publicly available documents such as SEC disclosures, accounting rules, and stock price data. *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390 n.10 (4th Cir. 2005) ("The percentages are derived from the CAC and documents publicly filed by each Appellee with the SEC, of which this court can take judicial notice."); *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004) ("We note that we, as well as the district court, may take judicial notice of published stock prices without converting a motion to dismiss into a motion for summary judgment."); *In re White Elec. Designs Corp. Sec. Litig.*, 416 F. Supp. 2d 754, 760 (D. Ariz.

[Footnote continued on next page]

Defendant <u>Alan Baldwin</u> was elected to Integral's board of directors on December 6, 2006. Compl. ¶ 192.  Following the departure of the previous Chief Executive Officer ("CEO"), Baldwin was appointed as Integral's interim Chief Executive Officer and President on May 30, 2007, and served in that position until defendant <u>John Higginbotham</u> was hired as permanent CEO (and also became a director) on July 9, 2008.  Compl. ¶ 193.  To ease this executive transition Baldwin continued to serve as President until December 10, 2008; he remains a director of the Company today.  Compl. ¶ 15.  For his part, Mr. Higginbotham served as CEO and a director until his resignation from those positions on August 5, 2009 (for reasons unrelated to this lawsuit).  Compl. ¶ 16.

Defendant <u>William Bambarger</u> was appointed as the Company's Chief Financial Officer ("CFO") on September 25, 2007, just days before the end of Integral's 2007 fiscal year, and continues to serve in that capacity.  Compl. ¶ 205.  Defendant <u>Hemi Lee-Gallagher</u> was hired as the Company's Corporate Controller in the first quarter of FY 2008 (October-December 2007), and continues to serve in that capacity.  Compl. ¶ 49.

**B.      The Key Events During the Relevant Time Period**

**1.      End of Fiscal Year 2007**

On December 12, 2007, Integral filed its Annual Form 10-K for FY 2007 (the "FY2007 10-K").  *See* App. Ex. A.  The FY2007 10-K—the material accuracy of which is *not* questioned in the

---

[Footnote continued from previous page]

2006) ("judicial notice is appropriate for SEC filings, press releases, and accounting rules"). Integral has filed a Motion for the court to take judicial notice of these facts and documents concurrently with this Motion to Dismiss.  The Index to the Appendix in Support of Defendants' Motion to Dismiss lists whether the document contained in an appendix was cited in the Complaint, or whether it is a document or fact for which Integral is seeking judicial notice.

Complaint—includes opinions issued by Integral's then-outside auditors, Bernstein & Pinchuk, stating both that the Company's financial statements "present fairly, in all material respects, the financial position of the Company as of September 30, 2007 and 2006," and that "the Company maintained, in all material respects, effective internal control over financial reporting as of September 30, 2007 and 2006 . . . ."  App. Ex. A, at F-2, F-3.

### 2.      First Quarter of Fiscal Year 2008

On February 4, 2008, Integral issued its earnings release for the first quarter of fiscal 2008. As pertinent here, Integral proactively disclosed in the release that its revenues and profits for the quarter were boosted by a non-routine sale of $2.4 million in software licenses, and also specifically noted that it had determined that the entire amount of the sale should be recognized during that quarter:

> Revenue for the Government Ground Systems segment includes $2.4 million of license revenue for the newly awarded GPS OCX (Next Generation Control Segment) contract.  The Company was able to deliver these licenses to the customer during the first quarter as a result of favorable contract terms that included up front delivery of the licenses under the contract. . . . The $2.4 million of license revenue generated from the GPS OCX contract represents acceleration into the first quarter of the entire GPS OCX license revenue previously anticipated by the Company to have been recognized throughout the entire fiscal year.

Compl. ¶  45.  In a conference call with investors the same day, CFO Bambarger was careful to again highlight that Integral's first quarter results included the benefit of this "non-routine" software sale.  Compl. ¶¶ 24, 48.  The Company's Form 10-Q for the quarter, filed with the SEC on February 7, 2008 (the "First Quarter 10-Q"), likewise noted that the higher revenue "in the first quarter 2008 was primarily attributable to the up-front delivery of licenses under the GPS OCX (Next Generation Control Segment) contract with Northrop Grumman Corporation, which was awarded during the first quarter 2008."  Compl. ¶ 50.

The First Quarter 10-Q also contained further explicit disclosure relevant to the present dispute.  As Integral had previously done in the FY2007 10-K and in other earlier SEC filings, the First Quarter 2007 10-Q disclosed (a) Integral's long-standing practice that "revenue under a fixed-price contract is recognized using a percentage of completion method based on costs incurred in relation to total estimated costs," and (b) the similarly long-time practice of recognizing revenue from post-contract support ("PCS") services "on a percentage of completion basis when PCS is part of a broader fixed-price contract that includes software and services."  *See* Compl. ¶¶ 51, 53; App. Ex. B (First Quarter 10-Q) at 13-14; *see also* App. Ex. A (FY2007 10-K) at 15, 26 .

### 3.     Second Quarter of Fiscal Year 2008

On April 28, 2008, Integral released its financial results for its second quarter of fiscal year 2008.  Compl. ¶ 69.  During a conference call the same day, Integral executives again were careful to highlight for investors that the Company's better-than-expected results for the quarter were the product, in part, of a second atypical transaction:  the recognition of revenue and associated costs on the "flow through" sales of certain items (antenna equipment) "that were accelerated at the request of the customer"—the U.S. Government—on the Company's Rapid Attack Identification Detection Reporting System (RAIDRS) contract.  CFO Bambarger made clear that "most of these costs were just pass-through costs," the transaction was "out of the ordinary" and "one-time in nature," and no significant profit resulted from the transaction because it "ha[d] an effect on revenue and project cost [that was] almost equal."  Compl. ¶ 74; App. Ex. C. at 2.  Bambarger also reminded investors that revenue in the first quarter had been higher than expected due to the acceleration of GPS software license revenue into that quarter.  Compl. ¶ 75.

On May 7, 2008, the Company filed its Form 10-Q for the second quarter of FY2008 ("the Second Quarter 10-Q").  App. Ex. D.  The Second Quarter 10-Q reiterated certain of the disclosures noted above, including emphasizing the significance of the GPS software sales on aggregate results for the first six months of fiscal year 2008, and again explaining the Company's use of percentage-of-completion accounting on fixed price contracts and for PCS services associated with contracts. Compl. ¶¶ 79, 81, 83.

**4.      Third Quarter of Fiscal Year 2008**

As noted above, on July 9, 2008—approximately mid-way through the third quarter of Integral's FY2008—John Higginbotham joined Integral as its new CEO, and Alan Baldwin stepped down from that position.  Compl. ¶¶ 15, 16, 195, 200.  Now no longer CEO, Baldwin shortly thereafter determined to exercise vested options he held for 55,000 shares of Integral stock, which he did on August 4-5, 2008.  Compl. ¶ 196; App. Ex. O (Form 4 filing).

On July 24, 2008, the Company released its third quarter earnings.  Compl. ¶ 96.  On a conference call with investors that day, CFO Bambarger again reminded investors that year-to-date revenue was up over FY2007 primarily "due to GPS and RAIDRS projects and higher license and maintenance revenue."  Compl. ¶ 99.

