**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

| | |
|---|---|
| IN RE INTEGRAL SYSTEMS, INC.<br><br>SECURITIES LITIGATION | Civil Action No. 08-cv-03387-RWT |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

**COHEN MILSTEIN SELLERS & TOLL PLLC**

ANDREW N. FRIEDMAN (Bar No. 14421)
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Telephone:    (202) 408-4600
Facsimile:    (202) 408-4699

**GLANCY BINKOW & GOLDBERG LLP**
LIONEL Z.GLANCY (*pro hac vice*)
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:    (310) 201-9150
Facsimile:    (310) 201-9160

*Co-Lead Counsel for the Putative Class*

**LAW OFFICES OF HOWARD G. SMITH**
HOWARD G. SMITH
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone:    (215) 638-4847
Facsimile:    (215) 638-4867

*Attorney for Plaintiff*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL ALLEGATIONS ............................................................................ 4

III.  ARGUMENT ...................................................................................................... 9

    A.     Defendants Bear A Heavy Burden to Obtain Dismissal of the Complaint ............ 9

    B.     Taken as a Whole, the Complaint Presents a Strong Inference of Scienter ........ 10

          1.     Defendants' Violations Of Basic GAAP Rules And Integral's Own Accounting Policies, Which Necessitated A Restatement, Give Rise To A Strong Inference Of Scienter ................................................... 11

               a.     Application of Integral's Long-Standing Revenue Recognition Policies and Basic GAAP Precluded Recognition of the Revenue at Issue ............................................. 11

                    i.     GPS OCX Software Contract ............................................ 14

                    ii.    RAIDRS ........................................................................ 17

                    iii.   Post-Contract Services (Warranty) Revenue ................... 19

                    iv.   "Software Only" Sales Revenue ...................................... 21

               b.     In Addition to the Obvious Nature of the Revenue Recognition Errors, Other Indicia of Scienter Are Present ........ 22

                    i.     Violation of a Company's Own Revenue Recognition Policy ........................................................... 22

                    ii.    Violations of GAAP/Company Policy as to a Small Number of Large Sales ................................................. 22

                    iii.   Defendants Made a Conscious Choice to Prematurely Recognize Revenue ..................................... 24

                    iv.   The Policy Violated Was Simple to Understand and Apply ........................................................................ 26

                    v.     A Misleading Description of the Reasons for a Restatement Gives Rise to an Inference of Scienter ........ 28

          2.     Defendants' False Sarbanes-Oxley Act Certifications Give Rise to a Strong Inference of Scienter ............................................................... 29

          3.     The Complaint Alleges Individual Defendants' Direct Involvement with the Specific Contracts and/or Accounting Principles at Issue ........ 34

**TABLE OF CONTENTS**
**(continued)**

**Page**

    4.    Financial Incentives and Insider Sales Create A Strong Inference of Scienter ................................................................................................ 36

IV.    PLAINTIFFS' SECTION 20(A) AND 20A CLAIMS ARE ADEQUATELY PLED.................................................................................................................... 40

V.    CONCLUSION............................................................................................................ 41

## TABLE OF AUTHORITIES

Page(s)

CASES

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ...............................................................................................9

*Backe v. Novatel Wireless, Inc.*,
607 F. Supp. 2d 1145 (S.D. Cal. 2009) ....................................................................31

*Batwin v. Occam Networks, Inc.*,
No. CV-07-2750, 2008 WL 2676364 (C.D. Cal. July 1, 2008).........................23, 24

*Beaver County Ret. Bd. v. LCA-Vision Inc.*,
No. 1:07-CV-750, 2009 WL 806714 (S.D. Ohio March 25, 2009) .................27, 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................9

*Chalverus v. Pegasystems, Inc.*
59 F. Supp. 2d 226 (D. Mass. 1999) ........................................................................22

*Cheney v. Cyberguard Corp.*,
Civ. No. 98-6879, 2000 WL 1140306 (S.D. Fla. July 31, 2000).............................28

*Croker v. Carrier Access Corp.*,
No. 05-1011, 2006 WL 2038011 (D. Colo. July 18, 2006).....................................31

*Crowell v. Ionics, Inc.*
343 F. Supp. 2d 1 (D. Mass. 2004) ..........................................................................24

*Greebel v. FTP Software, Inc.*,
194 F.3d 185 (1st Cir. 1999)....................................................................................38

*Grillo v. Tempur-Pedic Int'l, Inc.*,
553 F. Supp. 2d 809 (E.D. Ky. 2008) ......................................................................40

*Holmes v. Baker*,
166 F. Supp. 2d 1362 (S.D. Fla. 2001) ....................................................................28

*Howard v. Everex Systems, Inc.*,
228 F.3d 1057 (9th Cir. 2000) .................................................................................29

*In re Allscripts, Inc. Sec. Litig.*,
   No. 00 C 6796, 2001 WL 743411 (N.D. Ill. June 29, 2001) ..................................................24

*In re The Baan Co. Sec. Litig.*
   103 F. Supp. 2d 1, 15 (D.D.C. 2000) ....................................................................14, 22, 24, 25

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004)...................................................................................27

*In re Cardinal Health Inc. Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) .................................................................................38

*In re Comshare Inc. Sec. Litig.*,
   183 F.3d 542 (6th Cir. 1999) ................................................................................................24

*In re Dell Inc. Sec. Litig.*,
   591 F. Supp. 2d 877 (W.D. Tex. 2008)..................................................................................24

*In re E.spire Communications, Inc. Sec. Litig.*,
   127 F. Supp. 2d 734 (D. Md. 2001) ...................................................................26, 27, 36, 37

*In re Focus Enhancements, Inc. Sec. Litig.*,
   309 F. Supp. 2d 134 (D. Mass. 2001) ...................................................................................37

*In re Galileo Corp. Shareholders Litig.*,
   127 F. Supp. 2d 251 (D. Mass. 2001) ...................................................................................27

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009)...................................................................................33

*In re Inspire Pharms., Inc. Sec. Litig.*,
   515 F. Supp. 2d 631 (M.D.N.C. 2007) .................................................................................36

*In re K-tel Int'l, Inc. Sec. Litig.*,
   300 F.3d 881 (8th Cir. 2002) ................................................................................................38

*In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008)
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...............................................................................28

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ........................................................................... passim

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008).................................................................................32

iv

*In re Paincare Holdings Sec. Litig.*,
No. 6:06-cv-362, 2007 WL 1229703 (M.D. Fla. April 25, 2007) ...........................................28

*In re PEC Solutions, Inc. Sec. Litig.*,
418 F.3d 379 (4th Cir. 2005) ...................................................................................10, 11, 39

*In re Proquest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007)..............................................................................37, 38

*In re Ravisent Techs., Inc. Sec. Litig.*,
No. Civ. A. 00-CV-1014, 2004 WL 1563024 (E.D. Pa. July 13, 2004).....................22, 23, 34

*In re Raytheon Sec. Litig.*,
157 F. Supp. 2d 131 (D. Mass. 2001) ....................................................................13, 23, 28

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
432 F. Supp. 2d 571 (E.D. Va. 2006) ....................................................................................10

*Latham v. Matthews*,
Nos 6:08-cv-2995-RHB, 6:08-cv-3183-RHB, 2009 WL 3052223 (D.S.C. Sept. 4,
2009) ...............................................................................................................................34, 36

*Lefkoe v. Jos. A. Bank Clothiers*,
No. WMN-06-1892, 2007 WL 6890353 (D. Md. Sept. 10, 2007) .........................................40

*Lefkoe v. Jos. A. Bank Clothiers*,
No. WMN-06-1892, 2009 WL 3003247 (D. Md. May 1, 2009) ............................................37

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
927 F. Supp. 1297 (C.D. Cal. 1996) ...............................................................................28, 32

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) ...................................................................................... passium

*Merzin v. Provident Financial Group, Inc.*,
311 F. Supp. 2d 674 (S.D. Ohio 2004) ...............................................................................26

*New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*,
No. 1:98-cv-99-M, 1999 WL 33295037 (W.D. Ky. Aug. 16, 1999).....................................37

*Ottmann v. Hanger Orthopedic Group, Inc.*,
335 F.3d 338 (4th Cir. 2003) ........................................................................................ passim

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ..............................................................................................22

*Public Employees' Ret. Ass'n v. Deloitte & Touche LLP*,
 551 F.3d 305 (4th Cir. 2009) ...............................................................................10

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
 320 F.3d 920 (9th Cir. 2003) ...............................................................37, 38, 39, 40

*SEC v. Caserta*,
 75 F. Supp. 2d 79, 94 (E.D.N.Y. 1999).................................................................22

*SEC v. Lucent Techs., Inc.*,
 363 F. Supp. 2d 708 (D.N.J. 2005) .......................................................................29

*Shuster v. Symmetricom, Inc.*,
 35 Fed. App'x 705 (9th Cir. 2002) .......................................................................40

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
 552 U.S. 148 (2008).............................................................................................10

*Teachers' Ret. Sys. v. Hunter*,
 477 F.3d 162 (4th Cir. 2007) ...............................................................................36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)...........................................................................................9, 10

**OTHER AUTHORITIES**

Fed R. Civ. P. 15(a)(2)...............................................................................................41

Lead Plaintiffs Anthony Vidmar, Robert Ulrich, Mauro DiBacco, Charles E. Vernell, Jr, and Nettie J. Vernell ("Plaintiffs") submit the following memorandum in opposition to the motion to dismiss their Amended Class Action Complaint ("Complaint"), filed by Defendants Integral Systems ("Integral" or the "Company"), Alan W. Baldwin ("Baldwin"), John B. Higginbotham ("Higginbotham"), William M. Bambarger ("Bambarger"), and Hemi G. Lee-Gallagher ("Lee-Gallagher," collectively "Defendants").

## I.    INTRODUCTION

This straight-forward case arises from Integral's restatement of three quarters of unaudited financial reports to remove $10 million of prematurely recorded revenue which significantly inflated the Company's reported net income during the Class Period.[1]  Defendants' motion to dismiss concedes that the operative complaint adequately pleads all but one element of a securities fraud claim.  With respect to that single element, scienter, Defendants rely upon a series of implausible arguments to try to persuade the Court that the four categories of accounting errors at issue – which were only fully explained to investors months after the fact, at the urging of the SEC – were all just innocent mistakes.  None of their arguments are persuasive.

