# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### GREENBELT DIVISION

In Re Integral Systems, Inc.
Securities Litigation

Civil Action No. 8:08-cv-03387 (RWT)

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

John C. Millian (Bar No. 06459)
Michael D. Billok (Bar No. 16952)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500 (main phone)
(202) 530-9566 (Millian direct fax)
(202) 530-9534 (Billok direct fax)
jmillian@gibsondunn.com
mbillok@gibsondunn.com

*Attorneys for Defendants*

*Of Counsel for Defendants:*
Daniel A. Cantu
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500  (main)
(202) 530-9661  (Cantu direct fax)
dcantu@gibsondunn.com

Dated:  December 23, 2009

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES CITED IN DEFENDANT'S OPENING BRIEF, PLAINTIFFS' OPPOSITION, AND DEFENDANTS' REPLY .....................................iii

INDEX TO DOCUMENTS SUBMITTED AS EXHIBITS.......................................viii

I.   INTRODUCTION AND OVERVIEW ........................................................... 1

II.   ARGUMENT ............................................................................................... 4

　　A.   Plaintiffs' Amended Complaint Must Be Dismissed Unless It Adequately Alleges Facts That Would Support An Inference of *Scienter* At Least As Strong As Any Opposing Inference ................................................. 4

　　B.   Plaintiffs' Allegations Regarding Defendants' "Financial Incentives" Negate, Rather Than Support, Any Inference of Scienter ..................................... 6

　　　　1.   Defendants Received Stock Options During the Class Period That Vested No Earlier Than 2009, And Thus Their Personal Financial Interests Would Be *Not* to Inflate Integral's Stock Price During That Period................................................................................................ 6

　　　　2.   The Lack of Stock Sales by Three of the Four Individual Defendants, Including CFO Bambarger, Further Negates Any Inference of Scienter ................................................................................ 8

　　　　3.   Baldwin's Sale of Stock Does Not Support Any Inference of Scienter Given That Plaintiffs Cannot Tie the Transaction to Any Event Other Than His Resignation as CEO................................................ 9

　　C.   Plaintiffs Have Not Alleged Facts Demonstrating That Integral's Accounting Errors Were So "Obvious" As to Create a Strong Inference of Scienter ........................................................................................................ 14

　　　　1.   To Adequately Plead Scienter Based on "Obviousness," Plaintiffs Must Allege "'In Your Fact Facts That Cry Out, 'How Could Defendants Not Have Known That the Financial Statements Were False'''" .................................................................................... 14

　　　　2.   The Facts Alleged Here Fall Far Short of What Courts Require to Plead a Strong Inference of Scienter Based on "Obviousness"........... 16

i

3.     Integral's Contemporaneous Disclosures Regarding the Two Major Transactions at Issue Negates Any Inference That Defendants Either Knew of the Errors or That the Errors Were "Obvious" .................................................................... 18

D.     Plaintiffs' Hyperbole Regarding Post-Restatement Disclosures Does Not Create An Inference Of Scienter ................................................ 19

E.     Neither Signing A SOX Certification Nor A Recitation Of A Job Description Leads To An Inference Of Scienter ................................. 21

1.     Plaintiffs Must Allege "Red Flags" That Would Have Alerted SOX Signatories That The Accounting Was Incorrect, Yet Fail To Do So ............................................................................... 21

2.     Plaintiffs' Allegations Of Individual Defendants' "Direct Involvement" Are Nothing More Than Recitations Of Generic Job Descriptions Of Any CEO, CFO, And Controller .......................... 23

F.     Plaintiffs Do Not Even Attempt to Demonstrate That Any Inference of Scienter Is Both "Cogent" and "At Least as Compelling as Any Opposing Inference," And They Cannot Do So ................................. 25

III.    CONCLUSION ........................................................................................ 25

**TABLE OF AUTHORITIES CITED IN DEFENDANT'S OPENING BRIEF, PLAINTIFFS' OPPOSITION, AND DEFENDANTS' REPLY**

| Case | Open. | Opp. | Reply |
|---|---|---|---|
| **Abrams v. Baker Hughes Inc.,** 292 F.3d 424 (5th Cir. 2002) | | | 8 |
| **Ashcroft v. Iqbal**, 129 S. Ct. 1937 (2009) | 17 | 9 | |
| **Backe v. Novatel Wireless, Inc.,** 607 F. Supp. 2d 1145 (S.D. Cal. 2009) | | 31 | 22 |
| **Batwin v. Occam Networks, Inc.,** No. CV-07-2750, 2008 WL 2676364 (C.D. Ca l. July 1, 2008) | | 23, 24 | |
| **Beaver County Ret. Bd. v. LCA- Vision Inc.,** No. 1:07-CV-750, 2009 WL 806714 (S.D. Ohio Mar. 25, 2009) | 31 | 27, 28 | |
| **Bell Atl. Corp. v. Twombly,** 550 U.S. 544 (2007) | 16 | 9 | 5, 25 |
| **Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.,** 497 F.3d 546 (5th Cir. 2007) | | | 21 |
| **Chalverus v. Pegasystems, Inc.,** 59 F. Supp. 2d 226 (D. Mass. 1999) | | 22 | |
| **Cheney v. Cyberguard Corp.,** No. 98-6879, 2000 WL 1140306 (S.D. Fla. July 31, 2000) | | 28 | |
| **Cozzarelli v. Inspire Pharm. Inc.,** 549 F.3d 618 (4th Cir. 2008) | 18, 35 | | 21 |
| **Croker v. Carrier Access Corp.,** No. 05-1011, 2006 WL 2038011 (D. Colo. July 18, 2006) | | 31 | 22 |
| **Crowell v. Ionics, Inc.,** 343 F. Supp. 2d 1 (D. Mass. 2004) | | 24 | |
| **Garfield v. NDC Health Corp.,** 466 F.3d 1255 (11th Cir. 2006) | | | 21, 22 |
| **Greebel v. FTP Software, Inc.,** 194 F.3d 185 (1st Cir. 1999) | 27 | 38 | |
| **Greenhouse v. MCG Capital Corp.,** 392 F.3d 650 (4th Cir. 2004) | 3 | | |
| **Grillo v. Tempur-Pedic Int'l, Inc.,** 553 F. Supp. 2d 809 (E.D. Ky. 2008) | 28 | 40 | 11 |
| **Holmes v. Baker,** 166 F. Supp. 2d 1362 (S.D. Fla. 2001) | | 28 | |
| **Howard v. Everex Sys., Inc.,** 228 F.3d 1057 (9th Cir. 2000) | | 29 | |

| Case | Open. | Opp. | Reply |
|---|---|---|---|
| **In re Allscripts, Inc. Sec. Litig.**, No. 00 C 6796, 2001 WL 743411 (N.D. Ill. June 29, 2001) | 25 | 24 | |
| **In re Am. Serv. Group, Inc**., No. 3:06-0323, 2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) | | | 23 |
| **In re Bausch & Lomb, Inc. Sec. Litig.**, 592 F. Supp. 2d 323 (W.D.N.Y. 2008) | 21 | | |
| **In re Bristol-Myers Squibb Sec. Litig.**, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) | 29 | 27 | |
| **In re Bus. Objects S.A. Sec. Litig.**, No. C 04-2401-MJJ, 2005 WL 1787860 (N.D. Cal. July 27, 2005) | | | 9 |
| **In re Cardinal Health Inc. Sec Litig.**, 426 F. Supp. 2d 688 (S.D. Ohio 2006) | 34 | 38 | |
| **In re Ceridian Corp. Sec. Litig**., 542 F.3d 240 (8th Cir. 2008) | | | 22 |
| **In re Credit Acceptance Corp. Sec. Litig.**, 50 F. Supp. 2d 662 (E.D. Mich. 1999) | | | 7, 8 |
| **In re Criimi Mae,** 94 F. Supp. 2d 652 (D. Md. 2000) | 22, 26 | | 24 |
| **In re Comshare, Inc. Sec. Litig**., 183 F.3d 542 (6th Cir. 1999) | 23 | | 17 |
| **In re Dell Inc. Sec. Litig.**, 591 F. Supp. 2d 877 (W.D. Tex. 2008) | 21, 25 | 24 | |
| **In re E.spire Commc'ns, Inc. Sec. Litig.**, 127 F. Supp. 2d 734 (D. Md. 2001) | 3, 17, 22, 26, 27, 31, 33, 35 | 26, 27, 36, 37 | 9, 16 |
| **In re Focus Enhancements, Inc. Sec. Litig.**, 309 F. Supp. 2d 134 (D. Mass. 2001) | | 37 | 10, 13 |
| **In re Galileo Corp. Shareholders Litig.**, 127 F. Supp. 2d 251 (D. Mass. 2001) | 29 | 27 | |
| **In re Gildan Activewear, Inc. Sec. Litig.**, 636 F. Supp. 2d 261, 273-74 (S.D.N.Y. 2009) | 35 | 33 | |
| **In re Inspire Pharms., Inc. Sec. Litig.**, 515 F. Supp. 2d 631 (M.D.N.C. 2007) | | 36 | 21 |
| **In re K-tel Int'l, Inc. Sec. Litig.**, 300 F.3d 881 (8th Cir. 2002) | 26 | 38 | |
| **In re LDK Solar Sec. Litig.**, 584 F. Supp. 2d 1230 (N.D. Cal. 2008) | | 28 | |
| **In re MicroStrategy, Inc. Sec. Litig.**, 115 F. Supp. 2d 620 (E.D. Va. 2000) | | passim | 12, 13, 15, 16, 17 |