On July 29, 2008, Integral's board awarded options to purchase 275,000 shares of Integral stock to new CEO Higginbotham, options to purchase 120,000 (split-adjusted) shares to outgoing interim CEO (and still President) Baldwin, and options to purchase 90,000 (split-adjusted) shares to CFO Bambarger, all at an exercise price of $23.03 per share (the split-adjusted closing price on that day).  Compl. ¶¶ 195, 200; App. Ex. L, M, N (Form 4 filings).  About a week later, Higginbotham

was awarded options for an additional 100,000 (split-adjusted) shares at a (split-adjusted) exercise price of $24.75 per share.  Compl. ¶ 201; App. P (Form 4 filing).[2]

On August 7, 2008, Integral filed its Form 10-Q for the third quarter of FY2008 (the "Third Quarter 10-Q").  App. Ex. E.  As relevant here, the Third Quarter 10-Q contained disclosures similar to those in the Second Quarter 10-Q.  Compl. ¶¶  100, 102, 104.

In the months after CFO Bambarger's arrival Integral had hired several new senior individuals in its finance and accounting group, including Corporate Controller Lee-Gallagher, a senior contract administrator, and a senior treasury analyst.  Compl. ¶ 49.   On September 19, 2008, the Company took a further proactive step to promote the quality and accuracy of its financial reporting:  Integral retained the nationally-known, "Big Four" accounting firm of Ernst & Young LLP ("E&Y") as its independent auditors, replacing Bernstein & Pinchuk.  Compl. ¶¶ 115, 117.

**5.      The Restatement**

Shortly after it was retained, Ernst & Young began work on the audit for Integral's fiscal year ending on September 30, 2008.  During the course of this work by a new, top-tier audit firm bringing its greater resources, knowledge, and own views to this task, the conclusion was reached that Integral's unaudited, interim financial results for the first three quarters of FY2008 contained certain errors in the application of generally accepted accounting principles ("GAAP").  As described further below, these errors all concerned solely the proper *timing* of the recognition of revenue and expense under technical GAAP rules.  While most of the errors were immaterial in their

---

[2]  Integral undertook a two-for-one stock split effective on August 25, 2008.  Compl. ¶¶ 3, 195.  As a result, certain stock figures are described herein on a "split-adjusted" basis.

own right, taken collectively the errors led to the result that Integral determined to restate its financial results for the first three quarters of FY2008.

On December 11, 2009, Integral issued a press release and held a conference call with investors to inform them that the Company would need to restate its quarterly financials, and to advise them of the anticipated effect of the restatement—a deferral, from Q1-Q3 of FY2008 into future periods—primarily Q4 FY2008 and FY2009—of approximately $10 million in revenues (6% of the total recognized during Q1-Q3), $3 million in gross profits (5%), and commensurate amounts for operating income and earnings per share.  Compl. ¶¶ 125, 127-30; App. Ex. F, at 1.  As disclosed in Integral's Form 10-Q filed August 5, 2009, virtually all of this deferred revenue and earnings has since been recognized.  Compl. ¶ 5(f).

The Company's December 11, 2009 press release also provided detail regarding the three most significant errors causing the Restatement.  On December 24, 2008, Integral filed its FY2008 Form 10-K (the "FY2008 10-K"), which provided additional information on the errors underlying the Restatement.  Compl. ¶ 132-33; App. Ex. G, at F32-33.  On January 29, 2009, the SEC sent the Company a "comment letter" with respect to the FY2008 10-K, to which Integral provided detailed responses on February 12, 2009.  Compl. ¶¶ 135-36; App. Ex. I (response letter to SEC).  After the SEC replied that the information provided by Integral in its February 12, 2009 letter "would assist readers in better understanding the nature of the error identified," Integral included further

information regarding the accounting errors in its second quarter FY2009 Form 10-Q.  Compl.

¶¶ 137-38; App. Ex. J.[3]

### 6.        The Litigation

The present lawsuit was filed on December 15, 2008 by Mr. Anthony Vidmar, represented by

the Cohen, Milstein law firm and its co-counsel.  In accordance with the requirements of the Private

Securities Litigation Reform Act of 1996 (the "PSLRA"), the filing was publicized on Business

Wire with a notice that other eligible purchasers of Integral stock could file motions seeking

appointment as lead plaintiff in the case.  No institutional investors, other competing plaintiffs, or

other plaintiffs' law firms showed any interest in pursuing the action.  Accordingly, Mr. Vidmar,

together with four other individuals gathered together by Cohen, Milstein and its co-counsel, were

subsequently appointed as lead plaintiffs in this action without opposition.  As noted above they

assert that, collectively, they have suffered damages of $22,018.69.

As this Court is aware, on February 23, 2009, Integral also received a "shareholder demand

letter" from another Integral shareholder threatening the filing of a derivative action, and this

threatened lawsuit was indeed filed on July 14, 2009.  *Thirkill v. Daughtridge*, No. 8:09-cv-01828.

---

[3]  Plaintiffs' Complaint laments that details concerning the Restatement were not all disclosed in a single neat package, Compl. ¶ 6, and attempts to make something of the fact that the SEC suggested in March 2009 that Integral include additional information regarding the Restatement in its next quarterly filing (*without* suggesting that prior filings required amendment).  *See, e.g.*, Compl. ¶¶ 5, 25, 137.  Yet while plaintiffs complain that the initial Restatement disclosure lacked further detail about the accounting errors, Compl. ¶ 27, they do not allege that either the December 11, 2008 disclosures or the December 24, 2008 Form 10-K were materially false or misleading.  The Class Period likewise is limited to individuals who purchased Integral stock before December 11, 2008, affirming that plaintiffs make no allegations that any statements on or after that date were false or misleading.

The complaint in *Thirkill* is based on essentially the same alleged factual predicate as the present action, *i.e.*, that "the Individual Defendants cause[d] Integral to issue false and misleading financial statements" beginning with the February 4, 2008 earnings release.  *See Thirkill* Complaint at 11.  On September 14, 2009, however, the parties in *Thirkill* advised the Court that

> Plaintiff has agreed to dismiss this lawsuit voluntarily based on the results of an investigation by the Demand Review Committee ("DRC") of the Board of Directors into the allegations raised in the Complaint, and the DRC's recommendation that the Company take no action against any individual.  Neither Plaintiff nor his counsel will receive any attorney's fees or other remunerations as a result of this dismissal.

Memorandum in Support of Voluntary Motion to Dismiss, at 1 (*Thirkill* Docket No. __).  The *Thirkill* plaintiff and his counsel thus determined that the closely-related derivative action was not even worth pursuing.  The Court has granted preliminary approval of the dismissal of *Thirkill*, and a motion for final approval of the settlement will be filed shortly.

**C.     The Accounting Errors in the Restatement**

As a result of the E&Y audit, four accounting errors were identified that comprise essentially all of the Restatement adjustments.  App. Ex. J (Second Quarter FY2009 10-Q) at 15.  Although (as discussed further below) the Complaint asserts, without specific factual support, that these errors were "evident" to Integral personnel at the time they occurred, each was in fact the product of what was, in hindsight, determined to be the misapplication of complex accounting rules.