First, Defendants seize upon out-of-context and obscure provisions to create a false appearance of accounting "complexity" with respect to simple Generally Accepted Accounting Principles ("GAAP") provisions which have long stood as Integral's own revenue recognition policies.[2]  Belatedly located for the sole purpose of this motion, these provisions were never disclosed to investors as part of Integral's Class Period accounting policies.  Additionally, the

---

[1]    The Class Period runs from February 4, 2008 and December 10, 2008, inclusive.

[2]    *See* Memorandum in Support of Defendants' Motion to Dismiss, filed Oct. 26, 2009, Dkt. No. 17 ("Def. Mem.") at 12-16 and 29-32.

claim that the accounting errors only came to light when top-tier auditor Ernst & Young agreed to come aboard, to bring "quality and accuracy" to Integral's financial reporting (Def. Mem. at 8), is belied by two facts: (1) Integral had previously engaged Ernst & Young as its outside auditor before dismissing the firm several years earlier – in favor of Grant Thornton, who later resigned and was replaced by Bernstein & Pinchuk;[3] and (2) Bernstein & Pinchuk's audited reports for 2006 and 2007 were not restated.

Next, Defendants seek to use Integral's self-inflicted internal control problems over basic revenue recognition (which admittedly led to the material weaknesses at the root of the restatement) as a shield. Specifically, Defendants argue that they and other members of Integral's accounting team were in a period of "transition" into their positions, thereby immunizing them from liability to investors for admittedly inflated revenue and income figures. (Def. Mem. at 23-25 and 34-35.) Quite the opposite is true. Not only did three of the four Individual Defendants join senior management *prior* to the Class Period,[4] but all became officers *after* the commencement of a three-year Securities and Exchange Commission ("SEC") investigation into former Chief Financial Officer ("CFO") Gary Prince's role at Integral. As described in a July 30, 2009 SEC Cease-and-Desist Order (entered in conjunction with Integral's offer of settlement), Integral had relied heavily upon former CFO Gary Prince for every aspect of its accounting and public reporting for many years. (Compl. ¶¶ 36-37.) Thus, when they

---

[3]     *See* Declaration of Andrew N. Friedman ("Friedman Decl."), served and filed herewith, at Ex. 1 (Form 8-K, filed January 6, 2004) (dismissing Ernst & Young) and Ex. 2 (Form 8-K, filed Jan. 23, 2006) (Grant Thornton resignation).

[4]     Only Higginbotham came to the Company during the Class Period. (*See* Amended Class Action Complaint, filed on September 21, 2009, Dkt. No. 14 (hereinafter cited as "Compl. ¶ __"), at ¶¶ 14-18.)

assumed their offices, the Individual Defendants were well aware of Integral's need to fill the vacuum which arose upon Prince's termination in early 2007 so as to ensure that Integral's publicly-reported financial figures were accurate.  Although Baldwin claimed that he fit that bill (*Id.* at ¶ 3), in 2008, Defendants consciously and recklessly chose to prematurely recognize revenue on both routine transactions and two of the Company's largest contracts – against Prince's express advice.  (*Id.* at ¶¶ 38, 185.)

Defendants also deride Plaintiffs for alleging scienter based solely upon the Individual Defendants' executive positions.    (Def. Mem. at 20-22.)[5]    Not so.    Plaintiffs allege that Defendants were well aware of Integral's undisclosed accounting weaknesses and/or the revenue recognition decisions made with respect to the items at issue.  In an interview, Baldwin boasted of his expertise with respect to the reporting required of public companies (Compl. ¶ 3) and, during two conference calls, he discussed critical accounting personnel hires he and Bambarger had made.  (*Id.* at ¶¶ 49, 76.)  Higginbotham, whose departure from Integral in August 2009 is claimed to be "for reasons unrelated to this lawsuit," (Def. Mem. at 4), had come to Integral with the goal of "turning around a company he said had suffered from accounting lapses."[6]

---

[5]    To criticize the allegations against each of them as "generic pabulum," Defendants cherry-pick general charging allegations, s*ee* Def. Mem. at 20-21 (citing Compl. ¶¶ 20, 182-83, 190, 199, 204), but ignore the allegations referenced in text and, *inter alia*, Compl. ¶¶ 184-86, 189, 191-96, 200-01, 210.

[6]    The claim that Higginbotham left for unrelated reasons – as opposed to leaving after specifically addressing the accounting issues noted herein – is belied by an August 10, 2009, Space News article, quoted in the text, which added: "One of Higginbotham's tasks in taking the Integral job was to clean up accounting practices that were recently the subject of a settlement with the [SEC]."    Peter B. de Selding, *Satellite Company's Chief Resigns Amid Lower Expectations*, Space News, August 10, 2009, http://www.space.com/news/090810-busmon-integral-higginbotham.html (Friedman Decl. Ex. 3).  In fact, Integral's announcement of

Bambarger specifically described the accounting rationale used by the Company with respect to the items at issue, both during the Class Period and in post-Class Period correspondence with the SEC.  (*See, e.g.,* Compl. ¶¶ 27, 29, 30, 48, 61(c), 74-75, 91.)

Regarding motive, the Individual Defendants contend that scienter is negated because they would have suffered financially had they exercised overpriced options.  Although they grumble about being "harmed" by such option grants, none bought shares during the Class Period.  (Def. Mem. at 27-28.)  To the contrary, Baldwin, who remained at Integral after stepping down as Chief Executive Officer ("CEO"), sold *all* of his stock in August 2008 – at a price near the Class Period high.  (Compl. ¶ 196.)

For three quarters, in unaudited financial statements, Defendants recklessly recognized revenue in violation of GAAP, Integral's accounting policies, and against the advice of Integral's long-time accounting maven.  When the need to restate was made public, Integral's price plummeted.  (*Id.* at ¶ 4.)  Injured investors are entitled to redress.

## II.    FACTUAL ALLEGATIONS

Integral builds satellite ground systems and equipment for command and control, integration and test, data processing, and simulation.  The Company has a domestic and international customer base that includes government and commercial satellite operators, spacecraft and payload manufacturers, and aerospace systems integrators.  (*Id.* at ¶ 2.)  During the Class Period, from February 4th until December 11th, 2008, Integral prematurely and improperly accounted for revenue from warranties, equipment, and product sales with respect to a number of contracts, chief among them the Next Generation Global Positioning System

Higginbotham's departure prominently highlighted his achievement of "significant gains in compliance and governance."

("GPS OCX") contract and the Rapid Attack Identification Detection Reporting System ("RAIDRS") contract with the Federal Government, which, along with one additional contract, were responsible for 50-60% of the Company's government contract revenues, and 25-30% of the Company's total revenues. (*Id.* at ¶ 21.)

Plaintiffs' Complaint alleges in detail how Defendants artificially inflated Integral's stock price by prematurely recording revenues in violation of Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. The Complaint names as defendants both Integral and four individuals who were intimately involved with the contracts and/or accounting practices at the core of the restatement, to wit, (i) Baldwin, who served as President, CEO and a director of Integral until July 9, 2008, at which time he resigned as CEO but continued serving as President until December 10, 2008, then stepped down as President and continued serving as a director; (ii) Higginbotham, who became CEO and a director of Integral on July 9, 2008, and became President on December 10, 2008; (iii) Bambarger, who served, at all relevant times, as Integral's CFO and Treasurer; and (iv) Hemi G. Lee-Gallagher, who served, at all relevant times, as Integral's Corporate Controller (collectively, the "Individual Defendants"). (*Id.* at ¶¶ 14-18.)

The misleading financial statements began with the Company's earnings report for the first quarter of fiscal year 2008 ("Q1'08"), issued on February 4, 2008. (*Id.* at ¶ 43.) Announcing record financial results and raising earnings projections, Integral also indicated that it had accelerated license revenue from the GPS OCX contract, a subcontract for Northrop Grumman (*id.* at ¶ 24), into Q1'08, instead of recognizing it throughout the fiscal year. (*Id.* at ¶¶ 43-45.) In a conference call later that day, Defendant Bambarger discussed the GPS OCX

contract, reiterating "we negotiated favorable contract terms that included upfront delivery of the licenses under the contract, allowing us to recognize license revenue and profit in the first quarter, rather than during the entire fiscal year, as we had originally planned."  (*Id.* at ¶ 48.) During that call, Defendant Baldwin boasted that Integral had made a number of key hires in the accounting department, including a senior corporate controller, a senior contract administrator, and a senior treasury analyst.  (*Id.* at ¶ 49.)  On February 7, 2008, Integral filed its Q1'08 results with the SEC on Form 10-Q, affirming its announced results, explaining Integral's critical accounting policies, and certifying the accuracy of the financial information.  (*Id.* at ¶¶ 50-60.)

On April 28, 2008, Integral issued a press release announcing its financial results for Q2'08, highlighting that "[t]he results for the first six months of 2008 include a large amount of license revenue generated from the GPS OCX contract."  (*Id.* at ¶ 71.)  Later that day, in a conference call, Defendant Bambarger again explained Integral's Q1'08 accounting reversal, which allowed for a "very high profit" on the GPS OCX contract.  (*Id.* at ¶ 75) (GPS OCX license revenue was "originally anticipated to be spread throughout the remainder of this year and even a little into the next fiscal year").  In response to a question about any similar "one time" financial events in Q2'08, Bambarger noted one "major significant event that would be out of the ordinary;" with respect to the RAIDRS contract, "we did accelerate some contract cost at the request of the customer and that has an effect on revenue and project cost almost equal."  (*Id.* at ¶ 74.)  During the call, Baldwin again boasted that he and Bambarger had been "beefing up" the accounting staff by "a lot of very talented people."  (*Id.* at ¶ 76.)  The Form 10-Q for Q2'08, filed May 7, 2008, attributed revenue and gross profit increases in Integral's Ground Systems Segment "primarily" to the GPS OCX Q1'08 license revenue.  (*Id.* at ¶¶ 79-80.)  The Form 10-Q

also set forth the same accounting policies and the same internal controls reassurances that were contained in the Q1'08 Form 10-Q.  (*Id.* at ¶¶ 81-85, 87.)

On July 24, 2008, Integral announced its financial results for Q3'08 in a press release and conference call, in which Defendant Bambarger stated:  "Revenue was higher by 14% over the prior year for our Government business, due to GPS and RAIDRS projects and higher license and maintenance revenue than we had over the prior year." (*Id.* at ¶ 99.)  On August 7, 2008, Integral filed its quarterly report for Q3'08 on Form 10-Q and continued to highlight the GPS OCX contract, stating, "The increase in gross profit was primarily attributable to the GPS OCX (Next Generation Control Segment) contract which included $2.4 million of license revenue." (*Id.* at ¶ 101.)  The Form 10-Q set forth the same accounting policies and the same internal controls reassurances that were contained in the earlier-filed Form 10-Qs.  (*Id.* at ¶¶ 102-106, 108.)