| Case | Open. | Opp. | Reply |
|------|-------|------|-------|
| **In re NDCHealth Corp., Inc. Sec. Litig**., No. 1:04-cv-0970-WSD, 2005 WL 6074918 (N.D. Ga., Jul. 27, 2005) | | | 19 |
| **In re New Century,** 588 F. Supp. 2d 1206 (C.D. Cal. 2008) | | 32 | |
| **In re Paincare Holdings Sec. Litig.,** No. 6:06-cv-362, 2007 WL 1229703, at *7 n.8 (M.D. Fla. Apr. 25, 2007) | 32, 34 | 28 | 18-19 |
| **In re PEC Solutions, Inc. Sec. Litig.,** 418 F.3d 379 (4th Cir. 2005) | 3 | 10, 11, 39 | |
| **In re Proquest Sec. Litig.,** 527 F. Supp. 2d 728 (E.D. Mich. 2007) | | 37, 38 | 12 |
| **In re Ravisent Techs., Inc. Sec. Litig.,** No. 00-CV-1014, 2004 WL 1563024 (E.D. Pa. July 13, 2004) | | 22, 23, 34 | |
| **In re Raytheon Sec. Litig.,** 157 F. Supp. 2d 131 (D. Mass. 2001) | | 13, 23, 28 | |
| **In re SmarTalk Teleservices Sec., Inc. Litig.,** 124 F. Supp. 2d 505 (S.D. Ohio 2000) | 31 | | |
| **In re Telxon Corp. Sec. Litig.,** 133 F. Supp. 2d 1010 (N.D. Ohio 2000) | | | 15-17 |
| **In re The Baan Co. Sec. Litig.,** 103 F. Supp. 2d 1 (D.D.C. 2000) | | 14, 22, 24, 25 | |
| **In re The First Marblehead Corp. Sec. Litig**., 639 F. Supp. 2d 145 (D. Mass. 2009) | | | 19 |
| **In re Vantive Corp. Sec. Litig.,** 283 F.3d 1079 (9th Cir. 2002) | | | 10 |
| **In re Veeco Instruments, Inc. Sec. Litig**., 235 F.R.D. 220 (S.D.N.Y. 2006) | | | 20 |
| **In re White Elec. Designs Corp. Sec. Litig.,** 416 F. Supp. 2d 754 (D. Ariz. 2006) | 3 | | |
| **In re Winstar Commc'ns.,** Nos. 01- CV-3014, 01-CV-11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) | | 22 | |
| **Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.,** 432 F. Supp. 2d 571 (E.D. Va. 2006) | 22 | 10 | |
| **Latham v. Matthews,** Nos 6:08-cv-2995-RHB, 6:08-cv-3183-RHB, 2009 WL 3052223 (D.S.C. Sept. 4, 2009) | | 34, 36 | |
| **Lefkoe v. Jos. A. Bank Clothiers,** No. WMN-06-1892, 2007 WL 6890353 (D. Md. Sept. 10, 2007) | | 37, 40 | 13 |
| **Lefkoe v. Jos. A. Bank Clothiers,** No. WMN-06-1892, 2008 WL 7275126 (D. Md. May 13, 2008) | | | 13 |

| Case | Open. | Opp. | Reply |
|------|-------|------|-------|
| **Ley v. Visteon Corp.,**<br>543 F.3d 801(6th Cir. 2008) | | | 20, 22 |
| **Marksman Partners, L.P. v. Chantal Pharm. Corp.,**<br>927 F. Supp. 1297 (C.D. Cal. 1996) | | 28, 32, 33 | |
| **Matrix Capital Mgmt. Fund, LP v. BearingPoint,<br>Inc.,** 576 F.3d 172 (4th Cir. 2009) | 17, 19, 35 | passim | 5 |
| **Merzin v. Provident Financial Group, Inc.,**<br>311 F. Supp. 2d 674 (S.D. Ohio 2004) | 31, 32 | 26 | |
| **Metzler Inv. GMBH v. Corinthian Colleges, Inc.**<br>540 F.3d 1049 (9th Cir. 2008) | | | 8 |
| **New England Health Care Employees Pension Fund<br>v. Fruit of the Loom, Inc.,** No. 1:98-cv-99-M, 1999<br>WL 33295037 (W.D. Ky. Aug. 16, 1999) | | 38 | 12, 13 |
| **New Jersey Carpenters Pension & Annuity Funds v.<br>Biogen IDEC Inc.,**<br>537 F.3d 35 (1st Cir. 2008) | | | 8 |
| **No. 84 Employer-Teamster Joint Council Pension<br>Trust Fund v. Am. W. Holding Corp.,**<br>320 F.3d 920 (9th Cir. 2003) | | 37, 38,<br>39, 40 | 12 |
| **Ottmann v. Hanger Orthopedic Group, Inc.,**<br>353 F.3d 338 (4th Cir. 2003) | 23, 29 | 11, 24 | |
| **Phillips v. LCI Int'l, Inc.,**<br>190 F.3d 609 (4th Cir. 1999) | 26 | | |
| **PR Diamonds, Inc. v. Chandler,**<br>364 F.3d 671 (6th Cir. 2004) | | | 16 |
| **Provenz v. Miller,**<br>102 F.3d 1478 (9th Cir. 1996) | | 22 | |
| **Pub. Employees' Ret. Ass'n v. Deloitte & Touche<br>LLP,** 551 F.3d 305 (4th Cir. 2009) | | 10 | 5 |
| **Rosky ex rel. Wellcare Health Plans, Inc. v. Farha,**<br>No. 8:07-cv-1952-T-26MAP, 2009 WL 3853592<br>(M.D. Fla. Mar. 30, 2009) | | | 23 |
| **Roth v. OfficeMax, Inc.,**<br>527 F. Supp. 2d 791 (N.D. Ill. 2007) | 24 | | |
| **San Leandro Emergency Med. Group Profit Sharing<br>Plan v. Philip Morris Cos.,**<br>75 F.3d 801, 814 (2d Cir. 1996) | | | 8 |
| **SEC v. Caserta,**<br>75 F. Supp. 2d 79 (E.D.N.Y. 1999) | | 22 | |
| **SEC v. Lucent Techs., Inc.,**<br>363 F. Supp. 2d 708 (D.N.J. 2005) | | 29 | 20 |

| Case | Open. | Opp. | Reply |
|---|---|---|---|
| **Shuster v. Symmetricom, Inc.,** 35 Fed. App'x 705 (9th Cir. 2002) | 28 | 40 | 7 |
| **South Ferry LP, No. 2 v. Killinger,** 542 F.3d 776, 783 (9th Cir. 2008) | | | 5 |
| **Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,** 552 U. S. 148 (2008) | | 10 | |
| **Svezze v. Duratek, Inc.,** No. Civ.A. MJG-01-CV-1830, 2002 WL 1012967 (D. Md. Apr. 30, 2002), *aff'd* 67 Fed. App'x 169 (4th Cir. 2003) | | | 6 |
| **Teachers' Ret. Sys. v. Hunter,** 477 F.3d 162 (4th Cir. 2007) | 18, 19, 35 | 36 | 10 |
| **Tellabs, Inc. v. Makor Issues & Rights, Ltd.,** 551 U.S. 308 (2007) | 1, 18 | 9, 10 | 1, 5, 25 |
| **Walker v. Prince George's County, Md,** 575 F.3d 426 (2009) | 17 | | |
| **Zucco Partners, LLC v. Digimarc Corp.,** 552 F.3d 981 (9th Cir. 2009) | | | 22 |

| Other Authorities | Open. | Opp. | Reply |
|---|---|---|---|
| L.E. Turner & T.R. Weirich, **A Closer Look At Financial Restatements: Analyzing the Reasons Behind the Trend, The CPA Journal** (Dec. 2006), at 5 | | 33 | |
| Peter B. de Selding, **Satellite Company's Chief Resigns Amid Lower Expectations**, Space News, August 10, 2009 | | 3, 36 | |