The first two errors relate to transactions specific to FY2008:  the timing of revenue recognition on the sale of software licenses for the GPS contract that occurred during the first quarter of FY2008, and the purchase of antenna equipment for the RAIDRS contract during the second quarter of FY2008 (plus a similar, small transaction during the third quarter).  The other two errors concern two of the Company's historical accounting practices: the timing of revenue recognition on

multiple element contracts involving post-contract support services ("PCS"), and for PCS services, and the timing of revenue recognition on certain contracts that do not involve significant customization, modification, or production.  *Id.*

### 1.    Timing of Revenue Recognition on the Sale of Software Licenses Under the GPS OCX Contract

During the first quarter of FY2008 Integral *delivered* and *received payment for* software licenses under the GPS contract at a specified contract price of $2.4 million, and accordingly recognized revenue of this amount on the transaction during that period.  Compl. ¶ 138.  The Company made no effort to disguise this straightforward accounting treatment, but rather *made a point, repeatedly, of highlighting the fact that this one-time event had a major impact on first quarter results so that investors would not be misled.   See* Compl. ¶¶ 24, 25, 47-48, 50, 75, 79, 99, 100.

Statement of Position ("SOP") 81-1 issued by the American Institute of Certified Public Accountants ("AICPA"), titled "Accounting for Performance of Construction-Type and Certain Production-Type Contracts," sets out guidance to companies on methods of revenue recognition for construction-type contracts, including the percentage-of-completion method, where revenues are recognized depending on the level of contract completion.  During the relevant time period, the Company generally applied SOP 81-1 to its contracts.  Compl. ¶¶ 25, 26, 88, 148, 153.  Notably, paragraph 39 of SOP 81-1 states that if portions of a project can be "segmented," revenues can be recognized on a per-segment basis, regardless of the state of performance of the other segments. App. Ex. Q.  Based on this provision, it thus appeared to Integral appropriate to recognize the GPS software sale during the first quarter.  App. Ex. J at 15.

During the course of the E&Y audit, however, a determination was reached that this result was incorrect, and that Integral should have deferred a portion of the revenue under the terms of

Statement of Position ("SOP") 97-2 issued by the American Institute of Certified Public Accountants ("AICPA"), titled "Software Revenue Recognition."  App. Ex. F, at 2, 14.  The correct application of SOP 97-2 to software revenue recognition involves two issues:

- First, SOP 97-2 applies only if the software portion of the contract is not "incidental" to the contract as a whole.  The term "incidental" is not defined, but is left as a matter of judgment.  App. Ex. R, at ¶ .02.

- Second, even if SOP 97-2 applies, revenue can be recognized upon delivery of the software if payment collection is probable, as long as the software does not require "significant . . . customization."  *Id.* at ¶ .08.  Otherwise, software contract accounting requires revenue to be recognized on a percentage-of-completion basis.  *Id.* at ¶¶ .75, .78. SOP 97-2 does not define "customization."  *See id.* at ¶ .02.

The Company indicated in its December 11, 2008 call with investors that the timing of revenue recognition for the GPS licenses ultimately depended upon the amount of customization under SOP 97-2.  *See* App. Ex. F, at 2 ("For the GPS-OCX contract, it is debatable whether we are making significant modifications or merely adding functionality above and beyond the software's core capabilities."); *id.* at 14 (the issue "is merely whether we are making significant modifications to our . . . system that we had delivered to the customer").

The effect of applying the corrected accounting treatment to the GPS license transaction resulted in $1.3 million of the original $2.4 million of revenue being deferred from the first three quarters of FY2008; some of that deferred revenue would be recognized in the fourth quarter of FY2008, and the remaining $700,000 would be deferred into fiscal 2009.  Compl. ¶ 26, 27.

## 2.  Timing of Revenue Recognition on an Antenna Sale Under the RAIDRS Contract

During Q2 FY 2008, Integral paid approximately $5 million to purchase antenna equipment for the RAIDRS contract for which it was the prime contractor, billed the Government for the amount spent, *was reimbursed by the Government*, and recognized the $5 million in both revenue

and expense in that quarter.  Compl. ¶ 138.  As described above, the Company disclosed this

transaction, and the associated accounting treatment, in conference calls with investors.  Compl.

¶¶ 74, 99.

Construction Accounting Co5, issued by the Financial Accounting Standards Board

("FASB"), provides in relevant part: "Ordinarily it is acceptable to accrue the fees as they become

billable . . . Amounts billable indicate reasonably assured realization, possibly subject to

renegotiation, because of the absence of a credit problem and minimum risk of loss involved."  App.

Ex. S, at .103.  Thus, as Integral billed the Government for the cost of antenna equipment—which

the Government paid—Co5 by itself would permit recognition of that revenue.   **CITE**

During the course of Ernst & Young's audit, however, it was determined that the revenue

recognition had been in error because the antenna had not yet been *installed*.  SOP 81-1 ¶ 50

provides that *"[i]n some circumstances"* costs actually incurred and reimbursed for project

components, even components specifically purchased for that project, should not be utilized in the

percentage-of-completion calculus and recognized as revenue "before the components are installed."

Compl. ¶ 166; App. Ex. Q.  During the E&Y audit, the RAIDRS antenna transaction was determined

to fall within such "circumstances."

When SOP 81-1 ¶ 50 was applied to the antenna contracts, $6.3 million of revenue was

deferred from FY 2008 to FY 2009.  Compl. ¶¶ 29, 88.  Because the purchase and sale of the

antenna was essentially a pass-through transaction, however—as the Company disclosed at the

time—the Restatement adjustment on this item had no appreciable effect on net income and gross

profit.  App. Ex. F, at 3.

3.      **Timing of Revenue Recognition on Post-Contract Services Included in Multiple Element Contracts**

Integral and its subsidiaries sold systems with software components that include limited-time Post-Contract Services ("PCS") for software, such as telephone support and post delivery implementation and warranty services.  As noted above, the Company disclosed in its 10-Qs for the first three quarters of FY2008—as it had previously in its Form 10-K for FY2007, which included financials statements that had been audited by Bernstein & Pinchuk—that it recognized "PCS revenue on a percentage of completion basis when PCS is part of a broader fixed-price contract that includes customization or implementation support services."  Compl. ¶¶ 53, 83, 104; App. Ex. A at 26.

During the FY2008 Ernst & Young audit, however, the Company's historical practice of recognizing such PCS revenue on a percentage-of-completion basis was determined to be in error.  As discussed above, SOP 97-2 is to be applied whenever the software component is not "incidental" to a product.  App. Ex. R, at ¶ .02.  The Company determined in the Restatement that the software component of several PCS contracts were not "incidental," and as a result that SOP 97-2 required the Company to assess the value of PCS based on a "Vendor Specific Objective Evidence" ("VSOE") analysis required by SOP 97-2, and then recognize that value ratably.  Compl. ¶ 138.

After the VSOE analysis was undertaken, $1.9 million of revenue was deferred from the first three quarters of FY 2008 to later periods.  Compl. ¶¶ 33, 64, 167.

4.      **Timing of Revenue on Contracts "Without Significant Customization"**

Finally, as also noted above, the Company disclosed in its 10-Qs for the first three quarters of FY2008—and in the Form 10-K for FY2007 that had been audited by Bernstein & Pinchuk—its general practice that "[o]ur revenues on fixed-price contracts are recognized on a percentage-of-

completion basis and we calculate an estimate of completion to determine revenue for each fixed-price project."  Compl. ¶¶ 51, 81, 102; App. Ex. A at 15.