On December 11, 2008, Integral shocked investors when it revealed that its unaudited financial statements for the interim periods ended December 31, 2007, March 31, 2008, and June 30, 2008, should no longer be relied upon due to an error in the accounting treatment for certain transactions with respect to the timing of revenue recognition.  (*Id.* at ¶ 125.)  As a result, Integral would have to restate its previously-filed financial results for those three periods (hereinafter, the "Restatement" and the "Restatement Period").  Integral estimated the approximate net impact of the adjustments would result in a decrease of $10 million in revenues, a decrease of $3 million in gross profit, a decrease of $4 million in operating income, and a decrease of $0.13 in earnings per share.  (*Id.* at ¶ 125.)  On this news, shares of Integral declined

$6.38 per share, or 28.61%, to close at $15.92, on unusually heavy trading volume.  (*Id.* at ¶ 126.)

Following this announcement, Defendants gradually released the details surrounding the Restatement, to obscure the fact that they had violated basic revenue recognition principles.  (*Id.* at ¶ 5.)  First, during the December 11, 2008 conference call, only three types of accounting errors were briefly identified.  (*Id.* at ¶¶ 128-130.)  Later, in its December 24, 2008, Form 10-K for fiscal 2008, the Company vaguely described four types of accounting errors, gave line item changes for each restated quarter, and admitted to material weaknesses in internal controls over accounting procedures, including revenue recognition.  (*Id.* at ¶¶ 132, 134.)  The Restatement also admitted that Integral's internal controls – created to ensure timely recognition of revenue – were ineffective, and that deficiencies in the internal controls caused the material misstatements of previously recognized revenue, gross profit, and net income.  (*Id.* at ¶ 134.)

On February 12, 2009, in response to a number of questions posed by the SEC, the Company explained, *inter alia*, the four restated items, identifying the accounting error, the correct GAAP principle and/or company policy that should have been followed, and the total dollar amount of each type of error.  (*Id.* at ¶¶ 5(c), 63-65, 88(d).)  The Company also provided dates on which the actual and expected revenue was or would ultimately be recognized.  (*Id.* at ¶ 136.)

On March 20, 2009, the Company responded to an additional SEC inquiry, as to why the explanations in the February 12, 2009 letter had not been disclosed to investors.  (*Id.* at ¶ 137.)  In its response letter, the Company stated that it believed that the Restatement, as set forth in the

Form 10-K, complied with GAAP and the securities laws, but agreed nonetheless to supplement its disclosures in its next periodic filing.  (*Id*. at ¶ 137.)

On May 6, 2009, providing additional details not previously given to the SEC, Integral's Form 10-Q for Q2'09 explained the accounting bases for the Restatement, and specified both the restated items and the quarters in which each error occurred.  (*Id.* at ¶¶ 5(e), 64, 92, 138.)

Finally, on August 5, 2009, the Company reported that by the end of Q3'09, it had recognized $10 million of the $10.5 million removed from the books for the first three quarters of fiscal 2008, and would finally recognize the remainder in Q4'09 and Q1'10.  (*Id.* at 5(f).)

## III.    ARGUMENT

### A.    Defendants Bear a Heavy Burden to Obtain Dismissal of the Complaint

The Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007), reaffirms that, even for motions to dismiss securities fraud actions, courts must accept the factual allegations in a plaintiff's complaint as true and draw all reasonable inferences from them.  *See id.* at 322; *see also Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 176 (4th Cir. 2009).  Moreover, in ruling on a motion to dismiss, a court should not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). *Twombly*'s requirement of "facial plausibility" is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Significantly, a motion to dismiss merely tests "the sufficiency of the complaint and, most importantly, does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses."  *Iron Workers*

*Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 577 (E.D. Va. 2006) (internal quotations omitted).

To state a claim for securities fraud, a plaintiff must allege:   "'(1) a material misrepresentation or omission by the defendant; (2) *scienter;* (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"   *BearingPoint*, 576 F.3d at 181 (emphasis in original) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148 (2008)).   In their motion, Defendants tacitly acknowledge that the Complaint meets all but one element of the securities fraud claims – scienter.   As described below, the Complaint more than adequately meets the requirements for pleading scienter.

**B.        Taken as a Whole, the Complaint Presents a Strong Inference of Scienter**

Under the PSLRA, plaintiffs must allege facts that give rise to a "strong inference" of scienter.   *Tellabs,* 551 U.S. at 314; *BearingPoint*, 576 F.3d at 181.   When analyzing scienter, courts should ask, "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs,* 551 U.S. at 314.   In the Fourth Circuit, scienter may be alleged by pleading either intentional misconduct or recklessness, which is conduct "[s]o highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."   *BearingPoint*, 576 F.3d at 181 (internal quotations omitted); *Public Employees' Ret. Ass'n v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009); *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 387 (4th Cir. 2005).   When evaluating

scienter allegations, courts in this circuit use a "flexible, case-by-case analysis." *PEC Solutions*, 418 F.3d at 389 (citing *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 344-45 (4th Cir. 2003)).

> **1.      Defendants' Violations of Basic GAAP Rules and Integral's Own Accounting Policies, Which Necessitated a Restatement, Give Rise to a Strong Inference of Scienter**

Defendants seek to paint a picture of a company "in transition" that made four accidental accounting errors – two on very significant projects – while dealing with complicated GAAP provisions.  Further, they claim that only after Integral finally secured the services of a top-flight auditor, Ernst & Young, was it able to reach the correct accounting determination for each of these transactions.  The very straight-forward facts alleged and applicable GAAP principles do not support Defendants' version of events.

> **a.      Application of Integral's Long-Standing Revenue Recognition Policies and Basic GAAP Precluded Recognition of the Revenue at Issue**

Four years prior to the Class Period, Ernst & Young served as Integral's outside auditor. Following the filing of the Form 10-K for fiscal 2003, Integral dismissed Ernst & Young.  (*See* Friedman Decl. Ex. 1.)  For the next two years, Grant Thornton served as Integral's outside auditor before resigning on January 17, 2006.  (*See id.* and Ex. 2.)  Thereafter, until its dismissal in September 2008, Integral employed the services of Bernstein & Pinchuk.  (Compl. ¶ 115.) Through this succession of auditors, Integral's relevant revenue recognition policies *remained constant*:

**With respect to contract revenue, Integral stated, in 2003**:

Revenue under cost-plus-fixed-fee contracts is recorded on the basis of direct costs plus indirect costs incurred and an allocable portion of the fixed fee.  Revenue from fixed-

price contracts is recognized on the percentage-of-completion method, measured by the cost-to-cost method for each contract.  (Friedman Decl. Ex. 4, Form 10-K, filed Dec. 12, 2003, at F-9).

**… and in 2007**:

Revenue under a fixed-price contract is recognized using a percentage of completion method based on costs incurred in relation to total estimated costs.  Under a cost-plus contract, we are reimbursed for allowable costs within the contractual terms and conditions and are paid a negotiated fee.  The fee may be fixed or based on performance incentives.  Revenue recognition under a cost-plus contract is based upon actual costs incurred and a pro rata amount of the negotiated fee.  (Def. Ex. A, 2007 Form 10-K, at 25).

**With respect to software sales and services, Integral stated, in 2003:**

Most of the Company's contracts include the license of proprietary software products. Sales of the Company's software products take many forms.  The Company sells (i) software only (a "Software-Only Sale"), (ii) software and services together, or (iii) software, services and hardware together.  In addition, depending on a customer's requirements, the Company may or may not provide post-contract customer support ("PCS").

The Company's recognition of revenue for sales of Company software products depends on customer requirements and the nature of the contracts involved. In accordance with SOP 97-2, *Software Revenue Recognition*, for a Software-Only Sale, the Company recognizes revenue when all of the following criteria are met: persuasive evidence of an arrangements exists, delivery has occurred, the vendor's fee is fixed or determinable and collectibility is probable.  In situations where software is sold together with services and/or hardware, the Company recognizes software license revenue on a percentage of completion basis.

With respect to PCS, the Company recognizes PCS revenue on a percentage of completion basis when PCS is part of a broader fixed price contract that includes software and services.  Alternatively, when PCS services (i.e. software maintenance and support) are awarded to the Company under a separate maintenance contract, the Company recognizes PCS revenue on a straight-line basis pro rata over the term of the maintenance contract.  (Friedman Decl. Ex. 4, at F-9).

**… and in 2007:**

Many of our contracts include the sale of company-owned proprietary software products. Sales of our software products may take many forms.  We sell (1) software only (a "Software-Only Sale"), (2) software and services together, or (3) software, services, and

hardware together. In addition, depending on a customer's requirements, we may or may not provide post-contract customer support ("PCS").

Our recognition of revenue from sales of software products depends on specific customer requirements and the nature of the contracts involved.  In accordance with SOP 97-2, "*Software Revenue Recognition,*" for a Software-Only Sale, we recognize revenue when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery has occurred, the vendor's fee is fixed or determinable, and collectibility is reasonably assured.  In situations where software is sold together with services and/or hardware, we recognize software license revenue on a percentage of completion basis.

We recognize PCS revenue on a percentage of completion basis when PCS is part of a broader fixed-price contract that includes software and services. Alternatively, when PCS services (i.e., software maintenance and support) are awarded to us under a separate maintenance contract, we recognize PCS revenue on a straight-line basis pro rata over the term of the maintenance contract.  (Def. Ex. A, at 26).

The purpose of GAAP, as adopted in Integral's policies set forth above, is "to provide a reliable degree of predictability." *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 148 (D. Mass. 2001).  Sometimes, the application of simple accounting principles may involve certain factual details; this does not make the proper GAAP determination too complex to preclude a finding of scienter. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 & nn.35-36 (E.D. Va. 2000) (scienter alleged with respect to premature revenue recognition in violation of SOP 97-2).

Defendants concede that an "obvious" revenue recognition error gives rise to an inference of scienter.  (Def. Mem. at 29 (citing cases).)  Contrary to Defendants' efforts to complicate matters, the straight-forward application of Integral's policies and GAAP to the simple facts involved would not allow Defendants to prematurely recognize any of the revenue at issue. Defendants' after-the-fact attempts to create the illusion of complexity are transparent; they cannot mask the fact that each of these errors is obvious.