**INDEX TO DOCUMENTS SUBMITTED AS EXHIBITS**

Lettered exhibits submitted with Defendants' Opening Memorandum;
numbered exhibits submitted with plaintiffs' Opposition

| Date | Description | Am. Compl. ¶¶ | Ex. # |
|---|---|---|---|
| 12/12/03 | Form 10-K for FY'03 (ending 9/30/03) | -- | 4 |
| 1/6/04 | Form 8-K (dismissal of E&Y) | -- | 1 |
| 1/23/06 | Form 8-K (Grant Thornton resigns) | -- | 2 |
| 12/06 | Weirich and Turner, "A Closer Look at Financial Statement Restatements" | -- | 5 |
| 9/27/07 | Form 4  (Bambarger) | 205 | K |
| 12/12/07 | Form 10-K for FY'07 (ending 9/30/07) | -- | A |
| **2/4/08** | *Class Period Begins* | | |
| 2/7/08 | Form 10-Q for Q1'08 (ending 12/31/07) | 50-61, 189-190, 203-204, 209 | B |
| 4/28/08 | Transcript of Q2'08 earnings call | 73-76, 88 | C |
| 5/7/08 | Form 10-Q for Q2'08 (ending 3/31/08) | 79-88, 189-190, 203-204, 209 | D |
| 7/31/08 | Form 4 (Baldwin) | 195 | L |
| 7/31/08 | Form 4 (Higginbotham) | 200 | M |
| 7/31/08 | Form 4 (Bambarger) | -- | N |
| 8/6/08 | Form 4 (Baldwin) | 196 | O |
| 8/8/08 | Form 4 (Higginbotham) | 201 | P |
| 8/7/08 | Form 10-Q for Q3'08 (ending 6/30/08) | 100-109, 198-199, 203-204, 209 | E |
| **12/10/08** | *Class Period Ends* | | |

| Date | Description | Am. Compl. ¶¶ | Ex. # |
|---|---|---|---|
| 12/11/08 | Transcript of FY'08 earnings call | 4, 5(a), 21, 25, 26, 29, 32, 38, 61, 127-130, 166-167, 169, 184, 185 | **F** |
| 12/24/08 | Form 10-K for FY'08 (ending 9/30/08) | 5(b), 23, 61-62, 66-68, 88-89, 93-95, 109-110, 112-114, 119-120, 122-124, 132-135 | **G** |
| 1/22/09 | Proxy Statement (Form 14A) | -- | **6** |
| 2/5/09 | Form 10-Q for Q1'09 (ending 12/26/08) | -- | **H** |
| 3/20/09 | Letter to SEC staff responding to 3/10/09 comment letter | 5(d), 137 | **I** |
| 5/6/09 | Form 10-Q for Q2'09 (ending 3/31/09) | 25, 30, 33, 35, 61, 64, 88, 92, 138 | **J** |
| 8/10/09 | Space News, "Satellite Company's Chief Resigns Amid Lower Expectations" | -- | **3** |
| 7/15/81 | SOP 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts" | 25, 61, 63, 88, 109, 119, 149-52 | **Q** |
| 10/27/97 | SOP 97-2, "Software Revenue Recognition" | 34, 61, 88, 109, 119, 144, 145 | **R** |
| -- | ARB 43, "Contractor Accounting:  Government Contracts" | -- | **S** |
| -- | Stock prices | -- | **T** |

## I.    INTRODUCTION AND OVERVIEW

This action was filed reflexively after an announcement by Integral Systems, Inc. ("Integral")

that it would restate its unaudited financial statements for the first three quarters of fiscal year 2008.

As the Court is aware, no other plaintiffs or plaintiffs' counsel wanted this securities case.  A

companion derivative action has been withdrawn after plaintiff's counsel in that case reviewed the

results of an internal investigation addressing the causes of the restatement and concluding that he

simply did not have a case.  It is now time similarly to put an end to this would-be class action

lawsuit, since it is clear from the face of plaintiffs' Amended Class Action Complaint that no claim

can possibly be stated for violation of the federal securities laws.

To survive a motion to dismiss, the Amended Complaint must allege, as a critical element

underlying all of plaintiffs' claims, facts giving rise to "a strong inference of scienter."  Such an

inference must be much more than simply "plausible."  "A complaint will survive only if a

reasonable person would deem the inference of scienter *cogent* and *at least as compelling* as any

plausible opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues*

*& Rights, Ltd.*, 551 U.S. 308, 310 (2007) (emphases added).

We demonstrated in our opening brief in support of defendants' motion to dismiss (the

"Motion") that the Amended Complaint does even come close to meeting this standard.  As we now

explain below, nothing in plaintiffs' Opposition gives this Court the slightest reason to reach any

other conclusion.  Indeed, while plaintiffs repeat "strong inference of scienter" like a mantra

throughout their brief, they *never even attempt to argue* that the "inference" they ask the Court to

draw is "at least as compelling as any opposing inference one could draw from the facts alleged."

They duck this standard because they cannot meet it.

1

Plaintiffs' scienter theory is virtually incoherent and decidedly counter-logical.  Plaintiffs are effectively forced by the incontrovertible facts to ask this Court to accept not just one, but a *whole series* of illogical propositions in order to reach the conclusion that scienter has been adequately alleged and thus the Amended Complaint should not be dismissed.  In essence plaintiffs ask this Court to accept as "cogent and at least as compelling as any opposing inference one could draw from the facts alleged":

1. The proposition that during the first and second quarters of fiscal year 2008 the four senior officers of Integral named as defendants herein, including its recently-hired chief financial officer and controller, deliberately made "obvious" accounting errors on two major contracts (GPS and RAIDRS) for the purpose of overstating the Company's reported revenue and earnings figures—*even though* those figures already exceeded the Company's prior public guidance *without* any "need" for the errors.  *See* Opening Mem. at 11; Reply, *infra* at 6.

2. The proposition that having intentionally adopted accounting treatments for the GPS and RAIDRS contracts that were "obviously" wrong, these officers inexplicably *disclosed those accounting treatments* to investors along with the financial results for those quarters—and even emphasized for clarity's sake that the accounting for the GPS and RAIDRS had a significant impact on the reported results.  *See* Opening Mem. at 12; Reply, *infra* at 18.

3. The proposition that the Company's stock price was deliberately inflated by defendants *even though* there was no even *arguable* benefit to doing so for either the Company, which entered into no stock-based transactions during the period in question, or three of the four officers allegedly involved, who sold no stock during this period.  Indeed, the CFO, in the best position to know about and influence the Company's accounting determinations, had vested stock options in hand and *could* have exercised them for an "extra" profit while the stock price was inflated—but *did not*.  Meanwhile, the Corporate Controller (the next-most knowledgeable officer on accounting issues), and the new CEO who joined the Company only in July 2008, *did not even have* stock or vested options that could be sold to take personal advantage of the inflated stock price.  *See* Opening Mem. at 27, Reply, *infra* at 8-10.

4. The proposition that these four officers chose to further inflate Integral's stock price right through the third quarter of fiscal 2008, during when they *received* stock options, which meant that their purchase price for the options would be inflated—they would have to *overpay* if the options were ever exercised, and even worse, the options *might never be worth anything* if they went "underwater" (as indeed happened) once the accounting errors were corrected and Integral's stock price dropped.  *See* Opening Mem. at 25-26;  Reply, *infra* at 7.

5. The proposition that the one defendant who sold stock during the class period, outgoing interim CEO Alan Baldwin, sold 55,000 shares not because he had just stepped down from

that position at age 71 and logically wanted at that point in his life to realize the value in this investment, but because, *without any specific evidence to suggest this,* he had participated in a fraud and knew the stock price had been inflated for many months—*yet never sold earlier to avoid the risk of "missing the boat" on the inflated price*, and received during the same period options for 120,000 "new" shares for which he would have to "overpay" by *more than he "gained" on the 55,000 shares sold. See* Opening Mem. at 26-27; Reply, *infra* at 11-12.