During the course of the FY2008 Ernst & Young audit, however, it was determined that the Company should have applied the intricacies of SOP 97-2—including its test for whether the software was subject to "significant customization"—to certain contracts in order to determine the proper timing of revenue recognition.  Compl. ¶ 138.  Unlike the software in the GPS contract—which the Company ultimately decided *did* have significant customization and thus revenue for that software could not be recognized upon delivery—the Company determined that it should have been recognizing revenue upon delivery, rather than on a percentage-of-completion basis, for other software products that did *not* have significant customization.  *Id.*

After proper application of SOP 97-2 to these contracts, $296,000 of revenue was deferred from the first three quarters of FY2008 to later periods.  Compl. ¶¶ 35, 169.

As noted, virtually all of the revenue and profits deferred in the Restatement have since been recognized; thus, the errors at issue in this action relate only to the timing of revenue recognition.

### III.    ARGUMENT

Under Fed. R. Civ. P. 8(a)(2), a complaint is required to contain "a short and plain statement of the claim *showing that the pleader is entitled to relief*" (emphasis added).  A plaintiff's obligation to provide the "'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original).  "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* at 557.  Rather—as the Supreme Court has very recently emphasized— "[t]o survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.; see also Walker v. Prince George's County, Md*, No. 08-1462, 2009 U.S. App. LEXIS 16872, at *13 (4th Cir. July 30, 2009).

A.      **All of Plaintiffs' Claims Fail Unless the Complaint Adequately Alleges**
        ***Scienter* In Support of Plaintiffs' Securities Fraud Claim**

Plaintiffs' Complaint seeks to assert claims under three provisions of the Securities Exchange Act of 1934 (the "Exchange Act"):  the statute's principal anti-fraud provision, § 10(b), and related SEC Rule 10b-5 ("First Claim"); its "controlling person" provision, § 20(a) ("Second Claim"); and the statute's private insider-trading provision, § 20A ("Third Claim").

To state a claim for securities fraud under § 10(b), the Complaint must adequately allege, *inter alia*,  "(1) a material misrepresentation or omission by the defendant; [and] (2) *scienter* . . . ." *Matrix Capital Mgmt. Fund v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) (emphasis in original).  Thus, if the Complaint fails adequately to plead scienter then plaintiffs' First Claim, for violation of § 10(b), necessarily fails and must be dismissed.

A failure adequately to plead scienter also mandates dismissal of Plaintiffs' Second and Third Claims for violations of §§ 20(a) and 20A, respectively.  Each of those claims depends upon the existence of  "a well-pled *predicate* violation of the Exchange Act." *In re E.Spire Commc'ns, Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 750 (D. Md. 2001) (emphasis added).  Here, Plaintiffs seek to use their § 10(b) claim as the necessary "predicate violation"; hence, if the § 10(b) claim is

dismissed for failure to plead scienter, the §§ 20(a) and 20A claims must accordingly be dismissed as well. *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) ("Plaintiffs' claims under Sections 20(a) and 20A of the Exchange Act are derivative of their Section 10(b) and Rule 10b-5 claims, so the 20(a) and 20A claims were properly dismissed as well"); *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 188 (4th Cir. 2007) ("Because Section 20(a) and 20A claims require "a predicate allegation of a violation of law," and "the complaint fails to allege that [defendant] made any misleading statement or omission in violation of § 10(b) and Rule 10b-5, we affirm the district court's dismissal of these claims").

**B.      To Survive a Motion to Dismiss, the Complaint Must Plead As to Each Defendant Specific Facts Sufficient to Support a "Strong Inference Of Scienter," That Is, an Inference Both "Cogent" and "At Least as Compelling as Any Opposing Inference" That Could Be Drawn from the Facts Alleged**

The standards for determining whether a plaintiff has adequately alleged scienter for purposes of a § 10(b) claim were addressed by the Supreme Court in its landmark decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  In *Tellabs* the Court held that in considering whether a plaintiff has adequately alleged scienter "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," and that the relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original).  As the Supreme Court made clear in *Tellabs*, a plaintiff must do more than "allege facts from which an inference of scienter rationally *could* be drawn"; the plaintiff must "plead with particularity facts that give rise to a 'strong'—*i.e.*, a powerful or cogent—inference." *Id.* at 323 (emphasis in original).  To that end,

a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, *only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged*.

*Id.* at 323-24 (emphasis added).

The Complaint must allege facts that create a strong inference of scienter against *each and every* defendant.  Fraud claims cannot be imputed to individual defendants under a "group publication" theory: "the plaintiff must allege facts supporting a strong inference of scienter as to each defendant."  *BearingPoint*, 576 F.3d at 182; *see also Hunter*, 477 F.3d at 184 ("a plaintiff must allege facts that support a 'strong inference' that *each* defendant acted with at least recklessness in making the false statement.") (emphasis in original).  Nor can a plaintiff allege scienter against a company unless the complaint alleges "facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation."  *BearingPoint*, 576 F.3d at 182, 190 (internal quotation marks omitted).

As is evident from the Complaint, on the facts here plaintiffs have precious little material to work with in their attempt to allege scienter.  Cobbling together—and endlessly repeating—a few threadbare pieces, plaintiffs attempt to allege the requisite "strong inference of scienter" based on the following purported facts:

- The Company was not in compliance with GAAP due to the prematurely recorded revenue, Compl. ¶ 183;

- The individual defendants signed financial statements and made statements about finances that were later shown to be incorrect, Compl. ¶¶ 186, 189, 190, 198, 203, 208;

- The individual defendants, by virtue of their positions, had the ability and a duty to determine whether financial statements were properly reported, and knowingly or recklessly failed to do so.  Compl. ¶¶ 190, 199, 204, 209; and

- The Company supposedly concealed that its internal control systems were deficient, Compl. ¶ 186;

- The individual defendants "enjoyed rich compensation packages" dependent on the Company's stock price and received stock options, Compl. ¶ 187, 191-95, 200-01, 205-06, 210;

- Baldwin sold stock at a profit shortly after he stepped down as interim CEO, Compl. ¶ 196;

- A caller in the December 11, 2008 conference call claimed that a former employee had "warned" the Company that its revenue recognition was not correct, Compl. ¶ 185.

- The accounting errors supposedly involved accounting rules and/or company policies that were easy to apply, Compl. ¶¶ 61, 88;

Other than allegations regarding stock option grants and the sale of stock by interim CEO Baldwin, discussed in further detail below, the Complaint simply lumps the defendants into a group for purposes of pleading scienter.  Plaintiffs even admit that the individual defendants' liability stems from the "group published" financial statements.  Compl. ¶¶ 20, 221.  The Complaint thus takes no account, for example, of the fact that Controller Lee-Gallagher joined Integral only shortly before the Company's first quarter FY2008 results were published, or that CEO Higginbotham did not even join the Company until well after both the first and second quarter results were published.  Plaintiffs' allegations—that the individual Defendants acted with scienter because they prepared and signed financial statements, as officers had a duty to prepare and certify accurate financial statements, and were eligible for stock options—are entirely indistinguishable between and among the individual defendants, and could indeed be made about the senior executives of any company as to that company's SEC earnings filings.  *See* Compl. ¶¶ 186-95, 197-210.  As we discuss below,

20

such generalized, undifferentiated, across-the-board allegations, bereft of specific facts, are utterly insufficient to plead scienter as required under *Tellabs*.