### i.      GPS OCX Software Contract

As a preliminary matter, software sales range from those that provide a license for a single software product to those that, in addition to the delivery of software or a software system, require significant production, modification, or customization of software.  Defendants contend that because the software licenses under the GPS OCX contract were delivered and paid for,[7] Integral could recognize all $2.4 million of the license revenue when it was received, in Q1'08.  The basis for this claim is Integral's purported application of the American Institute of Certified Public Accountants Statement of Position ("SOP") 81-1, ¶ 39 – a provision that permits (otherwise) early revenue recognition where a contract can be "segmented."  (Def. Mem. at 12, 30; Def. Ex. Q.)  Defendants are wrong for several reasons.

First, the GPS OCX contract did not meet the criteria for segmenting.  SOP 81-1, ¶ 39 only allows the segmentation of contract elements "each of which the contractor negotiated separately . . . and agreed to perform without regard to the performance of the others."  SOP 81-1, ¶ 40, further requires, *inter alia*, as proof that segmentation is legitimate, that separate bids were made on each element and that the customer had the right to accept or reject each element.  (Def. Ex. Q.)  On its face, the GPS OCX contract was not severable; it was submitted as part of Northrop Grumman's bid to the Air Force.  (Compl. ¶ 24.)  Further, the press release announcing the contract award specifically noted the period of performance was through March 2009, and Baldwin described the contract elements to include "systems-requirement analysis," "preliminary systems design," and development of the "initial OCX system to work with existing GPM 2R-M

---

[7]      Although Defendants stress the receipt of payment for the licenses (Def. Mem. at 12), they also acknowledge (*id.* at 13, 30), that revenue is not automatically recognizable upon payment.  *In re The Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 15 (D.D.C. 2000) (applying SOP 97-2).

satellites." (Compl. ¶ 61(c)(i)&(ii).)  The 18-month subcontract clearly did not provide for bids for software licenses, alone, which the Air Force could accept or reject; nor could Defendants point to any evidence in Integral's public disclosures to support such an assertion.

Second, Defendants' sudden reliance on SOP 81-1's segmenting rules is disingenuous: Integral's stated contract revenue policies contain no reference to "segmenting" of long-term contracts or any explanation of SOP 81-1, ¶ 40's prerequisites for segmentation.

Third, no matter what type of contract GPS OCX is,[8] all of Integral's stated policies concerning contract revenue did not permit the Company to recognize prepaid amounts as earned revenue simply because software licenses were delivered "up front."  In particular, the "contract revenue" policy states that revenue on fixed-fee contracts is recognized on a percentage-of-completion basis, predicated upon the ratio of costs incurred to total costs.  Similarly, revenues on cost-plus-fee contracts are recognized as allowable costs are incurred, with the fee recognized on a *pro rata* basis.  None of Defendants' press releases or public filings concerning the GPS OCX contract made any reference to the $2.4 million as having been recognized as either a percentage of overall costs (fixed-fee) or a cost incurred under the contract (cost-plus-fee) – either at the time of the original decision to recognize the revenue, nor in the subsequent iterations of the reasons Integral restated.  Thus, if Defendants had, in fact, secretly applied SOP 81-1, ¶ 39 to calculate Q1'08 revenue, at some point – in the many explanations of the transaction given between December 2008 and May 2009 – there necessarily would have been a

---

[8]     At different times, Defendants inexplicably described GPS OCX as a fixed-fee contract (where the amount of payment does not depend on the amount of resources or time expended), a cost-plus contract (intended to reimburse all costs and some amount of profit), and a combined sale of software and services.  (Compl. ¶ 61(c)(iv).)

connection made between the revenues recognized and the costs associated with the purported software license "segment" of the contract.  No such explanation was ever given.

Fourth, even if the 18-month subcontract is characterized as a "software and services" sale, immediate recognition of the license revenue violated Integral's own accounting policy. Under the contract, Integral was required to perform a systems-requirement analysis and to develop both a preliminary systems design and an OCX system to work with existing satellites. Clearly, this was not a "software only" sale.  As set forth above, Integral's policy was straight-forward:  "In situations where software is sold together with services and/or hardware, we recognize software license revenue on a percentage of completion basis."  (Def. Ex. B, Form 10-Q, filed Feb. 7, 2008).  Consequently, Bambarger explained to the SEC on February 12, 2009: "The Company improperly recognized upfront license fee revenue of $2.4 million.  Through its Restatement, the Company applied percentage-of-completion accounting under SOP 81-1 for the entire contract, which resulted in the deferral of $1.3 million of revenue initially recognized." (Compl. ¶ 63.)[9]

---

[9]    Defendants' dissection of SOP 97-2's provisions is a red herring.  (*See* Def. Mem. at 13.) While revenue may be recognized under certain circumstances – persuasive evidence of an arrangement exists, delivery has occurred, the vendor's fee is fixed or determinable, and collectibility is reasonably assured (SOP 97-2, ¶ 8) – when significant production, modification and customization of computer software is not required, no judgment call on that issue was needed here.  Integral's revenue recognition policy drew a clear line, which applied SOP 97-2, ¶ 8, exclusively to "software only" sales.  Whenever services and/or hardware were also included as additional elements to be delivered under a contract, Integral *predetermined* that production, modification and/or customization of the software element was sufficient to trigger percentage-of-completion accounting.  (*Cf.* Compl. ¶ 145 (SOP 97-2, ¶ 13, provides that "delivery" of one element, for the purposes of ¶ 8, does not occur if undelivered elements are essential to its functionality).)

Fifth, and finally, the correct approach to revenue recognition was so obvious that Integral stated, in its Q1'08 earnings release, that it had "previously anticipated" recognizing the GPS OCX license revenue throughout the entire year.  (*Id.* at ¶ 45; *see also id.* at ¶ 48 (revenue was recognized earlier than "originally planned").)[10]  Under GAAP, a public company may not "manage" earnings – it must recognize revenues in the quarter in which they are earned.  Thus, when a company prepares its revenue forecasts, it does so mindful of GAAP and its own policies.  Defendants were well aware of the correct accounting for the GPS OCX contract.

### ii.    RAIDRS

Integral improperly recognized as revenue in Q2'08 a reimbursement payment of $5.1 million for a deposit Integral paid to purchase antennas to be delivered and installed in 2009. Defendants employed percentage-of-completion (ratio of costs incurred to total costs) accounting rules to this contract.  In this method of accounting, revenue is recognized as work on a contract progresses – allowing for ratable recognition of corresponding revenue and profits during the course of the project, rather than waiting until project completion – based upon the costs incurred in providing the services required under the contract.  Generally, revenue is recognized in the same proportion as costs incurred to date compared to expected costs to complete the contract. However, specific rules also apply to ensure the percentage of costs incurred and revenues accordingly recognized do not misrepresent the actual progress of project completion.

One such rule, SOP 81-1, ¶ 50, expressly applies to the monies received on the RAIDRS contract:  The cost of "expensive components to be installed into the deliverable items . . . should not be included in the [percentage-of-completion] measurement before the components are

---

[10]     Bambarger later indicated the revenue was planned to be recorded over the life of the 18-month contract.  (Compl. ¶ 75.)

installed if inclusion would tend to overstate the percentage of completion otherwise determinable."[11]  Whereas the RAIDRS contract was valued at $21 million and the equipment on which the $5.1 million deposit was paid was not due to be installed for another year, Defendants initially recognized revenue prematurely upon receipt of the deposit.[12]  Specifically, under SOP 81-1, ¶ 50, revenue recognition was improper because it would appear as if nearly 25% of the project was completed at that point – when it was not.  On restatement, citing SOP 81-1, ¶ 50, Bambarger thus explained to the SEC (Compl. ¶ 91):

> The Company made large dollar advance purchases of equipment . . . [and] incorrectly included [them] in its progress towards completion calculations . . . and overstated the percentage of completion . . . In accordance with paragraph 50 of SOP 81-1, the Company removed the advance purchases . . . result[ing] in a net deferral of $7.0 million in contract revenue. [13]

To avoid the inference arising from their "obvious" violation of the simple, straight-forward rule set forth in SOP 81-1, ¶ 50 – the uninstalled antennas should have been excluded from the percentage-of-completion measurement – Defendants located an obscure provision,

---

[11]     The entire provision, quoted in ¶ 30 of the Complaint, uses the words "in some circumstances."  While Defendants leap on these words as a basis to recognize the revenue, (Def. Mem. at 14), the "circumstances" in which the costs should *not* be included are those where doing so would "overstate" the percentage-of-completion ratio.  On restatement, Defendants admitted that their improper inclusion of the antennas deposit did precisely that.  (Compl. ¶ 91.)

[12]     The total amount ultimately deferred due to this accounting error was $6.3 million. (Compl. ¶ 29.)  This amount either represented a second deposit reimbursement in Q3'08 or that portion of the negotiated fee which was also prematurely recognized on this cost-plus contract.

[13]     Revenues prematurely recognized on advance equipment purchases on a commercial project were also reversed in the Restatement – for the same reasons given with respect to the RAIDRS project, to wit, failure to apply SOP 81-1, ¶ 50.  With respect to that contract, Defendants also admitted that the earning process was contractually tied to performance milestones and revenue should not have been recognized until the equipment was used in the project.  (Compl. ¶ 88(e).)  The total amount of revenues deferred on both projects was $7 million.

which they refer to as Contract Accounting Co5, to try to argue that their initial revenue recognition determination was viable.  Due to the lack of risk of non-payment on government contracts, Co5 provides that on a cost-plus contract, "[o]rdinarily, it is acceptable to accrue the fees as they come billable."  (Def. Mem. at 14.)  Thus, Defendants desperately suggest that Co5 provides authority for the immediate recognition of the antenna downpayment reimbursement.  (*Id.*)  However, Co5 deals with revenue recognition of the fee portion of a cost-plus-fee contract.  Here, the $5.1 million at issue was not a *fee* but an equipment *cost*.  (*See* Compl. ¶ 74 (Bambarger:  "we did accelerate some contractor cost at the request of the customer and that has an effect on revenue and project cost almost equal").)  Co5 does not provide cover for Defendants' obvious GAAP violation.[14]

Next, in keeping with their theme that scienter is absent because applicable GAAP was "difficult to interpret" (Def. Mem. at 2), Defendants ask the Court to believe that it was not until Ernst & Young brought "its greater resources, knowledge and own views" (*id.* at 8) to the year-end audit, that Integral was able to figure out that the equipment at issue – for which only a deposit was paid *and would not be delivered until 2009* – had not yet been installed in early 2008.  (*Id.* at 14.)  The Court need not indulge such implausible suggestions.