6.    Finally, the proposition that having deliberately made several "obvious" accounting errors that inflated Integral's financial results and stock price during the first three quarters of fiscal 2008, the defendants *insanely chose to replace the Company's existing auditors*, Bernstein & Pinchuk, who were unaware of the errors, with a "Big 4" accounting firm, Ernst & Young, that was guaranteed to conduct an extra-thorough audit in their first year on the job and *undoubtedly would find any "obvious" errors and force a restatement. See* Opening Mem. at 34-35; Reply, *infra* at 7.

The simple reality is that sustaining plaintiffs' Amended Complaint would require this Court to ignore common sense. The facts alleged by plaintiffs do not give rise to *any* appreciable inference of scienter, much less an inference "at least as compelling" as the opposing inference that the restatement was occasioned not be any deliberate or reckless misconduct but rather by good faith mistakes.

Not surprisingly given the foregoing, plaintiffs do not merely ask the Court in their Opposition to ignore the logical import of the as-alleged facts; they also ask the Court to misapply the law governing a motion to dismiss in a class action securities lawsuit brought under the Securities Exchange Act, and even to get side-tracked on matters that have little or no bearing at all on the question of whether scienter has been adequately pled. We address all of these points below, and explain how only one result can properly be reached on this Motion: plaintiffs have utterly failed to carry their burden of pleading facts supporting a strong inference of scienter, and hence the Amended Complaint must be dismissed.

## II.    ARGUMENT

We begin with a reminder of what is totally absent here:  any direct factual allegations whatsoever suggesting that defendants acted with scienter with regard to the accounting errors at issue.  No confidential sources purport to say that they know the errors were intentional, the Court is not faced with allegations of fraudulent transactions, contracts that were not yet signed when revenue was recognized, or revenue that was never collected.  The question is thus whether in the absence of such allegations plaintiffs have nonetheless pled facts that creating a "strong inference" of scienter.

We first briefly address in Section II(A) below the correct standard of review on this motion, which plaintiffs misstate.  Section II(B) next addresses the question that Courts primarily focus upon in determining whether scienter has been adequately pled:  whether facts are alleged showing that the Company as an entity, or the individual defendants personally, had a *motive* to misstate the Company's financial results.  We then turn in Section II(C) to plaintiffs' contention that a strong inference of scienter exists simply because the errors in question were so "obvious."  In Sections II(D) and II(E) we address what plaintiffs' refer to as "other indicia" of scienter, including the execution of Sarbanes-Oxley Act ("SOX") certifications by certain of the individual defendants.  Finally, in Section II(F) we note again that plaintiffs cannot, and have not even tried, to satisfy their duty to alleging facts leading to an inference of scienter "at least as compelling" as the "competing" inference that the accounting errors were simple mistakes.

A.    **Plaintiffs' Amended Complaint Must Be Dismissed Unless It Adequately Alleges Facts That Would Support An Inference of *Scienter* At Least As Strong As Any Opposing Inference**

Plaintiffs' Opposition misstates the legal test on this Motion to dismiss in two key respects.  First, the Opposition asserts incorrectly that "defendants bear a heavy burden to obtain dismissal."

Opp. at 9.  It is, of course, *plaintiffs'* affirmative burden to properly allege sufficient facts to survive a motion to dismiss.  Second, the Opposition misleadingly claims that "in ruling on a motion to dismiss, a court should not require 'heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'"  *Id.*, quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In cases where the Private Securities Litigation Reform Act ("PSLRA") applies, satisfying this general test is not enough; a plaintiff must indeed provide "heightened fact pleading of specifics" on precisely the issue presented here—the element of scienter.

In *Tellabs,* which plaintiffs acknowledge only in passing, the Supreme Court explained that the PLSRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  551 U.S. at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).  To apply the *Tellabs* test, the court must first determine whether the allegations "permit an inference of scienter, and if so, the persuasiveness of that inference," and then "discuss whether 'a reasonable person would deem [any] inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009) (quoting *Tellabs*, 551 U.S. at 324) (alteration in original).

These pleading requirements are "[e]xacting," *Tellabs*, 551 U.S. at 313, and courts have noted the "very high bar for securities plaintiffs under the PSLRA."  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008).  "In order to establish a strong inference of scienter, plaintiffs must do more than merely demonstrate that defendants should or could have done more. They must demonstrate that the [defendants] were either knowingly complicit in the fraud, or so reckless in their duties as to be oblivious to malfeasance that was readily apparent."  *Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 314 (4th Cir. 2009).  On

this question, "[t]he burden placed upon Plaintiff is great." *Svezzese v. Duratek, Inc.*, No. Civ.A. MJG-01-CV-1830, 2002 WL 1012967, at *4 (D. Md. Apr. 30, 2002).  Plaintiffs have not met this burden.

**B.     Plaintiffs' Allegations Regarding Defendants' "Financial Incentives" Negate, Rather Than Support, Any Inference of Scienter**

Our opening Memorandum demonstrates that consideration of the personal financial incentives of the individual defendants negates rather than supports any inference of scienter. Opening Mem. at 25-28.  Plaintiffs' weak attempt in their Opposition to argue otherwise, Opp. at 36-40, fails to solve this major problem with their case.

**1.     Defendants Received Stock Options During the Class Period That Vested No Earlier Than 2009, And Thus Their Personal Financial Interests Would Be *Not* to Inflate Integral's Stock Price During That Period**

Plaintiffs allege that all four individual defendants had a "motive to commit fraud" in order to receive stock option awards.  Compl. ¶ 187.  This theory makes sense, however, only if it is true that (1) the defendants would not have received the option awards *but for* their intentional commission of accounting errors, and (2) the timing of the option awards was favorable to them.

On the first point, plaintiffs' assertion that "eligibility for bonuses in the form of stock options" contributes to an inference of scienter, Opp. at 38, ignores the inconvenient but undeniable fact that Integral *exceeded* its original revenue and earnings guidance even *without* the accounting errors.  *See* Ex. 6 at 25; Ex. G at F-17, F-31 (revenue 107% and earnings per share 140% of target). Given this, there is no basis to conclude (and certainly none is alleged in the Amended Complaint) that the accounting errors were "needed" for the defendants to receive stock options as part of their compensation package—and hence no "motive to commit fraud" is evident at all.  Plaintiffs'

assertion that the stock option grants support an evidence of scienter thus fails as a matter of incontrovertible fact and simple logic.

The second point—whether the timing of the option grants was favorable to defendants—strongly militates *against* any inference of scienter because, as we have explained, a direct effect of the accounting errors is that option grants were priced "too high" to the individual defendants' detriment.  Opening Mem. at 27-28.  Plaintiffs' only response is to assert, inaccurately, that "any 'harm' to Defendants is purely hypothetical" because they did not actually purchase stock.  Opp. at 39.  This contention is false and indeed misses the point (no doubt deliberately), since the ongoing value of the options will depend in part on the price that must be paid when and if the options are exercised, and the higher that price the less valuable the options.  Defendants' "motive" would thus be for Integral's stock price to *not* be inflated at the time they received option grants, a fact that strongly negates any inference of scienter.

As discussed in Section I above, plaintiffs have "alleged" themselves into a ludicrous position:  that defendants (a) deliberately inflated the Company's stock price through "obvious" errors (one must ask, why not chose less obvious ones?); (b) then received stock options at inflated strike prices that could not be exercised until at least 2009, *see* App. Exs. L, M, N, P, (c) then hired a "Big Four" accounting firm to audit the fiscal 2008 year-end books, Compl. ¶ 115, making virtually inevitable that these "obvious" errors would be discovered, a restatement would be necessary, and the stock price would drop significantly *before* defendants could exercise their options; and (d) thus put themselves in the foreseeable position of having their stock options go deeply "underwater" and likely be worthless.  Far from being "cogent and compelling," this theory is nonsensical.  *See, e.g., Shuster v. Symmetricom, Inc.*, 35 F. App'x 705, 707 (9th Cir 2002) (defendants "actually lost money on the stock options they received"); *In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662,

7

677 (E.D. Mich. 1999) ("It seems unlikely that Foss would engage in a scheme to inflate the company's earnings after he sold his stock early on in the class period, and yet fail to sell any of his remaining shares at 'artificially inflated prices.'"); *Mathews v. Centex Telemanagement, Inc.*, No. C-92-1837-CAL, 1994 WL 269734, at *8 (N.D. Cal. Jun. 8, 1994) ("Centex bought 209,500 shares of its own stock in the open market, at a total price of almost four million dollars. It would have made no sense to purchase that stock if defendants knew the prices to be inflated.").