**B.     None of Plaintiffs' Allegations Raise *Any* Inference of Scienter**

       **1.     The Job Descriptions of the Individual Defendants Fail to Establish Scienter**

Plaintiffs' first effort at alleging scienter is to assert that Defendants "must have known" of accounting errors "because of their positions" with Integral.  "*Because of their positions* and access to material non-public information," states the Complaint, "each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading."  Compl. ¶ 20.  The Complaint does not, however, allege what "material non-public information" defendants supposedly had access to—it contains no allegation of *any* report, document, conversation or other specific "factual matter" demonstrating that the defendants knew (or were reckless in not knowing) that Integral's accounting was in error.  Instead, plaintiffs simply allege, over and over again, that by virtue of being there Defendants necessarily "knew and/or recklessly disregarded" that accounting errors were occurring and "knowingly and/or recklessly participated" in those errors.  *See, e.g.,* Compl. ¶¶ 20, 182, 183, 190, 199, 204, 209.

Such generic pabulum does not suffice.  "It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter."  *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 340 (W.D.N.Y. 2008) (internal quotation marks and citation omitted); *see also In re Dell, Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 893-94 (W.D. Tex. 2008) ("[P]leadings of scienter may not rest on the inference that defendants must have been aware of a

misstatement based on their positions with the company," but rather plaintiffs must plead

"knowledge or involvement with *specific* accounting practices or internal controls") (emphasis in

original); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co*., 432 F. Supp. 2d 571,

592 (E.D. Va. 2006) ("[A]n executive position alone does not necessarily lead one to infer that

Individual Defendants knew that the alleged omissions were false or misleading.").  As this Court

held in *In re Criimi Mae*, 94 F. Supp. 2d 652, 661 (D. Md. 2000), a "general inference that, because

of their positions with [the company], Defendants 'must have known' the statements issued by [the

company] were false and misleading at the time they were issued. . . . is inadequate to withstand the

special pleading requirements in securities fraud cases." *Id.*  Allegations concerning the defendants'

job descriptions therefore fail to establish an inference of scienter.

> **2.    Allegations of Internal Control Weaknesses and the Failure to Follow
> GAAP—Inherent to Restatements—Do Not Create a Strong Inference of
> Scienter**

Plaintiffs do no better by pointing out again and again that a restatement occurred.  Compl.

¶¶ 186, 189, 190, 198, 203, 208.  This Court, like many others, has squarely held that the fact "a

restatement of financials occurred is not sufficient to raise a strong inference of scienter." *E.spire*,

127 F. Supp. 2d at 745 (internal citation omitted).  "[M]ere allegations that statements made in one

report should have been made in earlier reports do not make out a claim of securities fraud." *Id.*

Thus, plaintiffs cannot create a strong inference of scienter from the bare allegation that Integral

issued financial statements that were later required to be restated.  There is no "fraud by hindsight,"

*E.spire*, 127 F. Supp. 2d at 748, merely due to the publication of a restatement.

Plaintiffs here attempt an end-run around this bar by alleging that the circumstances that *by*

*definition cause* a restatement are themselves necessarily evidence of scienter.  First, plaintiffs make

the vaguest of allegations that the GAAP violations that led to the restatement are evidence of scienter—that the defendants "knew that their actions violated GAAP," and therefore knew "that their public claims of Integral's strict GAAP adherence were blatantly false."  Compl. ¶ 183. Demonstrating scienter, however, "requires more than a misapplication of accounting principles." *E.spire*, 127 F. Supp. 2d at 745; *see also Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 351 (4th Cir. 2003) (mere allegations that defendants should have recognized accounting errors, without specific facts underlying the allegations, were insufficient to plead scienter).  The mere fact that GAAP violations occurred—necessitating the issuance of a restatement—is insufficient to plead scienter.

Likewise, plaintiffs' generalized, boilerplate allegations regarding deficiencies in internal controls, and the alleged concealment of such deficiencies, Compl. ¶ 186, do not create an inference of scienter.  It is not enough simply to rely on the fact that Integral determined in December 2008, with the benefit of hindsight, that internal control deficiencies had existed in earlier periods; plaintiffs must allege *specific facts* to show that the individual Defendants knew, or were reckless in not knowing, that those deficiencies existed back during the time periods in question.  *See In re Comshare, Inc. Sec. Litig*, 183 F.3d 542, 553 (6th Cir. 1999) ("While Plaintiffs claim Defendants 'were aware of, or were recklessly indifferent to' the revenue recognition errors, they allege no facts to show that . . . their regular procedures should have alerted them to the errors sooner than they actually did.").  Here, Plaintiffs allege *no* specific facts to show how Defendants were or could have been aware of internal control deficiencies, much less allege any specific facts indicating that Defendants allegedly *concealed* such deficiencies. *See* Compl. ¶ 186 (generic allegations of scienter re: internal controls).

23

Of importance, the Complaint also lacks any specific factual allegations indicating that contemporaneous "red flags" existed that would have alerted any Defendant that material accounting errors were occurring during the first three quarters of FY2008.  The only specific allegations *at all* are that (a) Integral was in the process of hiring senior accounting department personnel during the class period, Compl. ¶ 49; and (b) during the December 11, 2008 conference call at the end of the class period, a "caller" asserted that the Company had been "warned" of revenue recognition practices by an ex-employee who had left the Company nearly a year before the proposed Class Period even began (and who plaintiffs take great pains to point out had been barred from practicing as an accountant before the SEC due to his activities at another company),  Compl. ¶¶ 36, 38, 185. Neither of these allegations, however, remotely helps plaintiffs' cause.  In the first instance, the fact that the Company was adding new accounting personnel suggests nothing but that the CEO and CFO were attentive to keeping the accounting function strong.  As to the supposed "warning" noted by a "caller" in December 2008, the individual who the "caller" stated supposedly had provided that warning (Mr. Gary Prince) had been gone from the Company since March 2007, nearly a full year before the first alleged misstatement identified in the Complaint even occurred.  Compl. ¶ __. Further, nothing in the Complaint gives any indication as to the nature of this elusive "warning," or to whom and when it supposedly was communicated.  "[U]nsupported allegations that defendants 'must have known' about . . . red flags are insufficient to draw any inference, much less a compelling one, of scienter." *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 799 (N.D. Ill. 2007).