### iii.    Post-Contract Services (Warranty) Revenue

During each quarter of the Restatement Period, on fixed-price contracts where Integral provided both software and services, the Company failed to properly recognize revenue for post-contract services ("PCS") across the warranty period.  Instead, Integral prematurely recognized

---

[14]    Indeed, with respect to recognition of the fee component, Co5, ¶ 104, urges government contractors to use principles of "conservatism" – and to apply the "usual rule [of accrual] of deliveries or percentage of completion" – to "safeguard against too early proportionate payment."  (Def. Ex. S.)

total revenue under the contract, including $1.9 million in warranty revenue, upon contract completion, rather than waiting until such revenues were sufficiently earned across the post-contract warranty period.   However, applicable GAAP, in particular FASCON 5, ¶ 83, and various provisions cited in SEC Staff Accounting Bulletin No. ("SAB") 101, generally prohibit the recognition of revenues not yet earned because one has not yet performed the services for which the monies are paid.   (*See* Compl.   ¶¶ 142-43 (quoting provisions in full).)   A specific provision, EITF 00-21, requires the severance of post-contract services that have independent objective value to the customer from the remainder of the contract, with revenues on the former to be recognized over the warranty period and the latter on a percentage-of-completion basis.

Powerful evidence that Integral knew the proper GAAP to apply is set forth right in its critical accounting policies, quoted above.   Because Integral also sold maintenance services separately, its stated policy for such services was, in accordance with GAAP, to recognize revenue on a straight-line, basis pro rata over the contract period, *i.e.*, ratably recognized in equal amounts as the services are provided and the revenue is earned.   Integral knew it could not recognize separately-sold service revenue upon contract execution, for example, because it was not yet earned until such time as the service period expired.   Yet Integral made the obvious error of prematurely recognizing this type of revenue because it also provided other services and software under the same contract.[15]

---

[15]      Yet again, Defendants ask the Court to believe the Restatement was occasioned by a judgment call under SOP 97-2 as to whether the software component was "incidental" to the sale.   (Def. Mem. at 15.)   Not so.   The explanation of the error ultimately provided to the SEC stated that Integral "improperly accounted for the PCS-related services element within its percentage of completion calculation" – even though it had "vendor specific objective of the fair value of the PCS-related services" (because they were also sold separately) – rather than properly

### iv.    "Software Only" Sales Revenue

Certain off-the-shelf software was sold by two Integral subsidiaries without significant production, modification or customization.   Thus, pursuant to Integral's stated policy for software only sales, each of the four elements of SOP 97-2, ¶ 8's four-part test needed to be met before revenue could be recognized, to wit:   persuasive evidence of an arrangement exists, delivery has occurred, the vendor's fee is fixed or determinable, and collectibility is reasonably assured.   Inexplicably, Defendants applied percentage-of-completion accounting to certain software only sales rather than waiting until either customer acceptance (pursuant to contract) or delivery of the software.   Almost $300,000 was prematurely recognized due to this blatant violation of both GAAP and Integral's stated policy.   (Compl. ¶¶ 34-35.)

Yet again Defendants claim that the "intricacies of SOP 97-2" were called into play to make a judgment as to whether "significant customization" was required.   (Def. Mem. at 16.) This is a ruse.   Typically, when this question is being asked on restatement, it is because revenue recognition needs to be deferred until the period(s) during which the customization is provided or accelerated because no such customization was necessary.   Here, the Restatement determined that revenue needed to be *deferred* even though there was *no* significant customization required. Thus, it is clear that "customization" is being used as a pretext:   Integral made "software only" sales and, as Defendants admit (Def. Mem. at 16), failed to wait until delivery to recognize the revenue.   This is an obvious violation of GAAP and the Company's stated policy.[16]

---

"deferring and recognizing revenue for the PCS-related services over the service period." (Compl. ¶¶ 33, 138).

[16]    Defendants claim that Integral's policy was incorrect and that the error was not obvious because Bernstein & Pinchuk failed to notice it and instead gave Integral a "clean" audit opinion. (Def. Mem. at 31.)   This is not the case.   Integral's policy expressly adopts SOP 97-2, ¶ 8's four-

**b.      In Addition to the Obvious Nature of the Revenue Recognition Errors, Other Indicia of Scienter Are Present**

While violations of GAAP may be indicative of a violation of Section 10(b), they are not determinative. *Baan*, 103 F. Supp. 2d at 14.   Other facts and circumstances which surround GAAP errors contribute to a finding of scienter.   Courts have found the following circumstances, present here, to support a finding of scienter.

**i.      Violation of a Company's Own Revenue Recognition Policy**

Because a corporation and its executive officers are presumed to have knowledge of the corporation's own policies, their transgression "evidences knowing or reckless behavior." *Chalverus v. Pegasystems, Inc.* 59 F. Supp. 2d 226, 234 (D. Mass. 1999).   Thus, violations of a company's own revenue recognition policies support an inference of scienter. *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996); *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-CV-1014, 2004 WL 1563024, at *9 (E.D. Pa. July 13, 2004); *MicroStrategy,* 115 F. Supp. 2d at 638; *Chalverus*, 59 F. Supp. 2d 226, 234.   Here, as set forth above, with respect to the GPS OCX and RAIDRS contracts and off-the-shelf software only sales, Defendants violated Integral's own revenue recognition policies.

**ii.      Violations of GAAP/Company Policy as to a Small Number of Large Sales**

Where the number of sales at issue is small in number yet represents a large portion of earnings, defendants are presumed to have greater awareness of them.   Consequently, violations

---

part test.   By recognizing revenue before delivery, Integral failed to comply with its stated policy.   For this reason, a claim of good faith reliance on accountants, *e.g.*, under *SEC v. Caserta*, 75 F. Supp. 2d 79, 94 (E.D.N.Y. 1999), is not available here. *In re Winstar Commc'ns.*, Nos. 01-CV-3014, 01-CV-11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) (so holding).

of company accounting policies and/or GAAP as to such highly significant transactions are indicative of scienter. *Ravisent*, 2004 WL 1563024 at *9 (premature recognition of even one contract would grossly overstate results of operations due to company's limited number of customers); *Raytheon*, 157 F. Supp. 2d at 148 (majority of irregularities related to defendant's seven largest contracts); *MicroStrategy*, 115 F. Supp. 2d at 638-39 (premature revenue recognition on three contracts, representing 50% of third quarter revenue and 25% of fourth quarter revenue). In fact, the *MicroStrategy* court remarked that "problems with a transaction with a major impact on revenues . . . support a strong evidence of scienter," and that it "strain[s] credulity" to conclude otherwise. *Id.* at 639, 657.

Here, Defendants repeatedly credited the GPS OCX and RAIDRS contracts – in particular, the GPS OCX license revenues – for Integral's increased gross profits and revenues in the Restatement Period. (*See* Compl. ¶¶ 45, 46, 50, 71, 73, 79, 80, 99, 101.) An inference of scienter is thus raised by the fact that in Q1'08 and Q2'08, these key contracts were the primary cause of revenue overstatements of 10% and 19%, respectively, and net income overstatements of 39% and 30%, respectively. (Compl. ¶¶ 61(a), 88(a).)

Defendants instead focus upon the purported minor impact on the results for all of fiscal 2008 – a $10 million revenue reduction (6%) and a $3 million (5%) reduction in gross profits. (Def. Mem. at 25 n.4.) However, assessing the overall impact for fiscal 2008 intentionally masks the more striking effect on individual restated quarters – something which Defendants may not do. *Batwin v. Occam Networks, Inc.*, No. CV-07-2750, 2008 WL 2676364, at *13 (C.D. Cal. July 1, 2008) (4% overall revenue reduction ignores that individual quarters were off by 30% and 40%). Additionally, the Fourth Circuit warned that "courts should be wary when defendants

focus on the size of revenues in an effort to minimize the materiality of misstatements of income." *BearingPoint*, 576 F.3d at 184-85 (citing *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 18 (D. Mass. 2004) (the "focus on revenue" is "an old chestnut that securities fraud defendants frequently try on judges and juries")).[17]

Defendants also argue that the revenue was eventually recognized, primarily in 2009. (Def. Mem. at 16.)  This argument was rejected in *Occam*, 2008 WL 2676364, at *13.  With good reason:  investors are owed the truth every day and are guaranteed quarterly financial reporting which includes management's certification as to its accuracy.  Integral's investors were not required to hold their shares until all of the misreported revenues were eventually earned such that Defendants could finally proclaim "no harm, no foul."

### iii.    Defendants Made a Conscious Choice to Prematurely Recognize Revenue

Certain GAAP violations are more indicative of scienter than others:  While "the failure to detect an inaccuracy" "could easily be inadvertent," "violations involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a stronger inference of scienter." *Baan*, 103 F. Supp. 2d at 21.[18]

---

[17]     In fact, the two cases cited by Defendants had minimal bottom line impacts.  *See In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 894-95 (W.D. Tex. 2008) (net income was reduced less than 1%); *In re Allscripts, Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411, at *10 (N.D. Ill. June 29, 2001) (loss increased only 2%).

[18]     Several cases cited by Defendants are distinguishable on this very basis.  *See Hanger Orthopedic*, 353 F.3d at 350-51 (failure to discover verbal revenue recognition policies of acquired company until six months after merger); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 546 (6th Cir. 1999) (side letters issued by foreign subsidiary affected revenue recognition).

Here, as explained above, Defendants (save for Higginbotham), had prepared forecasts containing an expectation to recognize revenue on the GPS OCX contract over the course of the contract. As both Integral's press release and Bambarger (during a conference call with investors) explained, the decision to immediately record the revenue came as a result of the negotiation of "favorable contract terms" which resulted in upfront delivery of the software licenses. Clearly, Defendants sought a way to accelerate GPS OCX revenue recognition. They were aware of their actions – and how those actions would affect the financial statements.

With respect to the RAIDRS contract, Bambarger indicated that the government had made a specific request to prepay for the antennas that were going to be delivered and installed in 2009. (Compl. ¶ 74.) Thus, the issue of how to account for this large advance payment – $5.1 million represented more than 11% of initially reported revenues of $44.9 million in Q2'08 (*id.* at ¶ 69) – which would not be earned as revenue until the next year, was placed squarely before Defendants. (Indeed, Bambarger described this transaction as the only "major significant event that would be out of the ordinary" in Q2'08. (*Id.* at ¶ 74.) In light of the admittedly unique nature of the transaction, Defendants either chose to recognize revenue prematurely or were reckless in not ensuring it was recorded in compliance with GAAP. Cf. Baan, 103 F. Supp. 2d at 22 (inference of scienter arises when defendant is quoted in an article – as was Baldwin here, (Compl. ¶ 3), discussing compliance).