> 2.     **The Lack of Stock Sales by Three of the Four Individual Defendants, Including CFO Bambarger, Further Negates Any Inference of Scienter**

Plaintiffs' attempt to plead scienter also runs into another big problem:  only one of the four Integral officers alleged to have participated in the fraud sold any stock during the Class Period, and thus even arguably benefitted from the scheme.  Integral's CFO William Bambarger, who obviously was closest to the accounting issues, did *not* sell stock during the class period, and neither did either of the other two individual defendants, including controller Hemi Lee-Gallagher.  As numerous cases make clear, this fact is a substantial factor negating any inference of scienter. [1]

---

[1]  *See, e.g., Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (no scienter where one of three insiders did not sell stock because "[w]e typically require larger sales amounts—and corroborative sales by other defendants—to allow insider trading to support scienter"); *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 56 (1st Cir. 2008) ("Based solely on Bucknum's trading, a strong inference of scienter on the part of Biogen and the other individual defendants cannot be drawn."); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 435 (5th Cir. 2002) (noting that "even unusual sales by one insider do not give rise to a strong inference of scienter" when other insiders had not engaged in suspicious trading during the class period); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[W]e conclude that the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *Grillo v. Tempur-Pedic Int'l, Inc.*,

[Footnote continued on next page]

Plaintiffs' response is to assert that "Bambarger's and Lee-Gallagher's failure to sell any stock during the class period" does not negate an inference of scienter "because neither *held any stock* during the Class Period." Opp. at 39 (emphasis added). This disingenuous statement, however, ignores the fact that Bambarger did hold *exercisable options* and thus certainly could have sold stock at inflated prices, as plaintiffs are quite aware. *See* Opening Mem. at 28; App. Ex. K. It is for this reason that, as plaintiffs themselves state, courts look to the defendants' "total holdings and exercisable options available" to identify suspicious sales. Opp. at 37. Plaintiffs thus have no answer to the fact that Bambarger's failure to take advantage of Integral's inflated stock price negates the inference that he acted with scienter with respect to the accounting errors in question. *Cf. In re E.spire Commc'ns, Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 743 n.9 (D. Md. 2001) (holding allegations of insider trading to be weakened by the fact that the CFO did not sell stock during the class period).

> **3.    Baldwin's Sale of Stock Does Not Support Any Inference of Scienter Given That Plaintiffs Cannot Tie the Transaction to Any Event Other Than His Resignation as CEO**

Apart from trying unsuccessfully to turn the sow's ear of the option grants into what looks like a silk purse and wishing away the fact that CFO Bambarger could have but did not sell stock during the class period, plaintiffs try mightily to build an inference of scienter based upon the one

---

[Footnote continued from previous page]

553 F. Supp. 2d 809, 821-22 (E.D. Ky. 2008) (finding no scienter and granting motion to dismiss where two officers did not sell stock during the purported fraud); *In re Bus. Objects S.A. Sec. Litig.*, No. C 04-2401-MJJ, 2005 WL 1787860, at *8 (N.D. Cal. July 27, 2005) ("any inference of scienter is further negated by the fact that neither [the CFO] nor [the president and COO] sold any shares during the Class Period"); *E.spire*, 127 F. Supp. 2d at 743 n.9 (inference of scienter was "further weakened by the fact that defendant Piazza, who was e.spire's Chief Financial Officer, did not sell any of his e.spire shares during the Class Period").

transaction in which an Integral officer arguably did "benefit" from the restatement:  the exercise of

stock options and sale of stock by outgoing interim CEO Alan Baldwin in early August 2008, shortly

after his resignation from this position.  This effort, however, fails for multiple reasons.

First, as we have explained, any benefit that Baldwin might have obtained from selling

55,000 shares of Integral stock at an "inflated price" is more than offset by the fact that options he

received during the same time period for 120,000 additional shares are saddled with an equivalent

per share "inflated cost."  As is true for the other defendants, Baldwin's incentive was thus for

Integral's stock price *not* to be inflated rather than the other way around.  Opening Mem. at 26-27.

Second, the specific facts surrounding Baldwin's stock sales are inconsistent with an

inference of scienter.  As plaintiffs acknowledge, both the "timing and amount" of stock sales must

be examined in context to determine whether they contribute to an inference of scienter.  Opp. 36.

Of these two elements, "timing is more important than the amount of sales in determining whether a

strong inference of scienter is created."  *In re Focus Enhancement, Inc. Sec. Litig.*, 309 F. Supp. 2d

134, 163-64 (D. Mass. 2001) (cited in Opp. at 37).  Even where the amount of a stock sale can be

described as "unusual," no inference of scienter is appropriate unless the *timing* of the stock sale is

suspicious, such as before "a big 'event' unknown to the public."  *Id.* at 164.  Indeed, in order for the

timing of a stock sale to be suspicious enough to give rise to an inference of scienter, the sale must

be connected to a definitive event.  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir.

2002); *see also Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) (granting

motion to dismiss where "[t]he complaint does not allege that defendants timed their sales to profit

from any particular disclosures").

Plaintiffs allege no such suspicious timing.  Baldwin's stock sale fell within plaintiffs' very

lengthy (over 10 months long) proposed class period, but the mere fact that one executive exercised

stock options during a period of nearly a year does not suggest anything.  Of more significance,

Baldwin's exercise of stock options on August 4 and 5, 2008, occurred at a time quite remote from

both the February 4, 2008, and April 28, 2008 earnings announcements that included the errors on

the GPS and RAIDRS contracts (which accounted for nearly all of the total error amount), and the

announcement of the restatement on December 11, 2008.  *See* Compl. ¶¶ 24, 45, 48, 74, 75, 125.

Here, as in *Grillo v. Tempur-Pedic International., Inc.*, 553 F. Supp. 2d 809, 822 (E.D. Ky. 2008),

the Court should find no inference of scienter where a defendant sold stock "four to five months

prior to the Company's revised guidance announcement [that resulted in stock drop]."  "The longer

the time between the stock sales and the disclosure of bad news, the more scienter is negated."  *Id.*,

citing *In re Part City Sec. Litig.*, 147 F. Supp. 2d 282, 306 (D.N.J. 2001).

Given these unhelpful facts, plaintiffs contend in the alternative that the "timing" of

Baldwin's stock sale is suspicious because he sold near (although not at) the "Class Period high"

reached on August 14, 2008.  Opp. 37.  This argument is an utter red herring.  To start, the "Class

Period high" is but one of several similar local "peaks" that occurred as the stock price rose and fell

over the entire Class Period.  *See* App. Ex. T.  Thus, while Baldwin sold his shares at stock-split

adjusted prices of $23.66 and $24.35 on August 4 and 5, 2008, he could just as easily have sold at

about the same price at any time over the three-week span from July 30 ($24.13) to August 20

($24.985), or even in late October ($24.57) or late November ($24.00).  *Id.*  Further, plaintiffs offer

no reason at all to believe that Baldwin could even *know* when the stock price might hit reach a

"peak" during the class period.  Instead of demonstrating that Baldwin's sale was "suspicious," the

stock sale price suggests nothing at all.

Plaintiffs also claim that Baldwin's sale is "unusual" because he "had never previously sold

any Integral stock."  Opp. 37.  That hardly leads to an inference of scienter.  Baldwin's first-ever

stock sale would in this sense be unusual no matter *when* it occurred, whether in 2008 or 2018.  But Baldwin sold stock proximate to a significant life event, his resignation at age 71 as interim CEO.  It cannot legitimately be said that it is "unusual" to cash out of an investment because one is stepping down from an executive position—or even simply because one has reached 71 years of age.

Plaintiffs attempt to counter this point by citing *In re Proquest Securities Litigation*, 527 F. Supp. 2d 728 (E.D. Mich. 2007), as "rejecting [the] argument that sales following resignation from office negated scienter where [the] former CEO continued to serve on the board of directors."  Opp. at 38.  *Proquest*, however, held no such thing.  In that case the company *admitted* in an SEC Form 8-K that the CFO had "intentionally manipulated . . . financial reports in order to . . . create the appearance of profitability."  527 F. Supp. 2d at 734.  The *Proquest* court did not find an inference of scienter because the CEO remained a director; the court found scienter because the company admitted the CFO's fraud.

Finally, plaintiffs' assertion that the sale of stock by only one executive is enough to support a strong inference of scienter runs directly counter to the relevant case law cited at fn. 1, above.  Further, none of the half-dozen cases plaintiffs cite for the proposition that "[n]umerous courts have found that sales of all or a significant portion of an [i.e. one] insider's stock contribute to a strong inference of scienter," Opp. at 37, actually contains any such "finding."