In addition, the Court may properly take cognizance of the fact that as part of the FY2007 audit the Company's independent auditors issued a "clean" opinion as to Integral's internal controls, stating that "in our opinion, the Company maintained, in all material respects, effective internal

control over financial reporting as of September 30, 2007 and 2006, based on criteria established in Internal Control–Integrated Framework issued by COSO."  App. Ex. A, at F-3.  Particularly in light of this fact, there is simply no basis to conclude that any of the individual named Defendants—each of whom had not even become executives of Integral until relatively shortly before the proposed class period began, or even *after* it began—knew, or were reckless in not knowing, of any internal control deficiencies in the time period immediately after the Company's accounting firm had opined that none existed.[4]

### 3.    The Issuance of Stock Options, and Allegations of Stock Sales by the Defendant Least Familiar with the Accounting Issues, Fail to Raise an Inference of Scienter

Plaintiffs allege that defendants had a "motive" because "they enjoyed rich compensation packages, which depended in large part upon the Company's financial performance and its stock price."  Compl. ¶ 187; *see also* Compl. ¶¶ 191-95, 200-01, 205-06, 210.  Plaintiffs also allege that defendants Baldwin, Higginbotham and Bambarger received stock options, and that Baldwin exercised previously-issued stock options.  None of these allegations, however, raises even a meaningful inference of scienter, much less the requisite "strong" inference.

---

[4] As noted above, the magnitude of the errors were quite small in relative terms—revenue adjusted from approximately $170.5 million to $160 million (6% change), and gross profit adjusted from approximately $63 million to $60 million (5% change).  Small errors weigh against an inference of scienter.  *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 896 (W.D. Tex. 2008) ("the accounting errors had a relatively small cumulative impact on Dell's net income for the Restatement period—there is simply no reason to believe they were so egregious in the scope of Dell's entire business that not to notice them would give rise to an inference of scienter on the part of the Individual Defendants."); *In re Allscripts, Inc. Sec. Litig.*, No. 00C6796, 2001 WL 743411, at *11 (N.D. Ill. June 29, 2001) ("The small magnitude of the error, the Company's prompt acknowledgement of the error, and the fact that the revenue was ultimately realized all militate against an inference of scienter in this case.").

First, the mere fact that an executive is compensated in part based on the performance of company stock—a common practice among publicly-traded companies—does not allow for an inference of scienter. *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 622 (4th Cir. 1999) ("[A]llegations that corporate officers 'were motivated to defraud the public because an inflated stock price would increase their compensation'" are "insufficient"); *see also E.spire*, 127 F. Supp. 2d at 742 (allegations that defendants "were motivated by a desire to enhance their compensation and stock holdings" insufficient to create a strong inference of scienter); *Criimi Mae*, 94 F. Supp. 2d at 660 (same). Further, there is no reason to believe (and no specific facts are alleged to suggest) that the relatively small magnitude of the errors *would even have made any difference* in the individual Defendants' compensation.

Second, there is no basis to infer scienter from the option grants to the Individual Defendants, or from the exercise of options by one (and only one) of those four defendants. Plaintiffs' primary focus in this regard is on the fact that defendant Baldwin—who as noted above has served as a director from December 2006 to date, and who served as interim CEO from May 30, 2007, until July 9, 2008—determined shortly after stepping down as interim CEO to exercise options he held for 55,000 shares of Integral stock and sell those shares to realize the value of the options. Complaint ¶¶ 3, 196.

This fact fails to raise an inference of scienter for multiple reasons. As an initial matter, numerous courts have recognized that it is common for corporate executives to sell stock when or shortly after they leave a position, and accordingly that the fact of such a sale simply raises no inference that the executive sold because he knew the company's stock was artificially inflated. *See, e.g., In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 896 (8th Cir. 2002) (holding that the sale of

stock in May of 1998 by an executive who resigned in August of 1998 "should not materially impact the scienter analysis"); *Greebel v. FTP Software, Inc*., 194 F.3d 185, 206 (1st Cir. 1999) ("It is not unusual for individuals leaving a company, like [defendant], to sell shares").  Further, plaintiffs' contentions ignore the fact that at about the same time Baldwin made his sales, he was granted options for an additional 120,000 (split-adjusted) shares exercisable at the market price on the date of the option grant.  Compl. ¶ 195; App. Ex. L.  It would have been entirely nonsensical for Baldwin to wish for Integral's stock price to be inflated during this period, since he stood to have any gain from selling 55,000 shares at an inflated price more than offset by the "loss" from having to pay a similarly inflated price on the 120,000 shares when he exercised his new options.  Baldwin's option transactions thus tend to *negate*, rather than support, any inference of scienter as to him.

This same analysis applies with even more force to the individuals who were in a position to have the most knowledge regarding Integral's financial statements, CFO Bambarger and Controller Lee-Gallagher.  First, neither Bambarger nor Lee-Gallagher sold *any* Integral stock during the class period.  Where the individual defendants closest to the accounting issues did not sell stock, this supports a logical inference that *none* of the defendants had any knowledge of the accounting errors. *E.spire*, 127 F. Supp. 2d at 743 n.9 ("Defendants' intent to defraud by way of a motive to profit from insider trading is further weakened by the fact that defendant Piazza, who was e.spire's Chief Financial Officer, did not sell any of his e.spire shares during the Class Period").  Indeed, CFO Bambarger held vested stock options for 10,000 shares that he could have exercised during the class period at a substantial profit, but did not do so.  *See* Apps. N and O (shares vested on September 25, 2008 at an exercise price of $11.25 per share; on October 31, 2008, the stock closed at $24.57 per share).  Even more significant, Bambarger, like Baldwin, received stock options for 90,000 (split-

adjusted) shares in July 2008, the value of which was *negatively* affected by the fact that (according

to the Complaint) Integral's stock price, and hence the option exercise price, was artificially inflated

at that time.  *See* App. Ex. N.  It thus was *against* Bambarger's personal interest for Integral's stock

price to be inflated by accounting errors during the class period, rather dramatically undermining any

inference of scienter on his part.

Finally, consideration of new CEO Higginbotham's position is equally instructive.  During

the class period he received options to purchase 650,000 (split-adjusted) shares, and sold no Integral

stock.  Compl. ¶¶ 200-01; App. Ex. M, P.  It was thus also very much against Higginbotham's

interest for Integral's shares to be inflated during the class period.

Other courts have recognized that the receipt of stock options, and foregoing stock sales,

during the class period weighs *against* a finding of scienter.  In *Shuster v. Symmetricom, Inc*., 35 F.

App'x 705, 707 (9th Cir. 2002), for example, the Ninth Circuit placed weight on the fact that "the

officers, with the exception of [one officer], did not sell any of their stock holdings while the price

was high, and actually lost money on the stock options they received."  Similarly, in *Grillo v.

Tempur-Pedic Int'l, Inc*., 553 F. Supp. 2d 809, 821-22 (E.D. Ky. 2008), the Eastern District of

Kentucky found that where two officers "sold no stock during the purported fraud and suffered large

losses as a result," it "undermine[d] the inference of scienter" to the point where the motion to

dismiss was granted.  Here, likewise, the fact that the individual Defendants were personally

*harmed*, rather than benefited, by any inflation in the stock price during the class period as a result of

the timing of their option grants, strongly negates rather than supports any inference of scienter.

4.    **Conclusory Statements That Accounting Errors Were "Evident,"**
      **Without Allegations Concerning Defendants' Knowledge of the**
      **Underlying Transactions, Are Insufficient to Establish Scienter.**

Plaintiffs allege that defendants "should have known" of the accounting errors, because

"[t]he revenue recognition principles involved were not complicated to apply," Compl. ¶ 88, and the

errors involved "basic tenets of accrual accounting."  Compl. ¶¶ 148, 162.  Plaintiffs also allege that

the errors should have been evident because they were deviations from Company accounting policies

expressed in its SEC filings, Compl. ¶¶ 5, 6, 41, 51, 61, 81, 82; *see also* Compl. ¶ 184 (alleging

knowledge of error because Company had initially planned to recognize GPS revenue throughout

FY2008, and then opted to recognize it in the first quarter).