### iv.    The Policy Violated Was Simple to Understand and Apply

As opposed to cases where complex[19] or cutting edge[20] accounting issues are presented, the premature recognition of revenue in violation of well-established, simple rules gives rise to a strong inference of scienter.  As explained in *MicroStrategy*, what such rules boil down to is compliance with the old adage, "don't count your chickens before they hatch."  115 F. Supp. 2d at 638.  Here, this occurred on several items.  Regarding the RAIDRS contract, SOP 81-1, ¶ 50, plainly states not to include expensive equipment in the percentage-of-completion calculation if it is not yet installed; Defendants admitted they violated this rule.[21]  (Compl. ¶ 91.)  On the GPS OCX contract, Integral's simple stated rule was, in accordance with SOP 81-1, to employ percentage-of-completion accounting in all instances where services and/or hardware were sold in addition to software; Defendants admitted they violated this rule.  (*Id.* at ¶ 64.)  With respect to off-the-shelf "software only" sales, the simple rule stated in Integral's policy is not to recognize revenue before delivery; Defendants admitted they violated this rule.  (Def. Mem. at 16.)[22]

---

[19]    *Merzin v. Provident Financial Group, Inc.*, 311 F. Supp. 2d 674, 676 (S.D. Ohio 2004), (Def. Mem. at 31-32), involved errors in a financial model created to predict income and expenses on nine auto lease securitization transactions; defendant's outside auditor changed positions, reclassifying off-balance sheet operating leases as on-balance sheet direct finance leases.  *Id.* at 682 n.2.  Unlike here (with the exception of the PCS services policy), a disagreement later arose between two auditors.  *Id.* at 682-83 & n.2.  Here, three quarters of unaudited financial statements misapplied revenue recognition policies in place since Ernst & Young's last tenure; the financial statements for 2006 and 2007, audited by Bernstein & Pinchuk, were not restated.

[20]    Inexplicably, Defendants devote several paragraphs trying to unfavorably compare this case to *In re E.spire Commc'ns, Inc. Sec. Litig.*, 127 F. Supp. 2d 734 (D. Md. 2001), arguing, with respect to the GAAP violation, that scienter cannot arise where reading the GAAP rule is not sufficient to determine the proper accounting.   (Def. Mem. at 32-33.)  However, *E.spire* involved accounting for a new animal, "indefeasible rights of use" ("IRUs") – long-term leases

Regarding the fourth category, citing *Beaver County Ret. Bd. v. LCA-Vision Inc.*, No. 1:07-CV-750, 2009 WL 806714 (S.D. Ohio Mar. 25, 2009), Defendants argue that a simple rule regarding recognition of warranty revenue may be difficult to apply, thereby failing to give rise to an inference of scienter.  The policy applied in *LCA* with respect to *lifetime* warranty revenue on Lasik eye surgery was that it was to be initially deferred and recognized on a straight-line basis over the life of the warranty, unless LCA's prior experience dictated otherwise.  *Id.* at *19. Because both the rule and the underlying commitment (a lifetime warranty on a surgical

of portions of a telecommunications company's fiber optic network – and brand new GAAP concerning the passage of title under such arrangements.  *E.spire*, 127 F. Supp. 2d at 738.  As both the complex lease provisions and applicable GAAP were new and evolving, *E.spire* bears no resemblance to a case where the applicable GAAP provisions were authored in 1981 (SOP 81-1) and 1997 (SOP 97-2).

[21]     Shockingly, Defendants argue that application of this rule was not simple because it is fact-intensive.  (Def. Mem. at 30.)  It is almost comical for Defendants to compare the very basic fact of whether a yet-to-be-delivered, multi-million dollar piece of equipment was or was not yet installed with facts in the cases cited.  *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 567 (S.D.N.Y. 2004) (proper revenue recognition would require knowledge of a customer's carrying costs); *In re Galileo Corp. Shareholders Litig.*, 127 F. Supp. 2d 251, 265 (D. Mass. 2001) (in a case where there was no restatement, the question of whether there is a lack of reasonable assurance of collection is a judgment call based upon knowledge of customer's finances).  In *E.spire*, not only did the court find the underlying contracts to be complicated concerning the issue of title transfer, but the transactions at issue took place during the year in which the new GAAP pronouncement, FIN 43, was enacted.  127 F. Supp. 2d at 746-47.

[22]     Defendants even suggest that scienter must be negated due to purported complexity because they incorrectly applied the same basic rule on two separate occasions.  (Def. Mem. at 30-31.)  To reach this conclusion, however, would be to reward Defendants simply because they blatantly utilized the wrong accounting treatment twice – an approach that is at odds with the underlying facts.   By recognizing revenue on delivery of licenses on the GPS-OCX contract, Defendants violated Integral's stated policy, which predetermined that significant customization, production or modification would occur where software was sold with services and/or hardware, requiring percentage-of-completion accounting.  On off-the-shelf sales, Defendants violated the same stated policy, to wit, where significant customization does not occur, revenue is not recognized on a percentage-of-completion basis, but must await delivery.  Also, while the results were wrong both times, they did not go in opposite directions – both resulted in premature revenue recognition.

procedure) was more complicated than Integral's stated straight-line policy (which covered warranties no longer than 360 days), so was the application: the error made by LCA was in measuring the amount of deferred revenues it could recognize over certain time periods. *Id.* Here, in contrast, Defendants deferred *none* of the warranty revenue, recognizing all of it before it was earned, before the commencement of the warranty period.[23]

### v.   A Misleading Description of the Reasons for a Restatement Gives Rise to an Inference of Scienter

The description of the reasons for the Restatement given on December 11, 2008, was vague and only included three of the four categories of errors.  A fourth category of error was included in the Form 10-K, two weeks later, along with an admission of material weaknesses in internal controls over Integral's revenue recognition process.  (Compl. ¶¶ 5(a)&(b), 134.)  The SEC did not deem these explanations sufficient, however, and grilled Integral on a number of issues, *inter alia*, the dollar amounts of each error type and when the revenues were expected to be earned.  On February 12, 2009, Integral responded to these questions, explaining the GAAP

---

[23]     Defendants try to get mileage from the fact that their stated PCS revenue recognition rule – which violated GAAP and needed to be changed – was publicly disclosed.  (Def. Mem. at 15, 34.)  However, in *In re Paincare Holdings Sec. Litig.*, No. 6:06-cv-362, 2007 WL 1229703, at *7 n.8 (M.D. Fla. Apr. 25, 2007), scienter was negated because the incorrect policy also resulted in *understatements* of net income, a fact not present here.  Also, the fact that Bernstein & Pinchuk gave Integral a clean audit opinion despite the fact that its PCS services revenue policy was not in compliance with GAAP is not dispositive of liability.  *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008); *Cheney v. Cyberguard Corp.*, No. 98-6879, 2000 WL 1140306, at *6 (S.D. Fla.  July 31, 2000); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996); *see also Raytheon*, 157 F. Supp. 2d at 149, 156; *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1376-80 (S.D. Fla. 2001) (dismissing auditors but not corporation and officers).  This is especially true, where, as here, the audited financial statements for 2006 and 2007 were not restated.

provisions applied in the Restatement.[24]   (*Id.* at ¶ 5(c).)   Only after the SEC urged Integral to share these details with investors did Integral include them in a public filing, the Q2'09 Form 10-Q, filed five months after the Restatement was first announced.   Even that filing contained new details not previously shared with the SEC.  (*Id.* at ¶¶ 5(e), 64, 92.)

The slow dribbling out of the truth, which, when viewed in light of the information finally provided in May 2009, demonstrates the blatant nature of the accounting errors, smacks of a cover-up.   "[C]ommon sense dictates that actions taken after the fraud occurred can be circumstantial evidence that the defendant acted with the requisite state of mind."   *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005) (cover ups are indicative of scienter).

### 2.   Defendants' False Sarbanes-Oxley Act Certifications Give Rise to a Strong Inference of Scienter

"[T]he affixing of a signature is not a mere formality, but rather signifies that the signer has read the document and attests to its accuracy." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000) (citation omitted).   Thus, in promulgating the certification rules mandated by the Sarbanes-Oxley Act ("SOX"), the SEC warned that "[a]n officer providing a false certification potentially could be subject to . . . both Commission and private actions for violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5."   SEC Release No. 8124, RIN 3235-AI54, 2002 WL 31720215, at *9 (Aug. 28, 2002).   Here, Baldwin, Higginbotham and Bambarger executed the company's SOX certifications for the first three quarters of 2008, certifying that they *inter alia*, designed internal controls over Integral's financial reporting to "provide reasonable assurance regarding the reliability of financial reporting and the preparation

---

[24]     Bambarger's February 12, 2009 letter to the SEC did not state that Integral erroneously applied SOP 81-1, ¶39, or Accounting Standard Co5 in its initial accounting for these transactions – underscoring that these provisions were recently located, solely for this motion.

of financial statements for external purposes in accordance with generally accepted accounting principles." These Defendants also certified that they disclosed all significant deficiencies and material weaknesses which are "reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

In the Form 10-K filed two weeks after the end of the Class Period, however, Defendants admitted that during the Restatement Period, Integral had material weaknesses over its internal controls with respect to (i) recognizing revenue in compliance with its stated policies;[25] (ii) recognizing revenues in proper periods in accordance with "appropriate measures of progress towards completion"; (Compl. ¶ 134.)[26] and (iii) properly allocating revenues to delivered and undelivered elements in a multiple-element revenue arrangements.[27] Defendants also admitted that Integral did not have "an adequate level of skilled accounting resources," specifically, "accounting personnel with an adequate level of knowledge and experience." (Compl. ¶ 134.) Moreover, Integral expressly admitted that these deficiencies caused the material revenue misstatements. (*Id.*)

Because of the increased level of oversight over financial reporting that management is expected to undertake and affirmatively guaranty, courts have held that the execution of false SOX certifications are a factor in determining whether, taken collectively, a complaint's scienter

---

[25]   This refers to the off-the-shelf sales – clearly covered by SOP 97-2's four-part test set forth in Integral's stated policy – and the GPS OCX contract. As to the latter, the admission that stated policies were not followed yet again emphasizes the disingenuous nature of Defendants now trotting out SOP 81-1, ¶ 39, and claiming that Integral thought it properly recognized all of the license revenue in Q1'08 by "segmenting" the contract.