Three of these cases fail to support the proposition for which they are offered because *all* of the defendants there sold stock, not just one.  *See No. 84 Employer-Teamster Joint Council Pension Trust Fund. v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003); *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 640-41, 645-47 (E.D. Va. 2000); *New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*, No. Civ. A.1:98-cv-99-M, 1999 WL 33295037, at *9 (W.D. Ky. Aug. 16, 1999).  Moreover, plaintiffs in each of these cases also alleged specific,

probative facts that are not present here.[2]  The other three cases likewise fail to support the

proposition that sales from a single insider support scienter.  As noted, *Proquest* turns on the

company's admission that its CFO had intentionally manipulated financial reports, 527 F. Supp. 2d

at 734.  The remaining two cases likewise do not say what the Opposition claims they do.  Plaintiffs

cite *In re Focus* as a case where insider stock sales "create [an] inference of scienter," Opp. 37, but

the court in fact held otherwise and *granted a motion to dismiss* because, like here, the plaintiffs did

not "tie" the sales to a particular event.  309 F. Supp. at 163-64.  *Lefkoe v. Jos. A. Bank Clothiers*,

No. WMN-06-1892, 2007 WL 6890353 (D. Md. Sept. 10, 2007), cited for the proposition that "[a]

strong inference of scienter may be sufficiently alleged against all defendants where one defendant

sold a large portion of his stock and others sold none," Opp. 40 n.35, also does not stand for that

assertion.  In its 2007 opinion, this Court specifically stated that the scienter allegations did "*not* rest

solely on Wildrick's stock sale," and went on to state that the defendants "*[did] not challenge that*

*they had access to reports*" that gave them knowledge of the company's financial troubles.  2007

WL 6890353, at *6 (emphases added).  Further, this Court later held that "Wildrick's sales certainly

created no inference [of scienter] with respect to either Ullman or Black [who had not sold stock]."

2008 WL 7275126, at *8.

---

[2]  *See No. 84*, 320 F.3d at 942 (plaintiffs offered internal reports, records of meetings, and FAA
reports and letters to show with particularity that company had been fully aware of problems in
conflict with public statements); *Microstrategy*, 115 F. Supp 2d at 640-41, 649 (CEO's public
admissions that he struggled with decisions of whether to declare revenue prematurely, as well as
stock sales by *all* defendants occurring immediately after announcement of allegedly premature
revenue recognition); *New England*, 1999 WL 33295037 at *9 (sales occurring immediately
before restatement announcement).

In sum, even standing entirely alone Baldwin's stock sale provides little if any support for any inference of scienter.  When considered in conjunction with the stock options he received during the same time period, it plainly provides none.  And when the several factors in the record affecting the four individuals' financial interest are looked at collectively, the only rational inferences that can be drawn strongly negate rather than support the existence of scienter.

**C.      Plaintiffs Have Not Alleged Facts Demonstrating That Integral's Accounting Errors Were So "Obvious" As to Create a Strong Inference of Scienter**

With consideration of the individuals' financial incentives a disaster for their case, plaintiffs devote a larger portion of their Opposition to the assertion that scienter has been adequately pled because the accounting errors at issue purportedly are "obvious."  Opp. at 11-21.  Despite the page length of this argument, however, plaintiffs offer little more than (1) a regurgitation of Integral's own disclosures of the accounting errors, which by their nature do of course explain that the original accounting treatment was incorrect; and (2) the *ipse dixit* assertion that the correct accounting identified during the restatement was thus somehow "obvious."  *Id.* at 17, 19, 20, 21.  Such an argument could, of course, be advanced in virtually *any* restatement case.  If it were enough simply to say that accounting errors must be "obvious" because once the correct accounting is laid out it is now understandable how the prior accounting was wrong, restatement cases would rarely if ever be dismissed.  This is not, however, the law.  As we explain below, plaintiffs' entire discussion of this issue misapprehends what the courts mean by accounting errors so "obvious" that their existence supports a strong inference of scienter.

1. **To Adequately Plead Scienter Based on "Obviousness," Plaintiffs Must Allege "'In Your Fact Facts That Cry Out, 'How Could Defendants Not Have Known That the Financial Statements Were False'"**

To raise an inference of scienter from so-called "obvious" accounting errors, plaintiffs must show large errors over a sustained time period that on their face appear highly unlikely to be a result of innocent mistakes. In *Microstrategy*, the principal case upon which plaintiffs rely, the complaint alleged that the errors in question caused the company reported a profit of $18.9 million over a three-year period when in fact it actually suffered a loss of more than $36 million, a difference that it is hard to fathom could have occurred without culpable intent. 115 F. Supp. 2d at 636. Further, the specific errors alleged appeared unexplainable on their face. In the third quarter of 1999, for example, the company recorded revenue on a contract that was not executed until the following quarter, and revenue was likewise recognized for two more unexecuted contracts in the following quarter. *Id.* at 638-39. On top of this, the alleged timing of the transactions was highly suspicious since the transactions occurred at or near the end of fiscal years and quarters. *Id.* at 639. Concluding that these were truly "'in your face facts' that cry out, 'how could [defendants] not have known that the financial statements were false,'" the *Microstrategy* court held that the complaint adequately alleged the requisite "strong inference" of scienter. *Id.* at 637, 649 (alteration in original).

Similarly, in *In re Telxon Corporation Securities Litigation*, 133 F. Supp. 2d 1010, 1026-27 (N.D. Ohio 2000), the court emphasized in denying a motion to dismiss that the complaint alleged that the company had "overstated its revenues *for years,* did so by over $20 million in a *single* quarter and reported *profits* when it should have been reporting *losses* over *several different* quarters." *Id.* at 1031 (emphasis in original). The court also placed great weight on allegations of conduct that on its face plainly had "little or no justification": recognizing revenue for returnable

product without any increase in return reserves, and recognizing revenue "for goods that were shipped to another company location, rather than to a customer." *Id.* The magnitude of the alleged errors, the clear lack of justification for the company's alleged actions, and the "fortuitous" timing of the errors, occurring just when the company "foretold that it would return to profitability," were sufficient, the court concluded, to plead a "strong inference" of scienter. *Id.*.

While courts have found scienter to be alleged adequately on "obviousness" grounds when presented with "in your face" facts such as those in *Microstrategy* and *Telxon*, they have declined to reach this conclusion in cases, such as the present one, where accounting errors are not large relative to the company's finances, are of short duration, and are susceptible of innocent explanations. In *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004), the accounting errors occurred in the course of a single year and "turned the Company's 1999 operating loss of $50,000 into a $750,000 profit." *Id.* at 686. The errors included failures to reconcile intra-company transactions, account for uncollectible receivables, and disclose risks associated with the company's internal control system. *Id.* at 678-79. The court noted that such errors were "not especially dramatic" and led only to the result that the company "represented itself as a barely profitable company, when in fact it was a barely unprofitable company." *Id.* at 686. Because "[t]hese are not 'in your face facts' that 'cry out' scienter," it "cannot be said" that the accounting improprieties "should have been obvious" to defendants. *Id.* Likewise, in *In re E.Spire Communications, Inc. Securities Litig.*, 127 F. Supp. 2d 734 (D. Md. 2001), the plaintiffs—much like plaintiffs here—sought to argue that the errors were obvious given plaintiffs' proffered reading of the applicable accounting rules. The court rejected plaintiffs' argument, noting that the correct accounting could not be resolved by a mere reading of the accounting guidelines and that the magnitude of the errors "amounted to only 3.7% of the

Company's third quarter 1999 revenues and less than 1% of its revenues for the entire year"; thus, the errors could not be said to be so "simple" as to raise a strong inference of scienter. *Id.* at 747.

2.    **The Facts Alleged Here Fall Far Short of What Courts Require to Plead a Strong Inference of Scienter Based on "Obviousness"**

Viewed in the context of *MicroStrategy*, *Telxon*, and related cases, plaintiffs' Amended Complaint plainly fails to allege facts sufficient to permit any conclusion that Integral's accounting errors were sufficiently "obvious" to support a strong inference of scienter.

As a starting point, Integral's restatement was not especially significant in the context of its overall financial results. Rather than cause the company to report a substantial profit when it should have reported a substantial loss, as in both *MicroStrategy* and *Telxon*, the errors here merely caused Integral to report a modestly larger profit. *Cf., e.g., Telxon*, 133 F. Supp. 2d at 1031 (distinguishing *In re Comshare*, 183 F.3d 542 (6th Cir. 1999), in which a "fairly discrete" violation of GAAP caused a Company to move from one profitable position to another, "a far cry [from] the circumstances alleged here"). To put this in proper perspective, Integral's financial results beat its own original earnings guidance for the fiscal year *with or without the accounting errors*. Integral had projected revenues of approximately $147 million and earnings of $0.72 per share for the fiscal year ending September 30, 2008. *With the accounting errors corrected*, the Company still easily beat these numbers, posting revenues of approximately $160 million (107% of target) and earnings of $1.01 per share (140% of target). *See* Ex. 6 at 25; Ex. G at F-17, F-31.