To plead scienter by alleging that the accounting errors were "evident," however, plaintiffs

must "plead facts that show that the revenue recognition errors at [the Company] should have been

*obvious* to [the Company] or that [the Company] consciously disregarded 'red flags' that would have

revealed the errors prior to their inclusion in public statements."  *Ottman*, 353 F.3d at 351 (emphasis

added; internal citation omitted).  Even if the rules are "simple" on their face, there is no inference of

scienter where application of the rules to the facts at issue is difficult.  *In re Bristol-Myers Squibb*

*Sec. Litig.*, 312 F. Supp. 2d 549, 567 (S.D.N.Y. 2004).  *See also In re Galileo Corp. S'holders Litig.*,

127 F. Supp. 2d 251, 266 (D. Mass. 2001) (alleging only that company failed to follow internal

policies was akin to negligence, and not enough to create an inference of scienter strong enough to

survive motion to dismiss).

Plaintiffs utterly fail to allege specific facts establishing that any of the accounting errors

were "obvious."  A close reading of the Complaint, and of the accounting standards and bulletins

cited therein—SOP 81-1, SOP 97-2, FASB FASCON No. 1, FASB FASCON No. 2, FASB

FASCON No. 5, FASB FASCON No. 6, SAB 101, EITF 00-21, APB No. 10, and APB No. 28—

rather demonstrate that application of the relevant accounting guidelines is highly fact-intensive, and

that the appropriate accounting treatment cannot be determined without knowledge of the underlying

transactions:

- *GPS License Revenue.*  The Company delivered, and was paid for, software licenses as part of the GPS OCX contract.  Compl. ¶ 138.  Paragraph 39 of SOP 81-1 allows recognition of revenue for each "segment" of a project—thus, if the licenses are considered a separate segment, it could be argued that revenue could be recognized upon delivery.  App. Ex. Q.  SOP 97-2, however, requires percentage-of-completion accounting treatment for software contract accounting if (1) the software is more than "incidental" to the contract, and (2) the software requires "significant . . . customization," yet fails to define those terms.  App. Ex. R, at ¶¶ .02, .75, .78.  Bambarger stated on the December 11, 2008 conference call that the Company was still discussing the extent of customization with its auditors.  App. Ex. I, at 14.

- *RAIDRS.*  Integral purchased antenna equipment, was reimbursed by the Government for the equipment, and recognized the equipment purchase costs in the same quarter.  Compl. ¶ 138.  Accounting Standard Co5 allowed companies to accrue fees as they become billable.  App. Ex. S, at .103.  SOP 81-1 ¶ 50, however, provides that component purchases should not be recognized as revenue until installation, and the antennae had not yet been installed.  App. Ex. Q at ¶ 50.

- *Post-contract support*.  The Company used the "percentage-of-completion" method of accounting described in SOP ¶ 81-1 to guide revenue recognition for contracts with PCS.  Compl. ¶¶ 53, 83, 104.  SOP 97-2, however, requires different accounting when the software component is not "incidental" to the product, yet does not define "incidental."  App. Ex. R, at ¶ .02.

- *Contracts without significant customization.*  During the relevant time period, the Company generally applied SOP 81-1.  Compl. ¶¶ 25, 26, 88, 148, 153.  Revenue for contracts with non-"incidental" software that did not have "significant . . . compensation," however, should have been recognized upon delivery under SOP 97-2.  App. Ex. R, at ¶ .07.

Indeed, the very contrast between some of the errors belie an inference that they were evident or

obvious.  Under the exact same SOP, SOP 97-2, the Company was in error *not* recognizing revenue

upon delivery for contracts without significant customization, yet was in error when it *did* recognize

revenue upon delivery for the GPS software licenses.  Similarly, the Company erred in *applying* percentage-of-completion accounting to PCS and contracts without significant customization, but erred in *not* applying it to the GPS software licenses.

This Court has previously rejected a plaintiff's argument that "the simplicity of the accounting rule that was violated" supported a finding of scienter, where the proper accounting treatment depended on the Company's interpretation of certain key terms such as "property improvements" and "integral equipment" that were not explicitly defined in the accounting literature.  *E.spire*, 127 F. Supp. 2d at 745-47.  *See also Beaver County Ret. Bd. v. LCA-Vision Inc.*, No. 1:07-CV-750, 2009 WL 806714, at *19 (S.D. Ohio Mar. 25, 2009) (even where "the language of [the relevant accounting standard] is plain," court found that question of whether to apply provision in standard for "warranty" or provision for "separately priced extended warranty" was not simple); *cf. In re SmarTalk Teleservices Sec., Inc. Litig.*, 124 F. Supp. 2d 505, 517 (S.D. Ohio 2000) ("The accounting errors must be so obvious that any reasonable person would have been aware of them."). So too, here.  The undefined terms of "incidental" and "significant customization" in SOP 97-2, combined with the intricacies of determining whether particular software was significantly customized for a particular contract, indicate that the accounting errors were not evident.

Finally, the fact that Bernstein & Pinchuk had previously audited the Company and found its accounting to be "in conformity with the accounting principles generally accepted in the United States of America" at a time when two of the accounting errors existed—PCS services and contracts without significant customization—negates any inference that those errors were "evident."  App. Ex. A, at F-3.  Where accounting firms differ about how to apply an accounting rule, the error in applying that rule is not so blatant as to support an inference of scienter.  *Merzin v. Provident Fin.*

31

*Group, Inc.*, 311 F. Supp. 2d 674, 683 (S.D. Ohio 2004) (finding that treating leases as operating

leases, and not direct finance leases, was not a blatant accounting error, where the company's

longtime auditor Ernst & Young advised the Company to treat old leases as direct finance leases,

while PricewaterhouseCoopers later provided different advice); *see also In re Paincare Holdings*

*Sec. Litig.*, No. 6:06-CV-362, 2007 WL 1229703, at *7 (M.D. Fla. Apr. 25, 2007) (finding no

scienter where "the Company, in compliance with the applicable rules and regulations, employed

outside auditors during the Class Period and the auditors *certified* the financial statements, which

included the since withdrawn accounting methodology.").

**C.    Taking the Allegations of the Complaint as a Whole, an Inference of Fraud or Recklessness Is Far Less Cogent Than an Inference That the Accounting Errors Were Mere Mistakes.**

The Complaint is notable for what it *does not* allege.  There is no allegation that the

Company lied to its accountants.  There are no claims that the Company suppressed internal

memoranda, or ignored warnings from accountants.  There are no contentions that the Company

faked transactions that never took place.  *Cf. Paincare*, 2007 WL 1229703, at *7 (listing the

numerous allegations that the plaintiff failed to make that would have established scienter).  None of

plaintiffs' allegations—the existence of the restatement, the purported GAAP violations, the

purportedly "evident" accounting errors, the positions of the individual defendants, or their

purported "incentives" to inflate the stock price—amount to anything more than a contention that the

restatement itself should be regarded as evidence of scienter, an argument soundly rejected by the

courts.