[26]   This refers to Integral's failure to apply SOP 81-1, ¶ 50, to the advance equipment purchase reimbursements on the RAIDRS contract and the smaller commercial contract.

[27]   This refers to the premature recognition of warranty revenue before the running of 30-, 60- and 360-day warranty periods.

allegations give rise to a strong inference of scienter.  *Backe v. Novatel Wireless, Inc.*, 607 F. Supp. 2d 1145, 1163 (S.D. Cal. 2009) (relevant factor); *Croker v. Carrier Access Corp.*, No. 05-1011, 2006 WL 2038011, at *11  (D. Colo. July 18, 2006) (a factor to be considered "in the totality of the circumstances").  Defendants argue, unconvincingly, that there are no specific allegations of "red flags" indicating that they should have known about the admitted deficiencies when they executed the certifications.  (Def. Mem. at 23-24.)   To the contrary, under the unique circumstances of this case, the false SOX certifications were recklessly executed, giving rise to liability.

First, the SOX certifications were executed in 2008, long after former officer Gary Prince was terminated in the wake of the SEC's formal investigation into his role at Integral, specifically, whether he was acting as an accountant on Integral's behalf before the SEC. Integral's 2007 Form 10-K indicated that the Company was cooperating with the investigation, including responding to the SEC's subpoena.  (Def. Ex. A at 21.)  In light of the high-profile nature of this investigation of Integral and several of its former officers, Defendants were aware of Prince's importance to the Company.  (Compl. ¶¶ 36-37 (2009 consent decree stated that Prince "trained and supported the inexperienced CFOs who succeeded him. . . . suggested how accounting entries should be handled. . . . prepared quarterly financial forecasts. . . . drafted the MD&A section of periodic filings . . . reviewed and edited the entirety of each filed periodic report.").)[28]

_____

[28]    Defendants appear to rely upon the facts that Prince was a discredited felon and that he left the year before the Class Period began to negate scienter.  (Def. Mem. at 24.)  To the contrary, despite his status as a felon, Integral was totally dependent upon Prince to be an accounting jack-of-all-trades for the Company – even hiding his role for years so that he could

Second, Defendants suggest that the allegation that Prince alerted them to incorrect revenue recognition by early 2008 was too vague to be credible as a "red flag" that there were possible internal control problems.  (Def. Mem. at 24 (putting words in quotation marks to suggest that the allegation is trumped up).)  However, the transcript of the December 11, 2008, conference call submitted in support of Defendants' motion demonstrates that former director Bonnie Wachtel stated she had received an e-mail from Prince telling her that Integral was not listening to him when he warned Defendants (save for Higginbotham) that revenue recognition "over the quarters" was not being properly recorded.  In December 2008, she recounted raising this issue during the February 2008 shareholders meeting.  (Def. Ex. F at 14.)[29]

Third, in light of the Company's complete reliance on Prince for these very types of determinations for so many years, Defendants specifically acknowledged in Class Period conference calls with investors (during which both Baldwin and Bambarger spoke) that Integral had needed to hire key senior accounting personnel – and that they had done so in Q1'08 and Q2'08.  (Compl. ¶¶ 49, 76 ("we've been beefing up or busy building the staff in terms of . . . finance and accounting . . . [s]o there has been a lot of very talented people that have been

---

continue doing it.  The lack of competent accounting personnel that followed in the wake of his termination was admittedly still a problem during and after the Class Period.

[29]     To refute this red flag, Defendants may point to Wachtel's statement that she was assured (in February 2008) that the outside auditors approved of the accounting at issue.  Def. Ex. F at 14.  However, Defendants cannot shield themselves from liability by claiming that they relied upon Bernstein & Pinchuk's advice.  *See In re New Century,* 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) (in finding plaintiffs pled a strong inference of scienter "the fact that the [company's] independent auditor may have approved the accounting methods will not shield [the officers] from liability for deception such methods may have caused" (citing *Marksman Partners,* 927 F. Supp. at 1297)).  Moreover, Defendants cannot specifically point to a clean audit opinion on the original accounting treatment for the restated items, *id.*, as the restated quarters were not the subjects of formal audit opinions.  In any event, as explained in n.23, above, when a company's own accounting policy is violated, good faith reliance on outside auditors is not an available defense.

added.").)  In light of these facts, Defendants (save for Lee-Gallagher) recklessly executed the

SOX certifications for each of the restated quarters.[30]

Defendants weakly assert that scienter for their false SOX certifications is negated

because the Company was in a period of "transition" (Def. Mem. at 34-35), with several

defendants relatively new to the Company and/or their positions during the Class Period.[31]  Not

only were Defendants keenly aware of the accounting deficiencies Integral faced when they took

their positions (because of the Prince investigation), but Baldwin touted his expertise in the area

of SEC reporting compliance.  Defendants were highly paid executives who are supposed to be

competent in their roles as stewards over the financial reporting of a public company; affording

them immunity because they were just getting started would set a very dangerous precedent.

---

[30]    Defendants may try to argue on reply, as have others, that an admission of material weakness, indicating that prior SOX certifications were false, adds nothing to plaintiffs' allegations because restatements are routinely accompanied by such *mea culpas*.  Not so.  A study by former SEC Chief Accountant Lynn Turner of restatements filed in 2005 revealed that only one half of them also contained admissions of material weaknesses.  (Friedman Decl. Ex. 5., L.E. Turner & T.R. Weirich, *A Closer Look At Financial Restatements:  Analyzing the Reasons Behind the Trend*, The CPA Journal (Dec. 2006), at 5.)  In light of the fact that the SOX certifications are supposed to report conditions which *might* result in accounting errors, "there should be more companies reporting material weaknesses than restating."  (*Id.* at 2.)  But the authors found the reverse to be true – leading them to conclude that "it appears the auditors may have been cutting companies some slack."  (*Id.*)

[31]    The weakness of the "in transition" argument is demonstrated by its lackluster support – the citation of only two cases following the signal "Cf."  The facts of both cases bear little resemblance to the instant action.  *BearingPoint*, involved the malfunction of a new billing system while the company was trying to integrate 30 worldwide acquisitions and thousands of employees.  576 F.3d at 188.  In *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 273-74 (S.D.N.Y. 2009), plaintiffs alleged that defendants misrepresented that an acquisition had gone more smoothly than it had, using a loss of customers following abandonment of a business line as proof.  The court noted that there was no evidence of when defendants should have been aware of the problem – presumably, what Defendants are referring to as a "transition" issue.  Here, the complaint is replete with allegations of what Defendants knew concerning the gaping holes in Integral's accounting resources – and when they knew it.

### 3. The Complaint Alleges Individual Defendants' Direct Involvement with the Specific Contracts and/or Accounting Principles at Issue

Contrary to Defendants' contention, the Complaint does not merely rely on the Individual Defendants' positions within the Company to allege scienter. (Def. Mem. at 21-22.) Rather, the Complaint details each Individual Defendants' duties, their direct involvement with the Company's day-to-day affairs, and the Individual Defendants' knowledge of and involvement with the specific contracts and/or the specific accounting practices at issue, all of which give rise to a strong inference of scienter. *See Latham v. Matthews*, Nos 6:08-cv-2995-RHB, 6:08-cv-3183-RHB, 2009 WL 3052223, at *21 (D.S.C. Sept. 4, 2009) (finding an inference of scienter when the complaint alleged that defendants were "personally" or "intimately" involved with the activities that were the subject of the misleading statements); *Ravisent*, 2004 WL 1563024, at * 8 (finding scienter where*, inter* alia, the complaint alleged that individual defendants with strong accounting backgrounds improperly recognized revenue under the applicable accounting rules). For example, with regard to Defendant Baldwin, who served as President, CEO, and a director of Integral during the relevant time, the Complaint alleges:

- Baldwin boasted in a February 18, 2008 interview with the *Washington Post* that he had "a very strong background in accounting and in the public disclosure that's required in running a public company;" (Compl. ¶ 3);

- During two conference calls, Baldwin represented to investors that he and Defendant Bambarger had added additional key accounting and contract administration personnel to strengthen the Company's accounting processes; (*id.* at ¶¶ 49, 76); and

- Baldwin personally signed Integral's periodic reports filed on Form 10-Q on February 7, 2008, and May 7, 2008, and certified the Company's financial results, sound internal controls, and that he was responsible for creating the internal controls in each of these reports. (*Id.* at ¶¶ 189, 190).

The allegations relating to Defendant Bambarger – who served as CFO and Treasurer of Integral during the relevant time period – also do not merely rely on his job description, but rather indicate his specific involvement in the accounting related to the contracts in question:

- Bambarger was involved in adding accounting and contract administration personnel to strengthen the Company's accounting processes; (*id*. at ¶¶ 49, 76, 109(h));

- On February 4, 2008, Bambarger indicated that the Company had initially planned to recognize revenue from the GPS OCX contract during the entire fiscal year, but later decided to recognize the revenue up-front; (*id*. at ¶ 48);

- On April 28, 2008, Bambarger explained that there was "significant accelerated revenue" on the GPS OCX contract, which Integral initially had anticipated would be spread throughout 2008 and 2009 (the period of the contract); (*id*. at ¶¶ 74-75);

- On April 28, 2008, Bambarger explained why Integral recorded revenue for the $5.1 million downpayment reimbursement on the RAIDRS contract; (*id.* at ¶ 74);

- Bambarger was responsible for ensuring that Integral properly reported its financial statements, and personally signed all of Integral's financial reports, including the Forms 10-Q filed on February 7, 2008, and May 7, 2008, and August 7, 2008, and certified the Company's financial results, sound internal controls, and that he was responsible for creating the internal controls in each of these reports; (*id.* at ¶¶ 203-204); and

- Bambarger authored correspondence with the SEC concerning the Restatement. (*Id.* at ¶¶ 5(c)&(d).)

Similarly, the Complaint makes further specific allegations regarding Defendants Higginbotham and Lee-Gallagher:

- Higginbotham was CEO, President, and a director of Integral during the relevant time period and thus was responsible for ensuring that Integral properly reported its financial statements and the true nature of the Company's internal controls and had a duty of oversight that required him to implement reporting or information systems or controls and review information related to Integral's operations to be informed of risks; (*id*. at ¶ 199);

- Higginbotham personally signed Integral's Form 10-Q on August 7, 2008 and certified the Company's financial results, sound internal controls, and that he was responsible for creating the internal controls in that report; (*id.* at ¶ 198);[32]

- Lee-Gallagher was the Controller of the Company during the relevant time period and thus was responsible for ensuring that Integral properly accounted for the Company's revenues; (*id.* at ¶ 209); and

- Lee-Gallagher personally signed all the Forms 10-Q filed on February 7, 2008, and May 7, 2008, and August 7, 2008.  (*Id.* at ¶ 208.)