In addition, the timing of the errors does not support an inference of scienter. In *Telxon*, timing was suspicious because the errors occurred "at times when Telxon foretold that it would return to profitability." 133 F. Supp. 2d at 1031. Here, the Company hired a new auditing firm before the end of the fiscal year—increasing the risk of discovery of the purportedly "obvious"

17

errors in RAIDRS and GPS accounting—yet plaintiffs do not allege that any information was hidden from these auditors.  The compelling inference from these facts is that neither the Company nor the individual defendants knew of these errors.  Moreover, while plaintiffs emphasize that "revenue recognition policies *remained constant* over a succession of auditors," Opp. at 13, the fact that several firms failed to recognize the PCS or customization issues belies any finding that such errors were "obvious."

3.     **Integral's Contemporaneous Disclosures Regarding the Two Major Transactions at Issue Negates Any Inference That Defendants Either Knew of the Errors or That the Errors Were "Obvious"**

The vast majority of the restatement—approximately $9 million of the $10.5 million of the deferred revenue—was due to the two one-time transactions, GPS and RAIDRS.  Compl. ¶¶ 5, 26, 164, 166.  Plaintiffs do not dispute that the Company publicly disclosed that revenues for these transactions were being recognized in Q1 and Q2, respectively.  Compl. ¶¶ 24, 45, 48, 74, 75.  Such public disclosure negates any inference of scienter, since it is highly improbable that defendants would be aware the accounting was improper yet nevertheless announce that accounting treatment to the public via conference calls, press releases, and SEC filings.

Plaintiffs do not really dispute that public disclosure negates scienter.  Instead, they seek to divert the court's focus on this point via a hair-splitting discussion of *In re Paincare Holdings Securities Litigation*, No. 6:06-cv-362, 2007 WL 1229703 (M.D. Fla. Apr. 25, 2007), the case defendants cited for the common-sense proposition that public disclosure negates scienter.  Opp. 28 n.23.  Plaintiffs state that "scienter was negated [in *Paincare*] because the incorrect policy also resulted in *understatements* of net income, a fact not present here."  *Id.* (emphasis in original).  This characterization of *Paincare* is simply incorrect.  The *Paincare* court declared the case to be "simple" because "PainCare at all relevant times *disclosed* its method of accounting . . . To the

extent the flawed methodology [was] the misrepresentation sued upon, it was set forth and disclosed to the world."  2007 WL 1229703, at *7 (emphasis in original).  Thus, "[t]he fact that the accounting error, when discovered and corrected by Defendant, resulted in a massive restatement of earnings does not serve as an indicium of fraud."  *Id.  Paincare* is a clear example of a court finding no scienter where the company publicly disclosed the accounting treatment at issue, and where plaintiffs failed to make specific allegations to the contrary.  Other cases hold the same.[3]

Both the case law and common sense support the conclusion that defendants' disclosures that revenues for the GPS and RAIDRS transactions were being recognized up-front in Q1 and Q2 negates any inference that the defendants had reason to believe such accounting treatment to be incorrect.  Plaintiffs have failed to advance any reasonable argument to the contrary.

**D.      Plaintiffs' Hyperbole Regarding Post-Restatement Disclosures Does Not Create An Inference Of Scienter**

Plaintiffs' remaining efforts to find support for their scienter allegations are equally futile.  In their Opposition, plaintiffs try to make something of the fact that various details regarding the restatement were set forth in several successive SEC filings, asserting breathlessly that "[t]he slow dribbling out of the truth . . . smacks of a cover-up."  Opp. at 28-29.  Neither the Complaint nor the

---

[3]  *See In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 163 (D. Mass. 2009) ("Lead Plaintiffs have failed to plead sufficient facts giving rise to a strong inference of scienter because First Marblehead disclosed that which the Complaint alleges it concealed. . . . First Marblehead's detailed disclosures negate any inference of scienter."); *In re NDCHealth Corp., Inc. Sec. Litig.*, No. 1:04-cv-0970-WSD, 2005 WL 6074918, at *9 (N.D. Ga., Jul. 27, 2005) ("an immediate disclosure to the investing public weighs *against* a finding of scienter") (emphasis in original); *cf. Bearingpoint*, 576 F.3d at 187 ("A disclosure that meaningfully alerts investors to the risk that financial information is not accurate may suggest that the individuals responsible for the disclosure did not knowingly (or perhaps not even recklessly) misstate the underlying financial information.").

Opposition, however, offers any facts that actually support this assertion.  While plaintiffs claim that

the December 11 and December 24 disclosures were "vague," Opp. at 28, they do not allege *how* the

disclosures were in any way unclear or insufficient to alert investors to the accounting errors.

Indeed, a full reading of the December 11, 2008 call transcript and restatement readily shows that the

Company disclosed information sufficient to inform investors of the accounting errors and their

magnitude.  Compl. ¶¶ 25, 26, 29, 32 125-33; App. F (12/11/08 transcript); App. G at F-32-33

(restatement).[4]  Nor are allegations to be found that *any* of the Company's disclosures regarding the

restatement were materially incomplete, false, or misleading—unlike in the only case that plaintiffs

cite in this section of their Opposition.  *See* Opp. at 29; *SEC v. Lucent Techs. Inc.*, 363 F. Supp. 2d

708, 712 (D.N.J. 2005); *see also In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232

(S.D.N.Y. 2006) (finding scienter in part where defendants had made "false statements" about "the

reason for [the company's] restatement.  Further, the fact that the proposed class period ends on

December 11, 2008, means no claim even exists that investors continued to be misled after this date.

Where defendants state the truth in disclosing the restatement—albeit not in the "negative terms of

[plaintiffs' choosing]"—there is no evidence of scienter.  *Ley v. Visteon Corp.*, 543 F.3d 801, 813

(6th Cir. 2008) (finding no inference of scienter where plaintiffs alleged that information was

"misleading" because it was "disclosed piecemeal in two separate notes to the 2004 consolidated

---

[4]  Plaintiffs emphasize that the initial December 11, 2008 disclosure only listed three of the four
accounting errors.  Opp. at 28.  Although the Complaint quotes portions of the December 11,
2008 call with investors, plaintiffs leave out Bambarger's statement that "[w]e have identified
three primary source office audit adjustments *so far.*" App. Ex. F, at 2 (emphasis added).  The
Opposition further fails to note that the fourth error, concerning "off-the-shelf product sales,"
was disclosed in detail only two weeks later, amounted to only $296,000 of the $10.5 million of
the revenue ultimately restated, and thus was not even a "primary source" of the audit
adjustment.  Compl. ¶ 35.

financial statements that had to be read together").  Plaintiffs simply fail to explain how either

Integral's accurate disclosures to the public regarding the restatement, or its accurate responses to

the SEC's requests for additional information, raise any inference of scienter.

**E.     Neither Signing A SOX Certification Nor A Recitation Of A Job Description
        Leads To An Inference Of Scienter**

      **1.     Plaintiffs Must Allege "Red Flags" That Would Have Alerted SOX
        Signatories That The Accounting Was Incorrect, Yet Fail To Do So**

Plaintiffs also assert that signing Sarbanes-Oxley ("SOX") certifications should be indicative

of scienter.  Citing two district court cases, they claim that the accepted rule is that "the execution of

false SOX certifications are a factor in determining whether, taken collectively, a complaint's

scienter allegations give rise to a strong inference of scienter."  Opp. 30-31.

Plaintiffs' summation of the case law is incorrect.  As the Fourth Circuit stated in *Cozzarelli*

*v. Inspire Pharmaceuticals Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008), the "bare allegation" that

plaintiff "lied when she certified [the company's] financial statements in accordance with the

Sarbanes-Oxley Act of 2002 . . . does not provide independent support for an inference of scienter."

The Fourth Circuit cited two Courts of Appeals cases for this proposition: *Central Laborers'*

*Pension Fund v. Integrated Electrical Services., Inc.*, 497 F.3d 546, 555 (5th Cir. 2007), and

*Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265-67 (11th Cir. 2006).

*Garfield* specifically *rejected* the notion that a SOX certification that later proves to be

incorrect is evidence of scienter, because then "scienter would be established in every case where

there was an accounting error or auditing mistake made by a publicly traded company, thereby

eviscerating the pleading requirements for scienter set forth in the PSLRA."  466 F.3d at 1266.