To illustrate just how far short plaintiffs fall of the minimum pleading standard, it is

instructive to compare the allegations of this case with those made by the plaintiffs in *In re E.spire*

*Communications, Inc. Securities Litigation*, 127 F. Supp. 2d 734 (D. Md. 2001), which failed to survive a motion to dismiss even under the more lenient standard in place *before* the Supreme Court's decision in *Tellabs*. Plaintiffs in *E.spire* alleged that the company and certain senior officers and directors inflated the company's stock "by intentionally and recklessly utilizing improper accounting methods in violation of Generally Accepted Accounting Principles ('GAAP') in order to materially overstate e.spire's earnings for 1999." *Id.* at 738. Defendants' alleged motives were to enhance their compensation and stock holdings, to profit from insider trading, and to comply with certain debt covenants. *Id.* at 741-42. Plaintiffs alleged that scienter could be inferred from the simplicity of the applicable accounting rule, the defendants' knowledge of that rule, and certain statements by the subsequent CEO after the accounting errors were discovered. *Id.* at 745.

In granting a motion to dismiss, this Court flatly rejected the vague assertions in the complaint as insufficient to establish scienter where (a) only two of five defendants actually sold shares (and the CFO had not done so), and (b) the accounting treatment was not resolved by "a mere reading" of the accounting guidelines. *Id.* at 745-47, 743 n.9. This Court succinctly state that "allegations that statements made in one report should have been made in earlier reports do not make out a claim of securities fraud." *Id.* at 745 (internal citation omitted).

The allegations in *E.spire* mirror those made against Integral: the GAAP violations, the supposedly obvious accounting errors, and the "incentives" to inflate stock. Where this Court dismissed the *E.spire* complaint *applying a lesser standard of review than required in the Supreme Court's recent decision in Tellabs*, the complaint against Integral must be dismissed as well.

Moreover, the facts alleged in the Complaint belie an inference of scienter for two additional reasons: they show that the accounting treatment later determined to have been in error was openly

33

disclosed, and reveal that the Company was in a time of transition.  Regarding disclosure, the Company's decision to accelerate the recognition of GPS OCX software license revenue into the first quarter of FY2008 was announced to the world via press release, an 8-K, earnings calls, and 10-Qs.  Compl. ¶¶ 24, 45, 47, 48, 50, 75, 79, 99, 100.  The recognition of the RAIDRS revenue in the second quarter was also disclosed in earnings calls, in which Bambarger classified it as a "major significant event" that was "out of the ordinary."  Compl. ¶¶ 74, 99.  And the Company's accounting of PCS and other contract revenue on a standard percentage-of-completion basis was repeatedly disclosed in public SEC filings.  Compl. ¶¶ 51, 53, 81, 83, 102, 104.  Such public statements about the Company's accounting negate any inference of scienter, much less a strong inference.  Where the accounting, however flawed, was "disclosed to the world," there can be no inference of scienter. *Paincare*, 2007 WL 1229703, at *7 (finding no inference of fraud where the public record shows that the company "at all relevant times *disclosed* its method of accounting in the financial statements it issued and consistently used the same disclosed method of accounting, prior to the restatement") (emphasis in original).  *See also In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 769 (S.D. Ohio 2006) (holding fraud was not alleged where the company breached GAAP principles, but "was at all times truthful about its treatment of the [underlying transaction]").

The Complaint also reveals that the Company was in a time of transition.  Chief Financial Officer Bambarger and Controller Lee-Gallagher were relatively new to their positions, with Bambarger becoming CFO in September 2007, and Lee-Gallagher becoming Controller in the first quarter of FY 2008.  Compl. ¶¶ 49, 205.  Integral was also in the process of hiring additional financial and accounting personnel.  Compl. ¶ 49.  And of particular importance with respect to complex accounting issues where views can differ, the Company also changed audit firms during the

Class Period, transitioning from Bernstein & Pinchuk to Ernst & Young just three months before

Integral's FY2008 audited financial reports were due.  Compl. ¶¶ 115, 117.  A transition period may

negate an inference of scienter by providing an alternative explanation for accounting errors.  *Cf.*

*Matrix Capital Mgmt. Fund*, 576 F.3d at 188 (noting that a period of intense transition may mitigate

against a finding of scienter); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 274

(S.D.N.Y. 2009) (finding that mistakes made during period of transition to new facility were not

evidence of scienter).  It is, in fact, *virtually inconceivable that executives who were engaged in*

*securities fraud would affirmatively act to bring in a new, top-tier accounting firm* with greater

resources and expertise to audit the Company's books; such a proposition borders on being absurd

on its face.  What *is* conceivable, however—and is in fact the only *logical* inference here—is exactly

what happened:  new auditors came in, conducted a thorough top-to-bottom audit, identified certain

latent errors in the Company's accounting methodologies, and the Company disclosed and fixed

them.  In short, plaintiffs have not, and simply cannot, allege facts that would imply a strong

inference of scienter more cogent and compelling than the alternative, obvious explanation of what

happened at Integral.

Finally, because plaintiffs have failed to allege a Section 10 and Rule 10b-5 violation against

any of the defendants, their Section 20A and Section 20(a) claims must also fail.  *Cozzarelli*, 549

F.3d at 628 ("Plaintiffs' claims under Sections 20(a) and 20A of the Exchange Act are derivative of

their Section 10(b) and Rule 10b-5 claims, so the 20(a) and 20A claims were properly dismissed as

well."); *Hunter*, 477 F.3d at 188 (same); *E.spire*, 127 F. Supp. 2d at 750 ("Like a claim for control

person liability asserted under § 20(a), a § 20A claim must contain a well-pled predicate violation of

the Exchange Act.").

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Class Action Complaint should be dismissed

for failure to state a claim, with prejudice.

DATED this 26th day of October, 2009.

Respectfully submitted,

    /s/  John C. Millian
John C. Millian (Bar No. 06459)
Michael D. Billok (Bar No. 16952)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500 (main phone)
(202) 530-9566 (Millian direct fax)
(202) 530-9534 (Billok direct fax)
jmillian@gibsondunn.com
mbillok@gibsondunn.com
*Counsel for Defendants*

*Of Counsel for Defendants:*
Daniel A. Cantu
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500  (main)
(202) 530-9661  (Cantu direct fax)
dcantu@gibsondunn.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of October, 2009, I have electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such

filing (NEF) to the following:

> Andrew N. Friedman
> Cohen Milstein Sellers & Toll PLLC
> 1100 New York Avenue, N.W.
> Suite 500, West Tower
> Washington, D.C.  20005
>
> Lionel Z. Glancy
> Michael Goldberg
> Glancy Binkow & Goldberg LLP
> 1801 Avenue of the Stars, Suite 311
> Los Angeles, CA  90067
>
> Howard G. Smith
> Law Offices of Howard G. Smith
> 3070 Bristol Pike, Suite 112
> Bensalem, PA  19020
>
> *Counsel for Plaintiffs*

>    /s/ Michael D. Billock
> Michael D. Billok (Bar No. 16952)
> GIBSON, DUNN & CRUTCHER LLP
> 1050 Connecticut Avenue, N.W.
> Washington, D.C.  20036
> (202) 955-8500 (main phone)
> (202) 530-9534 (Billok direct fax)
> mbillok@gibsondunn.com