These allegations of the Individual Defendants' involvement with the specific contracts and/or the specific accounting practices at issue give rise to a strong inference of scienter.  *See Latham*, 2009 WL 3052223, at *21.

### 4.    Financial Incentives and Insider Sales Create A Strong Inference of Scienter

Allegations of insider trading contribute to an inference of scienter when the timing and amount of the trades are "unusual or suspicious."  *In re Inspire Pharms., Inc. Sec. Litig.*, 515 F. Supp. 2d 631, 639 (M.D.N.C. 2007) (quoting *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 183 (4th Cir. 2007)); *Microstrategy*, 115 F. Supp. 2d at 643-44.  When considering whether the timing of an insider's sales is unusual, courts look at the defendant's history and pattern of stock sales, as well as whether the sales were made near the high point of the stock's sales price.  *Hunter*, 477 F.3d at 184; *E.spire*, 127 F. Supp. at 743 (comparing trading patterns before class period with trading patterns during class period).

Here, Baldwin exercised 29,235 options on August 4, 2008, and 25,765 options on August 5, 2008, thus exercising all of the options that were exercisable during the Class Period.

---

[32]    Higginbotham had come to Integral with the goal of "turning around a company he said had suffered from accounting lapses." Peter B. de Selding, *Satellite Company's Chief Resigns Amid Lower Expectations*, Space News, August 10, 2009 (http://www.space.com/news/090810-busmon-integral-higginbotham.html).   (Friedman Decl., Ex. 3.)

Def. Ex. O.   Baldwin immediately sold those shares on the same days that he exercised the options, **thereby selling 100% of his stock holdings during the Class Period**.  (Compl. ¶ 196; Def. Ex. O.)  The timing of these sales was unusual, because Baldwin had never previously sold any Integral stock, but then exercised and sold all of his exercisable options within two days, making these sales out of line with his history of trading.  (*Id.* at ¶ 196.)  Additionally, Baldwin sold all of his shares for over $47 per share, near in both time and price to the Class Period high of $52.71 per share on August 14, 2008.  (*Id.* at ¶ 3.)  The timing of Baldwin's stock sales is both unusual and timed to maximize his benefit, giving rise to a strong inference of scienter.

In determining whether the size of an insider's sale of stock is unusual, courts in this Circuit and elsewhere compare the number of shares sold to the insider's total holdings and exercisable options available.  *E.spire*, 127 F. Supp. at 743; *Microstrategy*, 115 F. Supp. 2d at 645.  Numerous courts have found that sales of all or a significant portion of an insider's stock contribute to a strong inference of scienter.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003) (sales of 88-100% of shares are probative of scienter); *Lefkoe v. Jos. A. Bank Clothiers*, No. WMN-06-1892, 2009 WL 3003247, at *7 (D. Md. May 1, 2009) (sales of 74% of shares create an inference of scienter); *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) (inference of scienter arises when CEO sold 100% of his stock shortly before retiring and continuing to serve on the board of directors); *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 163 (D. Mass. 2001) (sales of 37%, 83%, and 100% of insiders' stocks create inference of scienter); *Microstrategy*, 115 F. Supp. 2d at 646 (sales of 56-91% of shares at unusual time probative of scienter); *New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*, No. 1:98-cv-99-M,

1999 WL 33295037, at *9 (W.D. Ky. Aug. 16, 1999) (sales of 80-100% of shares probative of scienter). Here, Baldwin exercised options to sell 100% of the shares available to him during the Class Period; his actions are highly probative of scienter. (Compl. ¶ 196; Def. Ex. O.)

Defendants' argument that the timing of Baldwin's sales near the time that he stepped down as CEO negates an inference of scienter overlooks the fact that Baldwin remained in a position of control even after stepping down as CEO. (Def. Mem. at 26-27.) After resigning as CEO, Baldwin continued to serve as President for an additional five months and as a director thereafter. (Compl. ¶ 15.) The cases cited by Defendants deal exclusively with insiders who – unlike Baldwin – left the defendant corporation.[33] In contrast, where a defendant remains on as a director after stepping down from an executive position, heavy stock sales following the office resignation can be indicative of scienter. *Proquest*, 527 F. Supp. 2d at 743 (rejecting argument that sales following resignation from office negated scienter where former CEO continued to serve on the board of directors).

Higginbotham's eligibility for bonuses in the form of stock options also contributes to a strong inference of scienter. Courts around the country have held that eligibility for bonuses in the form of stock options is indicative of scienter when the determination of an award of a bonus is based primarily on the company's financial performance. *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 737-38 (S.D. Ohio 2006) (finding an inference of scienter where an executive's bonus was related to the defendant's financial condition); *Am. W. Holding*, 320 F.3d at 944 (same). Here, Higginbotham was eligible for annual bonuses of stock options, including

---

[33]    *See In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 896 (8th Cir. 2002); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) (no inference of scienter where senior officers sold within months of leaving the company).

an annual bonus of 50,000 shares that was unique to his employment contract, as well as an additional bonus of up to 900,000 shares under the Company's 2008 Stock Incentive Plan. (Compl. ¶¶ 200-201.)  In fact, after only a month on the job, Integral awarded Higginbotham a bonus of 50,000 options under the 2008 Stock Incentive Plan.  (*Id.* at ¶ 201.)  The potential for obtaining these bonuses was closely tied to the performance of Integral's stock, as explained by the Company:  "Stock options are intended to align the interests of the Named Executive Officers with the interests of stockholders by tying a portion of executive compensation to long-term stock price appreciation."  (Friedman Decl. Ex. 6 at 28 (Proxy Statement, Form 14A, filed Jan. 21, 2009).)  Therefore, the connection between Higginbotham's bonus potential and the Company's stock price is sufficient to give rise to a strong inference of scienter based on his motive to keep that price inflated.  *See Am. W. Holding*, 320 F.3d at 944.

Higginbotham's failure to sell shares held under option during the Class Period does not negate an inference of scienter because he did not exercise those options.  *PEC Solutions*, 418 F.3d at 389 (an inference of scienter is negated when insiders *actually exercise* their options but do not sell shares during the class period).  Bambarger's and Lee-Gallagher's failure to sell any stock during the Class Period similarly fails to negate an inference of scienter, as Defendants claim (Def. Mem. at 27), because neither held any stock during the Class Period.

Defendants' insistence that they were somehow personally harmed by inflated share prices during the Class Period – because the price of options granted at that time would also be inflated – is wholly without merit because they did not actually purchase any stock during the

Class Period.  (*See* Def. Mem. at 27-28.)[34]  Thus, unlike class plaintiffs – who actually invested in Integral during the Class Period – any "harm" to Defendants is purely hypothetical.  The fact remains that Defendants (save for Baldwin) were eligible for bonuses of up to 900,000 options under the 2008 Stock Incentive Plan (Compl. ¶¶ 201, 206, 210), which, as explained above, specifically linked the eligibility for the bonus to the stock price, thus giving them a motive to maintain an inflated stock price in order to profit from the options granted during the Class Period, and creating a strong inference of scienter.  *See Am. W. Holding*, 320 F.3d at 944.[35]

## IV.     PLAINTIFFS' SECTION 20(A) AND 20A CLAIMS ARE ADEQUATELY PLED

A claim for control person liability under Section 20(a) of the Exchange Act requires only that Plaintiffs allege a primary violation of the securities laws and control by the Defendants.  *Microstrategy*, 115 F. Supp. 2d at 661.  Plaintiffs have done so.  (Compl. ¶¶ 182-201.)  For a Section 20A claim, Plaintiffs must allege:  (i) a primary violation; (ii) that plaintiffs' purchase of defendant company's stock was contemporaneous with an insider's sales of stock; and, (iii) that damages are available under Section 20A.  *Id.* at 661-62.  Plaintiffs so allege.  (*Id.* at ¶¶ 238-47.)  Defendants' only argument that there is no liability under Sections 20(a) and 20A is premised on the lack of an underlying 10(b) violation.  (Def. Mem. at 35.)  As Plaintiffs have

---

[34]     The cases cited by Defendants concerned individuals who owned stock but did not sell it during the class period.  *See Shuster v. Symmetricom, Inc.*, 35 Fed. App'x 705, 707 (9th Cir. 2002) (noting that the defendants "actually lost money"); *Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 821-22 (E.D. Ky. 2008) (noting the decline in value in defendants' holdings).

[35]     The fact that Higginbotham, Bambarger, and Lee-Gallagher did not sell any stock during the class period does not negate the strong inference of scienter created by Baldwin's cash-out of all his stock.  A strong inference of scienter may be sufficiently alleged against all defendants where one defendant sold a large portion of his stock and others sold none.  *Lefkoe*, No. WMN-06-1892, 2007 WL 6890353, at *6 (D. Md. Sept. 10, 2007).

demonstrated above that there is an underlying 10(b) violation, liability is proper under Sections

20(a) and 20A.

## V.     CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss should be denied in its

entirety.   In the alternative, should the Court find any infirmity in the allegations of the

Complaint, Plaintiffs request leave to amend.   *See* Fed R. Civ. P. 15(a)(2).   The Fourth Circuit

has stated that "leave to amend shall be freely given when justice so requires" in order to "give[]

effect to the federal policy in favor of resolving cases on their merits instead of disposing of

them on technicalities."   *BearingPoint*, 576 F.3d at 193 (internal quotations omitted).

Dated:  November 30, 2009                          Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**
By: /s/ ANDREW N. FRIEDMAN
ANDREW N. FRIEDMAN (Bar No. 14421)
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
afriedman@cohenmilstein.com
Telephone:     (202) 408-4600
Facsimile:     (202) 408-4699

**GLANCY BINKOW & GOLDBERG LLP**
LIONEL Z.GLANCY (*pro hac vice*)
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:     (310) 201-9150
Facsimile:     (310) 201-9160

***Co-Lead Counsel for the Putative Class***

[additional counsel on next page]

- 41 -

**LAW OFFICES OF HOWARD G. SMITH**
HOWARD G. SMITH
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone:     (215) 638-4847
Facsimile:     (215) 638-4867
***Attorney for Plaintiff***