Instead, the Eleventh Circuit found that SOX certifications would only be indicative of scienter "if

the person signing the certification had reason to know, or should have suspected, *due to the*

21

*presence of glaring accounting irregularities or other 'red flags,'* that the financial statements

contained material misstatements or omissions." *Id.* (emphasis added).  The Fifth Circuit in

*Integrated Electrical Services*, also cited by the Fourth Circuit, adopted this rule, 497 F.3d at 555, as

have several other Courts of Appeals. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1004

(9th Cir. 2009) ("Our sister circuits to rule on such questions have unanimously agreed [with

*Garfield*]"); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008) (quoting *Integrated*

*Elec. Servs*, 497 F.3d at 555); *Ley*, 543 F.3d at 812 ("We agree with the Eleventh Circuit['s *Garfield*

decision]").  Thus, plaintiffs' citation to *Backe v. Novatel Wireless, Inc.*, 607 F. Supp. 2d 1145, 1163

(S.D. Cal. 2009), and *Croker v. Carrier Access Corp.*, No. 05-1011, 2006 WL 2038011, at *11 (D.

Colo. July 18, 2006), is not representative of the relevant case law,[5] which requires allegations of

facts showing that defendants were aware of "red flags" when they signed the SOX certifications.

Implicitly realizing this problem, plaintiffs advance three red herring arguments that such red

flags were present at the time the SOX certifications were signed.  Opp. 31-33.  The first two center

on Gary Prince, terminated by the company on March 30, 2007, approximately a year before

plaintiffs' proposed class period even began.  Although Prince purportedly made negative comments

---

[5] Nor do these cases support a finding of scienter here.  The *Backe* court found that incorrect SOX certifications were "relevant," but were insufficient to show scienter.  The court only found scienter when combining the SOX certifications and GAAP violations with suspicious stock sales: "[all] Defendants unloading stock near in time to when the market would inevitably learn of the Sprint cancellation does support an inference that Defendants timed their sales [and amended their 10b-51 plans accordingly] to benefit from stock prices before the information leaked to the market."  607 F. Supp. 2d at 1162.  Similarly, *Carrier* demonstrates the miniscule role of SOX certifications in the scienter calculus: there, the CEO, CDO, and CFO all signed the SOX certifications, 2006 WL 2038011, at *2, but the court did not find scienter sufficiently alleged against the CFO.  *Id.* at *4-5, 12 (finding scienter sufficiently alleged against the CEO and CDO due to specific information provided by five confidential informants).

to another person also long gone from the Company, Bonnie Wachtel, not the slightest factual basis is offered for the proposition that Prince actually had any information that accounting errors existed, or if he did, that it was communicated to any of the defendants. *See* Opening Mem. at 24.  Plaintiffs' third argument is equally unavailing, and indeed borders on the absurd.  Plaintiffs contend that the Company's hiring of "very talented people" in the finance and accounting department in the first two quarters of FY2008 somehow should have been notification of incorrect accounting during that time period.  Opp. at 32.  This is evidence of people acting *appropriately*, not with culpable scienter, and is certainly unlike anything that courts have concluded constitutes a "red flag" for a corporate officer signing a SOX certification.  *See Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, No. 8:07-cv-1952-T-26MAP, 2009 WL 3853592, at *7 (M.D. Fla. Mar. 30, 2009) (current law enforcement investigations of the company were red flags of possible fraud, and citing cases for same); *In re Am. Serv. Group, Inc.*, No. 3:06-0323, 2009 WL 1348163, at *53 (M.D. Tenn. Mar. 31, 2009) (internal report of "unlawful practices" was a red flag).  Plaintiffs' claims that the individual defendants' SOX certifications provide evidence of scienter are meritless.

### 2.   Plaintiffs' Allegations Of Individual Defendants' "Direct Involvement" Are Nothing More Than Recitations Of Generic Job Descriptions Of Any CEO, CFO, And Controller

The parties agree that plaintiffs cannot rely on bare allegations that the Individual Defendants "should have known" of accounting errors based on their positions or job descriptions.  Opening Mem. at 21-22; Opp. at 34-36.  While claiming to do more than this, plaintiffs' assertion that scienter somehow flows from defendants' "direct involvement" in the accounting determinations in question is in substance nothing but the claim, quite undisputed, that the individual defendants (or more accurately, two of them) held positions involving accounting.  This suggests nothing.

For defendants Higginbotham and Lee-Gallagher, plaintiffs point only to their positions as CEO and Controller, respectively, their job descriptions, and their signatures on publicly filed documents, Opp. at 35-36, allegations that apply to *any* CEO and Controller of *any* company. Such empty assertions are indisputably insufficient to allege scienter under the PSLRA. *See, e.g., In re Criimi Mae Inc. Sec. Litig.*, 94 F. Supp. 2d 653, 661 (D. Md. 2000) (holding that the "general inference that, because of their positions with [the company], Defendants 'must have known' the statements issued by [the company] were false and misleading at the time they were issued. . . . is inadequate to withstand the special pleading requirements in securities fraud cases").

Nor do plaintiffs allege appreciably more against Baldwin or Bambarger. Plaintiffs' recounting of Baldwin's statements that he had a strong accounting background and hired additional accounting personnel does nothing to support an assertion that he knew the specifics of the accounting determinations at issue, much less that he knew those determinations were wrong. Opp. at 34-35. And Bambarger's disclosures of the revenue recognition of the GPS and RAIDRS transactions in Q1 and Q2 of FY2008, while indicating his obvious involvement as CFO in the accounting determinations at issue, likewise gives no indication that he knew the accounting for those transactions was in error—indeed, as addressed above, this disclosure negates any inference that he knew the accounting was incorrect. Plaintiffs' arguments are nothing but the "must have known by virtue of their position" claim that courts uniformly reject.

Simply put, plaintiffs allege no specific facts to show that the individual defendants knew of accounting irregularities—only positions, job descriptions, and statements that are either irrelevant or actually *negate* an inference of scienter. Opp. 33-35. Thus, plaintiffs again fail to allege specific facts to support any inference of scienter.

**F.      Plaintiffs Do Not Even Attempt to Demonstrate That Any Inference of Scienter Is Both "Cogent" and "At Least as Compelling as Any Opposing Inference," And They Cannot Do So**

Because plaintiffs misstate the standard of review—claiming that "*Twombly's* requirement of 'facial plausibility' is satisfied 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,'" Opp. at 9—they make no attempt to "consider the complaint in its entirety" including "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007).  Further, they never even address the question this Court must:  whether the specific facts alleged in the Complaint (taken together with other information in the Company's public documents that plaintiffs do not dispute are properly cognizable on a motion to dismiss) give rise to a strong, "cogent" inference of scienter "at least as compelling" as the opposing inference that the errors were occasioned simply by good faith mistakes.  The fact that plaintiffs duck this question speaks volumes.  The Court here faces nothing but the same thing the Fourth Circuit faced in *Duratek*—allegations by a plaintiff that the company "lacked internal controls," "violated simple accounting rules," and "violated its own internal revenue recognition policy," which taken together "are, in essence, [nothing but] allegations of accounting irregularities and violations." 67 Fed. App'x. at 173.  Because these allegations do not meet the *Tellabs* test, and because all of plaintiffs' claims thus fail, *see* Opening Mem. at 35 and Opp. at 40-41,  the Amended Complaint must be dismissed.

## III.      CONCLUSION

For the foregoing reasons and for the reasons stated in Defendants' opening memorandum, Plaintiffs' Amended Class Action Complaint should be dismissed for failure to state a claim, with prejudice.

DATED this 23rd day of December, 2009.

Respectfully submitted,

   /s/  John C. Millian
John C. Millian (Bar No. 06459)
Michael D. Billok (Bar No. 16952)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500 (main phone)
(202) 530-9566 (Millian direct fax)
(202) 530-9534 (Billok direct fax)
jmillian@gibsondunn.com
mbillok@gibsondunn.com
*Counsel for Defendants*

*Of Counsel for Defendants:*
Daniel A. Cantu
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500  (main)
(202) 530-9661  (Cantu direct fax)
dcantu@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of December, 2009, I have electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such

filing (NEF) to the following:

Andrew N. Friedman
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C.  20005

Lionel Z. Glancy
Michael Goldberg
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA  90067

Howard G. Smith
Law Offices of Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA  19020

*Counsel for Plaintiffs*

　　　/s/ Michael D. Billok
Michael D. Billok (Bar No. 16952)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500 (main phone)
(202) 530-9534 (Billok direct fax)
mbillok@gibsondunn.com